NATURAL RESOURCES DEFENSE COUNCIL, INC., Petitioner,

v.

John S. HERRINGTON, Secretary, U.S. Department of Energy, Respondent,

Hydronics Institute, et al., Florida Department of Community Affairs, Intervenors.

CALIFORNIA STATE ENERGY RESOURCES CONSERVATION AND DEVELOPMENT COMMISSION, Petitioner,

v.

DEPARTMENT OF ENERGY, and John S. Herrington, Secretary of the Department of Energy, Respondents,

Hydronics Institute, et al., Florida Department of Community Affairs, Intervenors.

NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Petitioners,

v.

John S. HERRINGTON, Secretary, U.S. Department of Energy, Respondent,

State of Texas, Association of Home Appliance Manufacturers, Whirlpool Corporation, et al., Air Conditioning and Refrigeration Institute, Gas Appliance Manufacturers Assoc., Hydronics Institute, et al., Florida Department of Community Affairs, Intervenors.

CALIFORNIA STATE ENERGY RESOURCES CONSERVATION AND DEVELOPMENT COMMISSION, Petitioners,

v.

DEPARTMENT OF ENERGY, and John S. Herrington, Secretary of the Department of Energy, Respondents,

Association of Home Appliance Manufacturers, Whirlpool Corporation, Gas Appliance Manufacturers Assoc., Air-Conditioning and Refrigeration Institute, Intervenors.

The STATE OF MINNESOTA, by its Attorney General, Hubert H. HUMPHREY III, Petitioner,

v.

The UNITED STATES DEPARTMENT OF ENERGY, John S. Herrington, Secretary, Respondent.

STATE OF NEW YORK, Petitioner,

v.

UNITED STATES DEPARTMENT OF ENERGY, Respondent,

Whirlpool Corporation & Heil-Quaker Corporation, Air-Conditioning and Refrigeration Institute, Gas Appliance Manufacturing Assoc., Association of Home Appliance Manufacturers, Intervenors.

Nos. 83–1195, 83–2117, 83–2128, 83–2318, 83–2319 and 84–1055.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 14, 1985.

Decided July 16, 1985.

As Amended July 16, 1985.

Alan S. Miller, Washington, D.C., with whom David B. Edelson, San Francisco, Cal., and William B. Churchill, Austin, Tex., were on brief, for petitioners Natural Resources Defense Council, et al.

Jonathan Blees, Sacramento, Cal., with whom William M. Chamberlain, Gregory Wheatland, Sacramento, Cal., Thomas Barrett, Robert Abrams, Peter Bienstock and Samuel A. Cherniak, New York City, were on brief, for petitioners Cal. State Energy Resources Conservation and Development Com'n.

Susan V. Cook, Atty., Dept. of Justice, Washington, D.C., for respondent John S. Herrington, Secretary, Dept. of Energy.

Paul M. Laurenza and John A. Hodges, Washington, D.C., with whom William C. Brashares, Charles A. Samuels, Washington, D.C., Louis R. Paulick, Pittsburgh, Pa., Patricia J. Beneke, Washington, D.C., and Theodore F.T. Corlius, were on brief, for intervenors Ass'n of Home Appliance Mfrs., et al. Edward W. Hengerer, John H. Korns, Stephen O. Houck and W. DeVier Pierson, Washington, D.C., entered appearances for intervenors Ass'n of Home Appliance Mfrs., et al.

Paul Sexton, Tallahassee, Fla., was on brief and Bruce W. Renard, Tallahassee,

Fla., entered an appearance for intervenor Fla. Dept. of Community Affairs.

Douglas E. Kliever, Washington, D.C., entered an appearance for intervenors Hydronics Institute, et al., in Nos. 83–1195 and 83–2117.

David R. Richards and William B. Churchill, Austin, Tex., entered appearances for intervenor State of Texas.

William F. Gary, Salem, Or., was on brief for amicus curiae State of Or. urging reversal in Nos. 83–1195, 83–1195, 83–2117, 83–2128, 83–2318 and 83–2319.

Frank W. Ostrander, Portland, Or., William R. Cook, Bernard Nash and Edward G. Modell, Washington, D.C., were on brief for amicus curiae Northwest Power Planning Council urging reversal in Nos. 83–1195, 83–2117, 83–2128 and 83–2319.

Diane L. McIntire, Washington, D.C., entered an appearance for amicus curiae Iowa State Commerce Com'n urging reversal in Nos. 83–1195, 83–2117, 83–2128, 83–2318 and 83–2319.

Before WALD and BORK, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge WALD.

## CONTENTS

| | | Page |
|---|---|---|
| I. | BACKGROUND | 1364 |
| II. | DOE's DEFINITION OF "SIGNIFICANT CONSERVATION OF ENERGY" | 1369 |
| | A. The Development of DOE's Definition | 1369 |
| | B. The Validity of DOE's Definition | 1372 |
| | C. DOE's Rationale for its Definition | 1377 |
| III. | DOE's METHOD OF DETERMINING SAVINGS THAT WOULD RESULT FROM STANDARDS | 1383 |
| | A. Statutory Authority for Subtracting "Base-Case" Savings From "Standards" Savings | 1384 |
| | B. The ORNL Model | 1385 |
| IV. | MAXIMUM TECHNOLOGICAL FEASIBILITY | 1391 |
| | A. The Statute | 1391 |
| | B. DOE's Treatment of Maximum Technologically Feasible Levels | 1392 |
| | C. DOE's Compliance with EPCA | 1394 |
| | 1. DOE's Failure to Determine Maximum Technologically Feasible Levels | 1394 |
| | 2. DOE's Refusal to Consider Standards Based on All Technologically Feasible Design Options | 1396 |
| | a. Prototypes | 1396 |
| | b. Foreign Market Design Options | 1403 |
| | c. The Five-Year Payback Period | 1404 |
| | d. Lead Times | 1407 |
| | e. Specific Design Options | 1408 |
| | 3. DOE's Reliance on 1980 Data | 1408 |
| V. | ECONOMIC JUSTIFICATION | 1410 |
| | A. DOE's Analysis of Benefits | 1410 |
| | 1. DOE's Discussion of the Nation's Need to Save Electricity and Energy Savings | 1410 |
| | 2. DOE's Use of a 10 Percent Real Discount Rate | 1412 |

CONTENTS Page

3. DOE's Calculation of Benefits from Central Air Conditioner Standards ............................................................................... 1414

 a. Possible Reduction of Peak Load Electrical Demand .......... 1414

 b. Failure to Consider High-Efficiency Models ..................... 1417

 c. Flaws in the Cost Efficiency Curve ................................. 1418

 d. Hours of Operation ...................................................... 1418

B. DOE's Analysis of Burdens ................................................. 1419

 1. The Financial Impacts Model ....................................... 1419

 2. The FIM Results for Central Air Conditioner Standards ......... 1422

 3. Forgone Investment and Reductions in Performance or Utility 1424

C. DOE's Weighing of Burdens Against Benefits ...................... 1425

VI. DOE's REFUSAL TO ALLOW CROSS-EXAMINATION ...................... 1425

VII. DOE's FAILURE TO PREPARE AN ENVIRONMENTAL ASSESSMENT OR ENVIRONMENTAL IMPACT STATEMENT ............................................. 1429

WALD, Circuit Judge.

The petitions in these consolidated cases require us to interpret section 325 of the Energy Policy and Conservation Act (EPCA or the Act), 42 U.S.C. § 6295, which was enacted in 1975 as part of a "comprehensive national energy policy." S.Rep. No. 516, 95th Cong., 1st Sess. 116 (1975), U.S.Code Cong. & Admin.News 1975, p. 1762 (conference report). In its initial version, section 325 required the Federal Energy Administrator to prescribe energy efficiency improvement targets for thirteen named household appliances, called "covered products." See EPCA § 325(a)(1)–(2), Pub.L. No. 94–163, 89 Stat. 871, 923–24 (1975).[1] If the Administrator determined that manufacturers of any of the covered products were not likely to achieve the aggregate gain in efficiency specified in the target by 1980, he was directed to begin a proceeding to prescribe a mandatory "energy efficiency standard" for that appliance. See id. § 325(a)(4)(A)–(B), 89 Stat. at 924.

In 1978, however, Congress amended EPCA to "eliminate[ ] the target approach

and improve[ ] the procedures for establishing standards to ensure that efficiency improvements will be made expeditiously." H.R.Rep. No. 496, Pt. 4, 95th Cong., 1st Sess. 46 (1977), U.S.Code Cong. & Admin. News 1978, pp. 7659, 8493; see National Energy Conservation Policy Act (NECPA) § 422, Pub.L. No. 95–619, 92 Stat. 3206, 3259 (1978). The amended version of section 325(a) orders the Secretary of Energy to prescribe energy efficiency standards for the thirteen covered products without first establishing industry targets. Under the Act, "[e]nergy efficiency standards for each type (or class) of covered products ... shall be designed to achieve the maximum improvement in energy efficiency which the Secretary determines is technologically feasible and economically justified." EPCA § 325(c). If the Secretary prescribes a standard at a level lower than the maximum technologically feasible level, the Secretary must explain why that lower level was chosen. Id. § 325(i)(3). The Act also declares that if, for any type or class of covered product,[2] a standard would not

1. The thirteen covered products are: (1) refrigerators and refrigerator-freezers; (2) freezers; (3) dishwashers; (4) clothes dryers; (5) water heaters; (6) room air conditioners; (7) home heating equipment, not including furnaces; (8) television sets; (9) kitchen ranges and ovens; (10) clothes washers; (11) humidifiers and dehumidifiers; (12) central air conditioners; and (13) furnaces. See EPCA § 322(a)(1)–(13). The Secretary may, upon making certain findings

specified in the Act, prescribe energy efficiency standards for products not specifically named in the Act. See id. §§ 322(a)(14), (b), 325(a)(2). He has not exercised this authority.

2. A "type" of covered product refers to one of the thirteen products specified in the Act and to any further products the Secretary designates as covered by the Act. See EPCA §§ 321(a)(2), 322(a). A "class" of covered product refers to

result in significant conservation of energy or would not be technologically feasible or economically justified, the Secretary shall not prescribe a standard. *Id.* § 325(b). A determination that no standard is warranted for a particular appliance, like the issuance of a mandatory standard, preempts any state-law efficiency requirements for the appliance, although the state may then apply to the Secretary for an exemption from the preemption provision. *Id.* §§ 325(b), 327. The Secretary was further instructed to give priority in formulating standards to nine of the covered products. *Id.* § 325(g).[3]

The final rules challenged here apply to eight of the nine covered products given priority under EPCA.[4] The Department of Energy (DOE)[5] determined that for seven of those eight products, a mandatory standard would not result in significant conservation of energy.[6] DOE also determined that for all eight products, a mandatory standard would not be economically justified. *See* 48 Fed.Reg. 39,376, 39,376 (1983); 47 Fed.Reg. 57,198, 57,198 (1982). These "no-standard standards" terminated the rulemaking for the eight products considered, and thus preempted state regulation without imposing any federal regulation at all.[7] The petitioners are the Natural Resources Defense Council (NRDC), Consumers Union of the United States, Representative Richard Ottinger, the California State Energy Resources Conservation and Development Commission, the State of Minnesota, and the State of New York.[8] The State of Texas, the Northwest

---

appliance models within a single type of covered product that the Secretary has grouped together for the purpose of analyzing a possible standard governing the class. *See* EPCA § 321(a)(9); 45 Fed.Reg. 43,976, 43,979–80 (1980). DOE summarized the criteria governing the definition of product classes in U.S. Department of Energy, Consumer Products Efficiency Standards Engineering Analysis Document B–1 to B–2 (1982) [hereinafter cited as 1982 Engineering Analysis Document], Joint Appendix (J.A.) at 1,569–70.

3. The nine covered products given priority are those numbered (1), (2), (4), (5), (6), (7), (9), (12), and (13) in the Act and in note 1 *supra*. *See* EPCA § 325(g).

4. The only covered product given priority that was not considered in the rulemaking under review is home heating equipment, not including furnaces. *See* 48 Fed.Reg. 39,376, 39,406 (1983) (relying chiefly on the inadequacy of test procedures); *see also* EPCA § 325(b)(1) (Secretary not to issue standard for product if no test procedure for product has been prescribed).

5. The Carter administration proposals that formed the basis for NECPA, like early versions of NECPA considered by Congress, charged the Federal Energy Administrator with management of the appliance program. As enacted, NECPA assigned that function to the head of the newly created Department of Energy. For convenience, in discussing NECPA we refer to both the Federal Energy Administrator and the Secretary of Energy as "DOE."

6. DOE determined that a standard for central air conditioners would conserve significant energy, *see* 48 Fed.Reg. 39,376, 39,402 (1983), but

that such a standard would not be economically justified, *id.* at 39,405–06.

7. EPCA requires DOE to grant a state's petition for exemption from EPCA's preemption provisions if DOE finds that there is a significant state or local interest to justify the state standard and the state standards is more stringent than the federal standard. *See* EPCA § 327(b)(3).

In December of 1982, DOE adopted a final rule establishing procedures for handling state petitions for exemptions. *See* 47 Fed.Reg. 57,198, 57,213–19 (1982); *see also* 48 Fed.Reg. 39,376, 39,406–07, 39,409 (1983) (amending rule). The rule is published at 10 C.F.R. § 430.41(b), .42–.49 (1985).

8. No. 83–1195 was filed by the Natural Resources Defense Council, Inc. in this court. Nos. 83–2117 and 83–2318 were filed by the California State Energy Resources Conservation and Development Commission in the United States Court of Appeals for the Ninth Circuit and transferred to this court. No. 83–2128 was filed by the Natural Resources Defense Council, Inc., Consumers Union of the United States, Inc., and the Honorable Richard L. Ottinger, M.C., in this court. No. 83–2319 was filed by the State of Minnesota in the United States Court of Appeals for the Eighth Circuit and transferred to this court. No. 84–1055 was filed by the State of New York in the United States Court of Appeals for the Second Circuit and transferred to this court.

The State of Minnesota petitions for invalidation of only the final rules governing clothes dryers and kitchen ranges and ovens. *See* Brief of Petitioners California State Energy Resources Conservation and Development Commission *et*

Power Planning Council, the Florida Department of Community Affairs, the Oregon Department of Energy, and the Iowa Commerce Commission have intervened in support of the broad attack on the rules mounted by petitioners. Various appliance manufacturers and trade associations have intervened in support of the Secretary of Energy.

We agree with the petitioners that in important respects DOE's determinations are unsupported by substantial evidence and are contrary to law. *See* EPCA § 336(b)(2). We also find that DOE violated section 336(a)(2) of EPCA by refusing to allow interested persons a meaningful opportunity to question DOE employees who participated in the rulemaking. Finally, we find that DOE did not adequately evaluate the environmental consequences of these rules, as section 102(2)(C) of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(C), requires. We therefore grant the petitions and hold the rules under review to be unlawful.

## I. BACKGROUND

EPCA was originally enacted in the aftermath of the oil embargo imposed against the United States in 1973 and 1974 by certain petroleum-producing countries. As the House Report commented:

> The 1973–74 Arab embargo resulted in a 2.2-million-barrel-per-day reduction on imports of crude oil and petroleum products—an interruption equal to about one third of the United States' imports and [to] about 12 percent of overall petroleum supplies. The embargo was accompanied by a 7 percent decrease in real Gross National Product for the first quarter of 1974, and an increase of unemployment of approximately 425,000 persons for that quarter. Dependence of the United States on petroleum products has risen since September, 1973, from 33 percent to approximately 36 percent in December, 1974.... Continuing dependence on foreign petroleum, and the eco-

nomic consequences of another embargo, require that the United States take steps to effectively reduce its vulnerability to future import interruptions.

H.R.Rep. No. 340, 94th Cong., 1st Sess. 20 (1975), U.S.Code Cong. & Admin.News 1975, p. 1782. This emergency vividly illustrated the serious long-term economic and national security problems that continuing dependence on foreign sources of energy would create. To meet these challenges, President Ford called for "the strongest and most far-reaching energy conservation program we have ever had." 11 Weekly Comp.Pres.Doc. 40, 41 (Jan. 20, 1975).

Congress responded by enacting EPCA, a wide-ranging statute establishing a comprehensive national energy policy. According to the conference report, EPCA was designed to:

> (1) maximize domestic production of energy and provide for strategic storage reserves of crude oil, residual fuel oil and refined petroleum products;
>
> (2) ... minimize the impact of disruptions in energy supplies by providing for emergency standing measures;
>
> (3) provide for domestic crude oil prices that will encourage domestic production in a manner consistent with economic recovery; and
>
> (4) reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs.

S.Rep. No. 516, 94th Cong., 1st Sess. 116–17 (1975) U.S.Code Cong. & Admin.News 1975, p. 1957. The energy conservation programs alone included separate provisions designed to:

> Establish mandatory average fuel economy performance standards for any passenger automobiles and other light duty highway vehicles;
>
> Require energy labeling of major home appliances and certain other consumer products, and authorize energy efficiency standards for major appliances;

*al.* at 3 [hereinafter cited as State Pet. Br.]. Other petitioners and intervenors in support of

petitioners seek invalidation of the final rules governing all eight products.

Authorize block grants-in-aid for States to assist in the development and implementation of state-administered energy conservation programs; and

Establish a program to encourage increased efficiency of energy use by American industry;

Establish a program for energy conservation within the Federal Government; and

Promote the use of recycled oil.

*Id.* at 118–19, U.S.Code Cong. & Admin. News 1975, p. 1959.

The EPCA appliance program had four elements. First, the Federal Energy Administrator was required to prescribe test procedures for measuring the energy efficiency and operating costs of thirteen named products. *See* EPCA § 323, Pub.L. No. 94–163, 89 Stat. 871, 919 (1975). Second, the Administrator was required to promulgate rules compelling manufacturers of covered products to label those products with information developed from the test procedures. *Id.* § 324, 89 Stat. at 920. Third, the Administrator was required to prescribe voluntary energy efficiency improvement targets, set at the highest efficiency that was economically and technologically feasible, for each of the thirteen covered products. *Id.* § 325(a)(1)(A), (a)(2), 89 Stat. at 923, 924. Targets for ten of those products were given priority. *See id.* § 325(a)(1)(A), 89 Stat. at 923. Targets for priority covered products were to be fixed so that the aggregate efficiency of all appliances belonging to those product types manufactured in 1980 would exceed the efficiency of the same appliances manufactured in 1972 by at least 20 percent. *Id.* § 325(a)(1)(B), 89 Stat. at 924. Finally, if

the Administrator determined that any target for a product type was not likely to be achieved, he was directed to begin a proceeding to prescribe a mandatory energy efficiency standard. *Id.* § 325(a)(4)(B). If, in that proceeding, the Administrator found that for the product type or for product classes within that type (a) improvements in energy efficiency were technologically feasible and economically justified, and (b) an unregulated market, as influenced by the labeling program, would not result in the production and purchase of products at the maximum technologically feasible and economically justified efficiency, EPCA required the Administrator to prescribe a mandatory energy efficiency standard. *Id.* § 325(a)(4)(C). EPCA also set specific deadlines for the Administrator in carrying out the provisions of the Act.[9]

In 1978, President Carter proposed a series of bills aimed at a complete overhaul of national energy policy. Among the major initiatives suggested were nationwide programs to encourage conservation and efficiency planning in transportation, buildings, appliances, and industry; cogeneration, district heating, and utility reform measures; price control and tax measures for oil and natural gas; incentives to stimulate production of Alaskan oil, oil from the outer continental shelf, shale oil, liquified natural gas, and synthetic fuels; and development programs for coal, nuclear, hydroelectric, solar, and geothermal energy. These proposals were, in various forms, enacted in five statutes: the Public Utility Regulatory Policies Act of 1978, Pub.L. No. 95–617, 92 Stat. 3117; the Energy Tax Act of 1978, Pub.L. No. 95–618, 92 Stat. 3174; the Powerplant and Industrial Fuel Use

---

**9.** EPCA required the Administrator to propose test procedures for nine of the covered products by June 30, 1976; for two others by September 30, 1976; and for the remaining two by June 30, 1977. *See* EPCA § 323(a)(3), Pub.L. No. 94–163, 89 Stat. 871, 919 (1975). Test procedures were to be prescribed for these groups by September 30, 1976; December 31, 1976; and September 30, 1977, respectively. *See id.* § 323(a)(4)(B). The Federal Trade Commission was required to propose a labeling rule for each named covered product within 30 days after a test procedure

for that product was proposed, and to prescribe a labeling rule between 45 and 60 days after a test procedure was proposed. *See id.* § 324(b)(1), (3), 89 Stat. at 921 (1975).

Finally, the Administrator was required to prescribe an energy improvement target for ten of the covered products within 180 days after enactment of EPCA, and to prescribe targets for the remaining three named covered products within one year of enactment. *See* EPCA § 325(a)(1)(A), (B)(2), 89 Stat. at 923, 924 (1975).

Act of 1978, Pub.L. No. 95–620, 92 Stat. 3289; the Natural Gas Policy Act of 1978, Pub.L. No. 95–621, 92 Stat. 3350; and NECPA, Pub.L. No. 95–619, 92 Stat. 3206 (1978). Together, these statutes were known as the National Energy Act.

NECPA, though only part of a mammoth legislative program, itself sought to strengthen and expand energy conservation programs in a number of ways. Title II of the Act inaugurated various programs involving public utilities in efforts to conserve the residential use of energy and authorized certain grants to low-income families for energy-saving improvements in housing; Title III created energy conservation programs for schools, hospitals, and other buildings owned by local governments and public institutions; Title IV established conservation programs for automobiles, appliances, and industrial equipment; Title V set forth energy conservation measures for the federal government, including the use of solar heating and cooling and a photovoltaic energy program; and Title VI contained miscellaneous conservation and reporting measures.

The Carter administration's National Energy Plan, which announced the details of this legislative package, declared that:

> Most [major home appliances] could achieve significant reductions in energy use with relatively small increases in cost. Current legislation relies mainly on voluntary efforts to meet industry-wide average target, and permits the establishment of mandatory standards only after long delays. New legislation is proposed to streamline the regulatory process. The present voluntary program will be replaced by mandatory minimum

standards on certain major home appliances as soon as possible.

Executive Office of the President, The National Energy Plan 43 (1977). In keeping with these views, the administration proposed a radical revision of the EPCA appliance program. Specifically, the administration's proposal would have required DOE to prescribe energy efficiency standards for seven of the thirteen covered products named in EPCA. *See* National Energy Act: Communication from the President of the United States, H.R.Doc. No. 138, 95th Cong., 1st Sess. 30 (1977) [hereinafter cited as H.R.Doc. No. 138]. Those seven products were selected because they consumed relatively large amounts of electricity—together, about 80 percent of the energy used in American households. *See* S.Rep. No. 409, 95th Cong., 1st Sess. 38 (1977). The proposal permitted but did not compel DOE to prescribe standards for the six lower-consumption covered products. *See* H.R.Doc. No. 138 at 30. Under certain conditions, DOE could also prescribe standards for further appliances not named in EPCA or in the new legislation.[10] The proposal did not require "significant" conservation; it simply demanded that standards be technologically feasible and economically justified. *See id.* at 30–35.

The House amended this proposal to require that DOE prescribe standards for all thirteen named products. The House bill retained discretionary standards only for appliances not named in the Act that DOE voluntarily designated for coverage. Having mandated standards even for the six low-consumption covered products, the House also decided DOE should not pre-

---

**10.** The conditions were that "(i) average per household energy use by products of such type exceeds 150 kilowatt-hours (or its Btu equivalent) per year; . . . (ii) aggregate energy use by products of such type exceeds 4,200,000,000 kilowatt-hours per year; and . . . (iii) substantial improvements in the energy efficiency of products of such type is possible." H.R.Doc. No. 138 at 30–31. Section 422 of NECPA, Pub.L. No. 95–619, 92 Stat. 3206, 3259 (1978), amended § 325(a)(2) of EPCA to include these three conditions in slightly different language. Section

422 of NECPA also added a fourth condition for the issuance of discretionary standards governing appliances not named in the Act: DOE must find that "the application of a labeling rule under section 6294 of this title to such type (or class) is not likely to be sufficient to induce manufacturers to produce, and consumers and other persons to purchase, covered products of such type (or class) which achieve the maximum energy efficiency which is technologically feasible to attain and is economically justified." EPCA § 325(a)(2)(D).

scribe standards that would not result in "significant" energy conservation. *See* H.R.Rep. No. 496, Pt. 4, 95th Cong., 1st Sess. 46–47 (1977). The Senate Bill required DOE to prescribe standards for nine of the covered products and authorized discretionary standards for the remaining four covered products and for other appliances designated by DOE. *See* S.Rep. No. 409, 95th Cong., 1st Sess. 32, 77 (1977). Like the administration proposal, the Senate bill contained no significance provision. *See* S. 2057, 95th Cong., 1st Sess. § 201(a), *reprinted in* S.Rep. No. 409, 95th Cong., 1st Sess. 13–14 (1977).

The conference report combined the two versions. Congress accepted the House provision requiring standards for all thirteen covered products, along with the significance provision, but standards for the nine appliances singled out in the Senate bill were given priority. *See* H.R.Rep. No. 1751, 95th Cong., 2d Sess. 114–15 (1978). The President signed NECPA into law on November 9, 1978. *See* 14 Weekly Comp. Pres.Doc. 1,978 (Nov. 9, 1978).

As the Act required, DOE proceeded to develop final test procedures for the thirteen covered products. *See* 10 C.F.R. § 430.22–.23 & apps. A–O (1985) (codifying current test procedures); 44 Fed.Reg. 49, 51 (1979) (tabulating *Federal Register* citations for test procedure notices). After issuing an advance notice of proposed rulemaking, *see id.*, DOE published proposed rules on June 30, 1980 that set forth mini-

mum efficiency standards for all eight of the products considered in the rulemaking. *See* 45 Fed.Reg. 43,976 (1980); *see also infra* note 15. DOE's general approach was to consider standards based on the most efficient combination of those design options commercially available in 1980. DOE did not consider standards based on prototype technologies or other advanced designs not yet on the market. DOE then developed several different possible standards at different efficiency levels for each product type or class, and evaluated those possible standards to decide if they were economically justified. *See* 45 Fed.Reg. at 43,983–85. Following that path of analysis, DOE concluded that standards for all eight covered products would result in significant conservation and were, on balance, economically justified. *See id.* at 43,976. DOE also prepared a lengthy environmental assessment of the proposed rules, although it did not prepare a full-scale environmental impact statement. *See* U.S. Department of Energy, Environmental Assessment: Energy Efficiency Standards for Consumer Products (1980) [hereinafter cited as 1980 Environmental Assessment], J.A. at 225.

EPCA required DOE to promulgate final rules by January 2, 1981.[11] In January of 1981, the outgoing administration informed a congressional committee that except for "fine-tuning," work on the standards was nearly complete.[12] However, in February

---

11. Section 323 of EPCA, as amended by NECPA, required DOE to prescribe test procedures for all named covered products by January 31, 1978, *see* EPCA § 323(a)(4), unless DOE determined that it could not prescribe test procedures meeting the statutory criteria by that deadline, formally submitted a report to Congress explaining that determination, and published a notice of the determination and reasons supporting it in the Federal Register, *see id.* § 323(a)(6)(A). DOE was also excused from the deadline if it determined that test procedures satisfying EPCA could not be developed. *See id.* § 323(a)(6)(B). DOE was further required to publish an advance notice of proposed rulemaking for the nine priority products, *see supra* note 3, within 30 days after a test procedure for the relevant product class or type was prescribed or 45 days after November 9, 1978, whichever is

later. *See* EPCA § 325(i)(2)(A). For the remaining named covered products, an advance notice was due within 30 days after a test procedure was prescribed or one year after November 9, 1978, whichever was later. *See id.* § 325(i)(2)(B). DOE was required to prescribe standards "as soon as practicable after such 60-day period [following publication of a notice of proposed rules], but in no event later than 2 years after publication of the advance notice." *Id.* § 325(i)(4).

DOE published its advance notice of proposed rulemaking on January 2, 1979. *See* 44 Fed. Reg. 49 (1979). Standards were therefore due for all named covered products by January 2, 1981.

12. *See* Letter from John Dingell to Charles Duncan (June 9, 1981), J.A. at 2279.

of 1981 the incoming administration announced that it would seek repeal of the mandatory appliance program [13] and in any event intended to undertake a comprehensive reassessment of the data supporting the proposed rules. *See* 46 Fed.Reg. 13,-517 (1981).

In October of 1981—over eight months after the statutory deadline—NRDC and Consumers Union of the United States filed suit to compel promulgation of appliance efficiency standards. *See Natural Resources Defense Council, Inc. v. Edwards*, Civ. No. 81–2546 (D.D.C.). On April 2, 1982, DOE issued a new notice of proposed rulemaking, which proposed a completely new and vastly higher definition of "significant" conservation of energy, entirely new views about the benefits and burdens of mandatory standards, and tentative determinations that no standard would be issued for any of the eight products involved in this rulemaking. *See* 47 Fed.Reg. 14,424 (1982). DOE's notice did not state when final rules would be prescribed, and NRDC and Consumers Union accordingly pressed forward with their litigation. DOE settled the suit by agreeing to promulgate rules no later than October 29, 1982, unless prevented by good cause. *See* 47 Fed.Reg. 57,198, 57,200 (1982). DOE failed to meet that deadline. On December 22, 1982, DOE published final rules determining that standards for kitchen ranges and ovens and for clothes dryers would not result in significant conservation of energy and in any event would not be economically justified.

*See id.* at 57,198. The December rulemaking also finally adopted a slightly revised version of the new definition of significant conservation proposed in the April notice. *See id.* at 57,202–09.

On August 30, 1983, DOE announced its refusal to prescribe mandatory standards for the six remaining priority products involved in this case. *See* 48 Fed.Reg. 39,376 (1983). DOE concluded that for seven of the eight appliances considered in the December 1982 and August 1983 rules, standards would not result in significant conservation and would not be economically justified. *See id.* at 39,376. For the eighth, central air conditioners, DOE concluded that a standard would result in significant conservation but would not be economically justified. *See id.* at 39,402, 39,-406. DOE's decisions were based only on technology available for appliances commercially sold in the United States by November of 1980. For reasons discussed below, DOE declined to assess prototypes and other advanced technologies, foreign models, or models that had appeared in the domestic market between 1980 and the issuance of final rules in 1982 and 1983. *See id.* at 39,379–80; *see also infra* at 76–100. These final rules ended federal consideration of standards for the eight appliances and preempted state efficiency regulation of those appliances. *See supra* note 7. DOE also decided that it was not required to prepare an environmental assessment or environmental impact statement for its

---

**13.** On February 19, 1981, the incoming administration sent a message to Congress proposing, among other steps, repeal of the appliance program. *See* U.S. Department of Energy, Reduction of Energy Conservation Programs *in* America's New Beginning: A Program for Economic Recovery 4–20, 4–20 (1981).

In March of 1981, Senators Henry Jackson, Wendell Ford, and Paul Tsongas wrote to the Secretary of Energy to urge that "you should proceed expeditiously with the [appliance standards] rulemaking ... not only because the law requires it, but because ... overall policy considerations ... compel it." Letter from Henry M. Jackson *et al.* to James B. Edwards (March 12, 1981), *reprinted in* Department of Energy Fiscal Year 1982 Authorization: Hearing before the Subcommittee on Energy Regulation of the

Senate Committee on Energy and Natural Resources, 97th Cong., 1st Sess. 100, 101 (1981) [hereinafter cited at 1982 DOE Authorization Hearing]. The Secretary replied that "the Department of Energy expects to propose, in the near future, the repeal of the existing statutory requirement to establish minimum energy efficiency standards for home appliances." Letter from James B. Edwards to Henry M. Jackson (April 1, 1981), *reprinted in* 1982 DOE Authorization Hearing, at 101. The administration's budget proposal for fiscal year 1982 requested no money for the appliance program. *See* 1982 DOE Authorization Hearing, at 85. However, Congress refused to repeal the program and restored funding to DOE's budget for its continuation.

"no-standard standard" determinations. *See* 48 Fed.Reg. at 39,407–08; 47 Fed.Reg. 57,198, 57,216–17 (1982).

In Parts II–V, we consider petitioners' arguments that the final rules are in violation of EPCA and unsupported by substantial evidence. Parts VI and VII discuss whether DOE allowed petitioners a reasonable opportunity to question DOE employees, and whether DOE was required to consider more thoroughly the environmental consequences of the final rules.

▌ In reviewing DOE's construction of EPCA, we first determine whether Congress "has directly spoken to the precise question at issue," *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* — U.S. —, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); if so, we "must give effect to the unambiguously expressed intent of Congress," *id.* 104 S.Ct. at 2781–82 (footnote omitted). "If Congress' intent is not clear, however, the court 'must conduct the "narrower inquiry into whether the [agency's] construction was 'sufficiently reasonable' to be accepted by a reviewing court." ' " *Eagle-Picher Indus., Inc. v. United States Envtl. Protection Agency,* 759 F.2d 922, 927 n. 5 (D.C.Cir.1985) (quoting *General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1567 (D.C.Cir.1984) (en banc)) (further citations omitted).

Although DOE developed the rules under review through informal rulemaking,[14] EPCA expressly provides that the substantial evidence standard guides our review of factual findings. *See* EPCA § 336(b)(2). "When reviewing the policy judgments made by the Secretary, including those predictive and difficult judgment calls the Secretary is called upon to make, we will subject them to searching scrutiny to ensure that they are neither arbitrary nor irrational—in other words, we must determine whether 'the decision is based on a consid-

eration of the relevant factors and whether there has been a clear error of judgment.' " *California v. Watt,* 668 F.2d 1290, 1302 (D.C.Cir.1981) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)); *see Industrial Union Dep't, AFL–CIO v. Hodgson,* 499 F.2d 467, 472–76 (D.C.Cir.1974); *cf. Weyerhaeuser Co. v. Costle,* 590 F.2d 1011, 1024–28 (D.C.Cir. 1978).

## II. DOE's DEFINITION OF "SIGNIFICANT CONSERVATION OF ENERGY"

### A. *The Development of DOE's Definition*

EPCA instructs the Secretary not to issue standards for a type or class of covered product if he "determines, by rule, that the establishment of such standard will not result in significant conservation of energy." EPCA § 325(b)(2). In the June 1980 proposed rules, DOE announced a two-part definition of significant conservation, both parts of which had to be met for a proposed standard to pass the test. First, a standard governing a product type or product classes within that type would have been required to result in national energy savings for the product type exceeding 840,000,000 kilowatt hours ($2.867 \times 10^{12}$ Btu) per year. Second, a standard would have been required to result in energy savings per unit over the product class involved exceeding 30 kilowatt hours (102,-390 Btu) per year. *See* 45 Fed.Reg. 43,976, 44,031–32 (1980); U.S. Department of Energy, Economic Analysis: Energy Efficiency Standards for Consumer Products § 6.3 (1980) [hereinafter cited as 1980 Economic Analysis Document], J.A. at 612–15.

DOE explained that this definition was drawn from figures in EPCA itself. Under EPCA as it was first enacted, the Federal Energy Administrator was required to pre-

---

**14.** Although DOE must observe special procedural requirements in prescribing appliance efficiency standards, EPCA does not require that DOE hold the full-scale evidentiary hearing described by § 7 and § 8 of the Administrative Procedure Act, 5 U.S.C. §§ 556, 557. *See* EPCA § 336(a). We understand the substantial evi-

dence review mandated by § 336(b)(2) of the Act to be the same as the review described by § 10(e)(2)(E) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(E). *See Association of Data Processing Serv. Orgs. v. Board of Governors,* 745 F.2d 677, 685–86 (D.C.Cir.1984).

scribe energy efficiency improvement targets for the same thirteen products that under NECPA became subject to mandatory standards. *See* EPCA § 325(a)(1)(A), (a)(2), Pub.L. No. 94–163, 89 Stat. 871, 920, 924 (1975). Of those products, ten were given priority. *See id.* Congress demanded that the targets for those priority products be designed to achieve an overall improvement in efficiency of at least 20 percent, measured by comparing the aggregate efficiency of all models of the ten priority products manufactured in 1972 against the same figure for models manufactured in 1980. *See* EPCA § 325(a)(1)(B), 89 Stat. at 924. DOE also noted that section 325(a)(2) of EPCA, as amended by NECPA, authorized DOE to prescribe energy efficiency standards for appliances not named in section 322(a) if, among other conditions,

> (A) the average per household energy use within the United States by products of such type (or class) exceeded 150 kilowatt hours (or its Btu equivalent) for any 12-calendar-month period ending before such determination [and]

> (B) the aggregate household energy use within the United States by products of such type (or class) exceeded 4,200,-000,000 kilowatt-hours (or its Btu equivalent) for any such 12-calendar-month period

> . . . .

EPCA § 325(a)(2)(A)–(B).

DOE evidently reasoned that Congress must have thought significant conservation of energy was possible from standards governing appliances that consumed energy at the minimum levels specified in section 325(a)(2), or Congress would not have authorized DOE to consider standards for those appliances. *Cf.* 1980 Economic Analysis § 6.3 at 6.4, J.A. at 613. In light of former section 325(a)(1)(B), DOE settled on a 20 percent reduction in energy consumption for an appliance that just met the minimum consumption levels as a reasonable definition of "significant" savings. A 20 percent reduction in energy consumption for an appliance that consumes 4,200,000,-000 kilowatt hours nationally per year yields a savings of 840,000,000 kilowatt hours ($2.867 \times 10^{12}$ Btu) per year—the amount specified in the first part of the 1980 definition of significance. A 20 percent reduction in energy consumption for an appliance unit that consumes 150 kilowatt hours per year yields a savings of 30 kilowatt hours (102,390 Btu) per year—the amount specified in the second part of the definition. *See* 45 Fed.Reg. at 44,031–32. These levels, DOE announced, would screen out standards that produced only "marginal conservation," *id.* at 44,032, and so fulfill the purposes of the significance requirement.[15]

On April 2, 1982, the new administration issued proposed rules that completely repudiated the 1980 approach to defining significance. *See* 47 Fed.Reg. 14,424, 14,429–31 (1982).[16] DOE first announced that sav-

---

**15.** Although DOE proposed mandatory standards for all product types in the June 1980 notice, it proposed no standard for certain product classes. Those classes were oil water heaters; microwave ovens; electric cooking tops; and electric, gas gravity, outdoor gas boiler, and outdoor oil boiler furnaces. *See* 45 Fed.Reg. 43,976, 44,035 (1980) (proposing rules to be codified at 10 C.F.R. § 430.32(e), (i) (n)). For microwave ovens and electric cooking tops, DOE determined that no cost-effective design options would save significant energy, under the 1980 definition of the term, without impairing product utility. *See id.* at 43,998. For electric furnaces, DOE determined that energy efficiency standards would be technologically feasible. *See id.* at 44,003. For the remaining classes listed above, DOE determined that standards

were not economically justified because, among other reasons, so few products in the classes were sold. *See id.* at 43,993, 44,003.

**16.** According to testimony by DOE officials before Congress, DOE completed a draft notice of proposed rulemaking that recommended no standards before DOE formulated its three proposed tests for significance. *See* Appliance Efficiency Standards: Hearings Before the Subcommittee on Conservation and Power of the House Committee on Energy and Commerce, 97th Cong., 2d Sess. 144 (1982). Originally, DOE intended to issue no-standard standards based on the statutory criteria but without a "specific cutoff number," *id.,* defining significant savings. As one DOE official put, it "before these three significant things [i.e., the three tests for signifi-

ings would be assessed as significant or insignificant over the 19-year period 1987 to 2005, see id. at 14,426–27, rather than on the annual basis proposed in 1980. DOE's basic approach was to compare, for each product, three measures of the difference between projected energy consumption during that period if standards were not imposed and if they were imposed. DOE then examined those figures, which it viewed as gauging the savings attributable to standards, for "significance."[17]

DOE's notice set forth its three measures of energy consumption and the level at which savings under each measure would be deemed significant. DOE argued that the overall goal of NECPA's conservation programs was to reduce national dependence on imported oil. For this reason, a saving for each of the thirteen product types would be deemed significant only if that saving made "a significant contribution to reducing this Nation's energy dependence on foreign nations." Id. at 14,429. According to DOE, the definition proposed in 1980 recognized as significant "savings so low as to be non-measurable in national reports," id. at 14,429 n. 14, and was therefore not rigorous enough under DOE's new approach. In place of the 1980 definition, DOE proposed three alternative tests for significant savings.[18] Under the first of these tests, savings were significant if they amounted to at least 10,000 barrels per day (bpd) of oil or an equivalent amount of natural gas. DOE later explained that this test was not satisfied if the combined savings of oil and gas equaled the equivalent of 10,000 bpd, but required that the full figure be met for one or the other of the two commodities sepa-

rately. See 47 Fed.Reg. 57,198, 57,208 (1982).

DOE's second test for significance was based on its finding that conservation of energy would also be "significant" if the electricity saved "would have a significant impact on the environment or significantly reduce the need for additional generating capacity." 47 Fed.Reg. 14,424, 14,430 (1982). DOE noted that according to the environmental assessment accompanying the June 1980 proposed rules, those rules would not have had a significant effect on the environment. Id. at 14,430; see 1980 Environmental Assessment at 5–11, J.A. at 241. It concluded that "[b]ecause the standards proposed in the June 30 proposal were predicted to create greater energy savings than the standards analyzed in this proposal, DOE believes that no single standard considered in today's proposal could have a significant effect on the environment." 47 Fed.Reg. at 14,430. DOE further decided that to have an effect on the need for new generating capacity, a national saving of electricity would have to exceed 1 percent of national usage. See id. That figure was therefore chosen as the second threshold level for significance.

Finally, DOE recognized that the first two proposed tests had "a built-in bias towards products that use a great deal of energy in the first instance." Id. In particular, DOE noted that those tests demanded an annual savings greater than the total annual consumption of some covered products. Standards for these products could not have resulted in significant savings even if the standard reduced energy consumption by the product to zero. DOE therefore proposed a third test, purportedly based on former EPCA section 325, under

cance DOE proposed and, in modified form, adopted], we had already made a determination of no standard." Id. DOE lawyers withdrew the draft notice that did not set forth any test for significant savings from the Office of Management and Budget and established the proposed tests in January or February of 1982. Id. at 143.

**17.** DOE calculated projected energy consumption under its standards and no-standards (or "base") scenarios using a complex computer

model called the Oak Ridge National Laboratory Residential End Use Model (the ORNL model). See 47 Fed.Reg. 14,424, 14,426–29 (1982). We discuss the ORNL model in Part III.B infra.

**18.** By "definition," we mean DOE's general formulation under which savings are significant if they satisfy any of DOE's three different criteria; by "tests," we mean those three criteria.

which savings would be significant if "the energy saved as a result of the standard, as measured by the ORNL Model, [would] be 20 percent of the energy that would be used by the product in the no-standard case." *Id.*

These tests were hotly debated in the comments on the proposed rules, and DOE responded in its December 22, 1982 notice of final rules by making several changes. Specifically, DOE abandoned its earlier decision to calculate energy savings over the 19-year period from 1987 to 2005, on the ground that many of the covered products had very different useful lives. Covered products with different useful lives necessarily have different "penetration rates"— that is, the shorter the useful life of a covered product, the more quickly new appliances of that type will tend to account for a large proportion of all such appliances in use. The penetration rate of a covered product in turn affects how quickly more efficient models will influence national energy consumption. DOE therefore adopted the average life of a product, beginning in 1987, as the appropriate period for analyzing savings for that product under the first two tests for significance. *See* 47 Fed.Reg. 57,198, 57,203 (1982).

The third proposed test presented a special timing problem because, as several commenters informed DOE,

> [S]ome products would not meet the test even if a standard required every new product sold to use no energy at all. This anomalous result occurred because so much of the energy being measured in the standards case would be energy consumed by products purchased before the standards were put into effect.

*Id.* at 57,208. For this reason, DOE settled on the "one-year period following the year of the retirement of the average product purchased immediately preceding the application of a standard," *id.,* as the year during which the third test was to be applied. For example, if standards were put into effect in 1987, the measuring year for an appliance with an average life of 18 years would be 2005. Products purchased in 1986—the last year before standards were imposed—would on average wear out in 2004. Thus in 2005, according to DOE, relatively few pre-standard models would remain to skew the calculation. Finally, DOE noted that former section 325 of EPCA referred to a 20 percent improvement in efficiency, while DOE's definition required a 20 percent decrease in energy use. In fact, however, a 20 percent improvement in efficiency mathematically results in only a 16.67 percent decrease in fuel use, and accordingly DOE substituted that lower percentage in its test. *See id.*

Although commenters voiced numerous other criticisms of DOE's proposed definition of significance, DOE adhered to that definition with the revisions described above. Under DOE's final definition, energy savings from a proposed standard were significant only if they met at least one of the following three tests: (1) "the standard would result in the saving of 10,000 bpd of oil or the saving of natural gas equivalent to 10,000 bpd of oil over the period of the average life of the product in question beginning with the year 1987," *id.* at 57,209; (2) "the standard would result in the saving of one percent of national electricity use over the period of the average life of the product in question beginning with the year 1987," *id.* ; or (3) "the savings attributable to a standard for a product were equal to 16.67 percent of the energy that would be used by that product in the absence of a standard measured over the one year period following the period of the average life of the product purchased in the last year before the standard would be imposed," *id.* at 57,209.

**B.** *The Validity of DOE's Definition*

EPCA does not define "significant conservation of energy," and DOE maintains that its interpretation of this statutory term is entitled to great deference. We agree that Congress left DOE with substantial discretion to set specific levels of significance, but no one disputes that the levels selected must be consistent with the express terms and underlying congression-

al intention of the Act. We must, as the Supreme Court has directed, decide whether EPCA's definition is "a reasonable choice within a gap left by Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* — U.S. ——, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984). Answering that question requires us to determine whether, as DOE thought in 1980, Congress meant to exclude only "marginal" savings as insignificant, or as DOE thought in 1983, Congress licensed DOE to create so formidable an obstacle that it blocked standards for seven of the eight priority products at issue here. To conduct that inquiry, we first look to the structure and text of the Act and then examine the rationale DOE offered for its most recent position. We conclude that DOE's definition of significant conservation is inconsistent with the congressional design reflected in NECPA.

We think the basic decisionmaking structure of the Act suggests that DOE has made a fundamental mistake. First, the elaborate NECPA provisions governing standards and their legislative history leave no doubt that Congress expected DOE to prescribe mandatory efficiency standards. Congress apparently intended the threshold significance determination only to weed out standards promising such negligible benefits that they were not worth the trouble of further examination. We note that DOE may not issue a standard it has disqualified under the significance provision *even if that standard imposes absolutely no burdens at all.* Consequently, even an efficiency standard with no technological or economic drawbacks whatever—one that offers a completely painless way to energy conservation—will

be discarded if it fails to achieve "significant" conservation. If, on the other hand, the standard under consideration survives this first look, DOE must still decide whether the standard would be economically justified. In reaching that decision, DOE is explicitly directed to weigh "the total projected amount of energy savings likely to result directly from the imposition of the standard." EPCA § 325(d)(3). Thus, a finding that a proposed standard results in significant conservation is far from a prologue to inevitable promulgation of a mandatory standard; instead, that finding simply triggers a much more thorough review in which the amount of energy a standard would save is assessed in light of any other benefits and countervailing burdens of the standard.

We think it unlikely that the Congress that enacted NECPA and its four related energy statutes intended DOE to throw away a cost-free chance to save energy unless the amount of energy saved was genuinely trivial.[19] Moreover, that general view is bolstered by the few specific figures Congress included in the sections of NECPA that created the appliance program. In particular, review of the energy consumption level at which DOE was authorized to prescribe discretionary standards for an appliance is revealing.

As we note above, section 325(a) of EPCA permits DOE to prescribe an energy efficiency standard for an appliance if its average per-household energy consumption exceeds 150 kilowatt hours, and its aggregate national household use during one year exceeds 4,200,000,000 kilowatt hours, or .014335 quadrillion Btu (Quads). Congress plainly thought that saving some part of the energy consumed by an appliance operating at those levels would be

**19.** As we emphasize below, *see infra* at 1376, 1382–83, our argument is not intended to dictate any specific definition of significance to DOE. In particular, we note that any scheme of mandatory appliance standards will have certain rough fixed costs that will probably not vary radically with the levels at which standards are set. Those costs might include, for example, the costs of administering a regulatory scheme, including the costs of enforcement, and perhaps certain generic burdens of regulation on indus-

try. *Cf. infra* at 1424–25 (discussing DOE's consideration of such generic burdens of standards). If it were truly obvious, without the extended investigation appropriately undertaken as part of the inquiry into economic justification, that the value of saving small amounts of energy was outweighed by the cost and trouble of undertaking any appliance program at all, DOE might be justified in determining that those small savings were not significant.

significant, or it would not have authorized DOE to prescribe mandatory standards for such an appliance. Our review of DOE's figures suggests that standards for three of the appliances DOE considered in this rulemaking would have saved more energy per year than the total annual energy consumption necessary to qualify an appliance for discretionary standards. These standards, in other words, would have saved more energy than would have been saved if a standard instantly reduced to zero the total energy consumption of an appliance operating at the minimum level for discretionary standards. Yet for two of those three appliances, DOE branded the savings from standards insignificant, and thus rejected savings that exceeded 100 percent of consumption for appliances Congress was willing to regulate.

We must briefly sketch some technical background in order to illustrate this anomalous result. The consumption figures in section 325(a) measure energy use at the *site* of consumption, *i.e.*, the energy actually consumed by an appliance in the house-hold. However, the ORNL model calculates the energy a standard would save in terms of *source* consumption, or the energy used as input to powerplants that in turn generate electricity used in the household. Because of inefficiencies in the generation and transmission of electricity, a given number of Quads in site savings yield a substantially larger number of Quads in source savings.

Under section 325(a), DOE may prescribe a discretionary standard for an appliance if, among other criteria, its national energy consumption exceeds .014335 Quads. According to DOE's figures, an appliance that consumes that amount of electricity at the site of use consumes approximately .0483 Quads annually at the source of generation.[20] The table below compares DOE's estimate of savings from standards for the six covered products considered in the 1983 final rules, calculated over the average lifetime of an appliance purchased in 1987, with the total consumption of an electrical appliance during that same period.

Table 1

| | Appliance Lifetime (years) | DOE-Estimated Savings (Quads) | Consumption of Appliance Qualifying for Discretionary Standards .014335 (Furnaces) or .0483 Quads (all others) times Lifetime |
|---|---|---|---|
| Refrigerators (Level 3) | 19 | 1.65 | 0.92 |
| Freezers (Level 3) | 21 | 0.58 | 1.01 |
| Water Heaters (Level 3) | 13 | 1.18 (electricity only) | 0.63 |
| Furnaces | 23 | 0.17 | 0.33 |
| Room Air Conditioners (Level 4) | 15 | 0.61 | 0.72 |

**20.** Section 325(a)(2)(B) of EPCA provides that DOE may not establish a discretionary standard for an appliance unless the appliance consumes at least 4,200,000,000 kilowatt hours annually. That number of kilowatt hours is equal to 14.-335 × 10$^{12}$ Btu, *see* 1980 Economic Analysis § 6.3 at 6–4, J.A. at 613, or .014335 Quads. The average power plant consumes 11,500 Btu to consume 1 kilowatt hour, *see* 47 Fed.Reg. 14,-424, 14,427 (1982), and 1 kilowatt hour is equivalent to 3413 Btu. Thus, the site energy consumption of an electrical appliance consuming .014335 Quads may be calculated as follows:

$$\frac{11{,}500 \text{ Btu [source]}}{3{,}413 \text{ Btu [site]}} \times .014335 \text{ Quads} = 0.483 \text{ Quads}$$

*See* Supplemental Br. of Petitioners at 4 n. 3; *see also* 47 Fed.Reg. 14,424, 14,427 & n. 8 (1982) (consumption at site approximately equal to 29% of consumption at source); *cf.* 47 Fed.Reg. 57,198, 57,204 (1982).

| | Appliance Lifetime (years) | DOE-Estimated Savings (Quads) | Consumption of Appliance Qualifying for Discretionary Standards .014335 (Furnaces) or .483 Quads (all others) times Lifetime |
|---|---|---|---|
| Central Air Conditioners (Level 4) | 12 | 1.23 | 0.58 |

Source: EPCA § 325(a)(2)(B); 48 Fed. Reg. 39,376, 39,385, 39,390, 39,392, 39,394, 39,396, 39,398, 39,402 (1983).[21]

Thus, DOE's definition does not recognize as significant energy savings equal to the total annual consumption of an electrical appliance that in the view of Congress might appropriately be subject to a mandatory standard, even when that savings is calculated according to DOE's own figures and over the periods DOE itself selected for analysis.[22] We think that such a high definition of significance is inconsistent with the congressional decision to authorize discretionary standards for appliances con-

21. This table is reproduced from figures developed by petitioners in response to a specific request from the court. See Supplemental Br. of Petitioners at 5; see also Supplemental Br. of Secretary of Energy at 4–5 [hereinafter cited as DOE Supplemental Br.] (acknowledging that standards for central air conditioners, water heaters, and refrigerators and refrigerator-freezers would save more energy than appliance at minimum level for discretionary standards would consume). The table compares savings from furnace standards to the *source* consumption of an appliance qualifying for discretionary standards, rather than to the site consumption of an electrical appliance so qualifying. This treatment is appropriate because furnaces, unlike the other appliances in the table, generally consume fuels directly without the intervening inefficiencies of electrical generation. The table does not list energy savings from standards for clothes dryers and ranges and ovens, which produced comparatively small savings.

We understand that the calculations presented in the table are somewhat rough. For example, the conversion factor we have used for site to source consumption depends upon the average efficiency of electricity generation, which varies over time. See supra note 20. Nonetheless, we cannot determine the lawfulness of DOE's tests without making some effort, whatever its incidental imprecisions, to compare those tests with the most relevant specific figure for energy consumption in the Act itself.

22. DOE designated and, to the extent it deemed possible, analyzed standards set at three or, in some instances, four different "levels" of energy efficiency for each type or class of covered product. The levels were stated in units DOE called "energy factors." Energy factors refer to the various measures of appliance efficiency DOE adopted for each covered product. DOE used different names for energy factors describing the efficiency of different covered products: for example, the term "energy factor" itself was used for refrigerators, "energy efficiency ratio" and "seasonal energy efficiency ratio" for air conditioners, and "annual fuel utilization efficiency" for furnaces. For each appliance, a higher energy factor designates a more efficient appliance.

The three or four "levels" that DOE considered for standards covering each appliance were initially based on the 1978 "shipment weighted energy factor" ("SWEF") for that appliance. The SWEF for an appliance in a year is "the summation of [the] number of units of a particular basic model multiplied by the energy factor, divided by the total number of shipments within a class." 45 Fed.Reg. 43,976, 43,986 (1980). In other words, it is roughly the efficiency of a representative appliance model shipped during a particular year, adjusted to reflect the number of appliance models shipped with different efficiencies. Efficiency levels analyzed as a basis for standards were then calculated in roughly the following way. Level 2 was initially set at the SWEF in 1978. Level 1 was set at one standard deviation below level 2, while levels 3 and 4 were set at one and two standard deviations above level 2. See, e.g., id. However, these levels were then adjusted in varying ways for different appliances. DOE generally attempted to end with a level 3 figure near the highest energy factor attainable through the commercially available technology analyzed; a level 4 figure based on some additional efficiency-improving design options; and level 1 and 2 figures scaled down from level 3 in varying amounts according to DOE's judgment. See U.S. Department of Energy, Consumer Products Efficiency Standards: Economic Analysis Document 3 (1982) [hereinafter cited as 1982 Economic Analysis Document], J.A. at 940.

suming the amounts of energy Congress specifically designated. Congress determined that discretionary standards for such appliances might be appropriate if they would result in "substantial" conservation of energy. Congress plainly thought that substantial conservation was possible for an appliance operating at the minimum level stipulated in the statute; and it therefore could not have thought that the *total energy consumption* of such an appliance might reasonably be considered an insignificant amount to save.[23]

In the December 1982 notice, DOE responded to a somewhat different version of the argument we have presented in the following way:

> DOE does not believe that because the oil or gas and the electricity savings tests would require greater savings of energy by the eight products subject to this rule than is required to be used by some other products in order to be possibly considered for standards means that these tests are unlawful or precluded by the statute. As indicated above, the oil or gas and electricity savings tests were designed with a bias to products that use large amounts of energy.

47 Fed.Reg. 57,198, 57,204 n. 11 (1982). DOE's comment, however, is directed only to the first two of its three tests. It does not acknowledge that, as we have shown, a standard might save an amount of energy equal to the total consumption necessary for a discretionary standard and nonetheless fail all three tests.[24]

More importantly, we think that DOE's approach is inadequately sensitive to the relationship between different passages in section 325 of EPCA. In effect, DOE points out that a fixed amount in energy savings might be a very small percentage of total use for a high-consumption appliance and a much larger percentage for a low-consumption appliance. DOE concludes that it may therefore reasonably regard energy savings as insignificant for a high-consumption appliance, even if the same amount would be significant for a low-consumption appliance.

■ In the abstract, we have no occasion to disagree with that idea. For example, we do not hold that the Act forbids DOE to set levels of significance for each product type as a percentage of the energy consumed by that product type, provided that the levels selected reasonably accommodate the policies of the Act. Our point is

**23.** We acknowledge, of course, that most of the appliance standards would not have saved more energy annually than the total energy consumption of an electrical appliance that was just eligible for discretionary standards. For two reasons, however, that fact does not mean that DOE's test for significance can stand as applied to those standard levels. First, we do not hold that any test for significance equal to or lower than .0483 Quads per year is necessarily consistent with EPCA. We believe that Congress' designation of appliances consuming .0483 Quads annually for discretionary standard shows that that amount of energy saved is significant; but it does not follow that lower amounts may not also be significant.

Second, we are considering the basic validity of the tests for significance that DOE used in analyzing all the standard levels it considered. If, as we conclude DOE's tests are invalid, then DOE's findings under those tests must also fall. It does not matter that DOE might have adopted some other, lower definition of significance, under which DOE might lawfully find that some of the standards analyzed still failed to produce significant savings. We may uphold DOE's find-

ings of insignificance only under the rationale the agency used—namely, the definition under review. *See Securities & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).

**24.** DOE stated the results of its third test for significance as percentages, but its *Federal Register* notices did not translate those figures into numbers of Quads saved. We are informed that for the six products considered in the 1983 rulemaking, the record contains the number of Quads standards would save under the third test only in the form of over 400 pages of computer printouts. *See* DOE Supplemental Br. at 1–2. DOE examined the printouts for standards governing refrigerators and refrigerator-freezers, and determined that the highest level of savings attributable to standards would be .136 Quads, as compared to .932 Quads of energy consumed in the absence of standards. *See id.* at 2. Thus, the one-year savings under the third test for this standard, .136 Quads, is substantially higher than the consumption of an appliance just qualifying for discretionary standards, .0483 Quads.

simply that DOE's definition of significance must show some awareness of the range of energy savings Congress thought worth pursuing. Congress unmistakably believed that savings for an appliance that just qualified for discretionary standards might be worth pursuing, even though the absolute amount of energy saved would be small. Perhaps DOE need not say that precisely the same amount of energy such a standard might realistically save would be significant if saved by a high-consumption appliance. However, DOE has gone much further than that. Obviously, the total consumption of an appliance subject to discretionary standards is much higher than the amount of energy Congress could have expected such a discretionary standard to save. Yet DOE has rejected as insignificant savings equal to the total minimum consumption of an appliance subject to discretionary standards.

As we have discussed, a determination that a standard does not result in "significant" savings means that DOE must discard the standard at a preliminary stage of decisionmaking as unworthy of detailed study. Moreover, DOE must reject the standard even if it imposes absolutely no costs on manufacturers, consumers, or anyone else. In our view, DOE's definition rejects savings that, judged against figures Congress included in the text of the Act, must be regarded as significant. At least in the absence of strong countervailing evidence of congressional intent, we think the anomalous and disproportionate results of DOE's definition are a powerful sign that DOE has passed beyond the limits of its statutory discretion. We turn, then, to the specific rationales DOE offers for its three tests to determine if they satisfactorily explain the strange consequences of those tests.

## C. *DOE's Rationale for Its Definition*

DOE claimed that the definition of significance announced in its December 1982 notice was based on congressional intent, although it had previously made the same argument for the radically different defini-

tion of significance advanced in June of 1980. In support of its first two tests, DOE cited the general findings in NECPA that stressed the importance of reducing national dependence on oil imports. *See* NECPA § 102(a), Pub.L. No. 95–619, 92 Stat. 3206, 3208 (1978); 47 Fed.Reg. 57,198, 57,205 (1982); 47 Fed.Reg. 14,424, 14,429 (1982). These broadly stated findings, however, describe overall goals for the national energy program from "all sectors of our Nation's economy," NECPA § 102(a)(3), 92 Stat. at 3209, to be "approached progressively in a step-by-step pattern to produce savings of a significant proportion." National Energy Act, Part I: Hearings Before the Subcommittee on Energy and Power of the House Committee on Interstate and Foreign Commerce, 95th Cong., 1st Sess. 2 (1977) (statement of Rep. Dingell). DOE could reasonably decide that a standard must make some progress towards the goals of the Act to be considered significant, but those general goals furnish little support for the specific tests DOE has adopted. Moreover, the appliance program is, of course, merely one program in a vast plan encompassing five statutes and scores of initiatives. Yet DOE steadfastly refused to consider that fact in deciding how great a contribution each standard must make to national conservation efforts in order to be deemed significant. Commenters echoed the view of Representative Dingell, Chairman of the House Sub-Committee on Energy and Power and a member of both of the House Ad Hoc Committee on Energy and the NECPA Conference Committee, that "conservation must be approached on a nickel and dime basis" and that "the cumulative impact of a series of conservation initiatives, which in themselves might appear insignificant, could be enormous," *id.*, but DOE was unmoved. It merely replied that the statute "makes clear that the determination of whether a standard will save significant energy is to be made on an individual product type basis, not on the basis that standards for all products together would save significant energy." 47 Fed.Reg. 57,198, 57,203 (1982).

DOE is right to think that under section 325, standards for each product type must result in significant conservation. But DOE is plainly wrong to think that the overall conservation possible under the appliance program, and indeed under other aspects of the 1978 national energy program, has no relevance at all to what qualifies as a reasonable definition of significant conservation. DOE itself relied heavily on the ultimate end Congress declared for its program: a gradual end to massive dependence on foreign sources of energy. But DOE cannot isolate that end from the means Congress selected—namely, a massive plan involving numerous programs. No single program was expected to be decisive in achieving Congress' ultimate goal, let alone a single standard within the appliance program. In this sense, the cumulative savings possible from the appliance program as a whole is certainly relevant to whether the conservation that standards for a particular product type might achieve should be deemed significant. By rejecting that linkage, DOE has plucked the general goals Congress set for NECPA from their place in the statutory scheme, and failed to consider important evidence of how far standards for one product type should be expected to go towards achieving those goals.

DOE also relied on 1979 decisions by two congressional committees rejecting a contingency plan for restricting the use of lighting for advertising during energy shortages. *See* 47 Fed.Reg. 14,424, 14,429 (1982). The committees found that the plan would save only 4,400 barrels of oil per day, which they regarded as inadequate to justify enactment of the program. *See* S.Rep. No. 98, 96th Cong., 1st Sess. 10–11 (1979); H.R.Rep. No. 122, 96th Cong., 1st Sess. 4 (1979). An unfavorable recommendation by two congressional committees on a substantially different proposal after passage of the legislation at issue is weak support indeed for DOE's test. Congress might well have thought that a single nation-wide emergency program should produce higher savings than the savings demanded for a standard governing any one of thirteen covered products, particularly since the appliance program was itself only part of the large-scale national conservation program embodied in the 1978 energy acts. Moreover, DOE set its first test at 10,000 barrels of oil per day, or more than double the 4,400 barrels of oil per day that the rejected program would have saved. If stronger support for DOE's definition cannot be found in congressional intent, this isolated, unrelated, and post-enactment example of legislative inaction cannot rescue it.

In addition, more direct evidence of congressional intent casts further doubt on the relevance of these committee decisions. The report on NECPA by the House Ad Hoc Committee on Energy predicted that the Act would result in the following savings:

Table 2

Estimate of oil import savings achieved by H.R. 8444

| Initiative: | Thousands of barrels per day, in 1985 |
| --- | --- |
| Transportation | 360 |
| Buildings | 420 |
| Appliance Program | 50 |
| Industry/utility conservation | 170 |
| Increased residential/commercial gas availability | 120 |
| Oil and natural gas pricing | 260 |
| Synthetic use | 420 |
| Coal conversion | 820 to 1,150 |
| Total Savings | 2,620 to 2,950 |

H.R.Rep. No. 543, 95th Cong., 1st Sess. 80 (1977) (footnotes omitted). The House Report commented that the NECPA conservation programs, considered as a bundle, would "provide[ ] a solid start" toward reducing oil imports and "chang[ing] the way we use energy." *Id.* Of those programs, Congress expected the lowest immediate return from appliance regulation, which was expected to save 50,000 barrels per day of imported oil in 1985—less than one-half the benefit projected from the program with the next smallest return and less than 2 percent of the total oil import savings projected from NECPA during that year.[25] Similarly, the minority members of the House Committee on Interstate and Foreign Commerce commented that "appliances consume only 2.7 percent of the energy consumed annually in the United States." H.R.Rep. No. 496, Pt. 4, 95th Cong., 1st Sess. 291 (1977) (minority views), U.S.Code Cong. & Admin.News 1977, p. 8679.[26] Yet those members supported the program. *See id.* Congress, in short, had a realistic notion of the relatively small energy savings to be expected from the appliance program, but nonetheless decided to regulate appliance efficiency as part of a national assault on unnecessary energy use.

DOE's first test for significance, in contrast, requires that standards for *each* of the eight covered products considered in the rulemaking save 10,000 barrels of oil a day or an equivalent amount of natural gas, even though Congress projected a 1985 saving from standards for all thirteen appliances of only 50,000 barrels a day. That congressional estimate, moreover, describes the saving Congress thought probable, and not the smallest saving that justified detailed evaluation of proposed standards. In light of these statistics, we think DOE's reliance on the obscure fate of quite a different program in committees of a later Congress is misplaced.

DOE justified its second test for significance on the ground that "a national savings of electricity would at least have to exceed 1 percent of national usage over the period of analysis in order to have an effect on the need for new generating capacity." 47 Fed.Reg. 14,424, 14,430 (1982). DOE followed its statement of this test with the following table:

Table 3
1980 Electricity Usage

| Appliance | Electric usage in quads | Percent of total electric usage |
|---|---|---|
| Central space heater | 0.96 | 3.8 |
| Room space heater | 0.62 | 2.5 |
| Air conditioner room | 0.38 | 1.5 |
| Air conditioner central | 1.47 | 5.9 |
| Water heater | 1.35 | 5.4 |
| Refrigerator | 1.17 | 4.7 |
| Freezer | 0.44 | 1.8 |
| Range | 0.54 | 2.1 |
| Clothes dryer | 0.45 | 1.8 |

25. We recognize that the table lists expected energy savings in 1985, when appliances sold after standards were expected to take effect would still have accounted for a fairly low percentage of total appliances in use. For that reason, Congress might have expected the energy savings from appliance standards to increase in years after 1985. Nonetheless, we believe the figures in the table are useful as evidence of the general range of savings Congress hoped to achieve.

26. Because the statistic mentioned in the text deals with national *energy* consumption, the statistic is not inconsistent with the figures dealing with national *electricity* consumption set forth in Table 3. *See infra* at 1379.

*Id.* (citing as source ORNL Residential Energy End Use Model) (footnotes omitted).

According to this table, each of the eight covered products identified in the table accounts for small percentages of national electricity consumption. Only a very dramatic drop in electricity consumption by a product would enable even the high-consumption covered products to meet DOE's test, and evidently some of the low-consumption appliances could not meet the test at all.[27] We view as suspect a test that demands a fixed amount of energy savings greater than the savings that low-consumption covered products could ever possibly achieve. By including low-consumption appliances in the mandatory standards program, Congress showed that it believed improved efficiency for those products could result in significant conservation. A test for significance that demands far higher savings than standards for low-consumption covered products could realistically ever produce is thus out of scale with the congressional view that these products should be included in the Act.

Moreover, our dubiousness about this test is heightened by DOE's equivocal response to comments submitted during the rulemaking. DOE summarized those comments by noting that:

> [S]everal commenters attempted to translate the aggregate electricity savings for all products using electricity, if standards were adopted for all those products, into additional new capacity that could be avoided. These estimates ranged from 16.8 GWe [gigawatts] ... to 17.6 ... GWe in the year 2005. Each of these commenters also reflected these estimated avoided capacities in terms of powerplant equivalents, which ranged from 17 1000 MW [megawatt] plants to 22 800 MW plants.

47 Fed.Reg. 57,198, 57,207 (1982) (citations and footnote omitted). DOE first complained that the commenters had impermissibly aggregated total savings from standards covering all covered products. When these aggregations were broken down into the savings attributable to standards for each product type, DOE maintained that:

> Under even [the] methodology [of commenter American Council for an Energy-Efficient Economy (ACEEE),] the largest reduction in need for new, incremental capacity attributable to one standard (electric water heaters) would be only 36 percent of the aggregate figure presented [for total electricity saved as a result of standards]. Under DOE's base case projection, the largest reduction would be only 17 percent of the aggregate figure presented, or approximately 3 GWe or three 1000 MW powerplant equivalents nationwide. As discussed earlier, Section 325(b) requires DOE to make a determination of significant savings on an individual product type basis, not on the basis of the aggregate savings if standards were imposed on all products.

*Id.*[28] As we have explained, we agree that savings for standards must be evaluated separately by product type, but DOE may not therefore close its eyes to the cumulative effect of imposing standards. We thus cannot agree that DOE's first reason supports its rejection of the comments submitted.

DOE also argued that:

27. *See* Testimony of Alan S. Miller at 7 n.* (Apr. 2, 1982), J.A. at 2501; *cf.* 47 Fed.Reg. 57,198, 57,203–04 (1982).

28. The ACEE founded its projection on a comparison of the ORNL model's "historical trends base case" with the standards case, rather than the ORNL model's actual "base case." *See* 47 Fed.Reg. 57,198, 57,207 n. 17 (1982); *see also infra* at 1383–1385. The historical trends base case substituted "the historic trend in efficiency improvements of a product for the Model's derived projections between life cycle costs and

the efficiency of the product." *Id.* at 57,201. As we discuss below, the base case of the ORNL model tended to predict rapid improvements in appliance efficiency during the immediate future, even in the absence of standards. *See infra* at 1385–1387. The historical trends base case, which projected the past rate of efficiency improvements into the future, forecast lower efficiency improvements than did the actual base case. Thus, ACEE's use of the historical trends case tended to increase the savings attributable to standards.

[I]t is not at all clear that even a 17 to 18 GWe theoretical reduction of additional new capacity is significant in terms of actually affecting potential new, incremental capacity. The 17 to 18 GWe capacity savings projected by the commenters would be less than 2 percent of the approximate forecast capacity for the year 2005, and these savings would for the most part be spread over large parts, if not all, of the Nation. The reuslt of this is that in some utility services areas, the level at which decisions are made as to the need for new, incremental capacity, these marginal savings could be so small compared to other factors, e.g., demographic changes, that they would have no impact on actual construction decisions. Thus, one cannot reliably assume that whatever number of gigawatts one may mathematically back out as a result of reduced kilowatt hours attributable to a standard represents the actual gigawatts of capacity construction foregone.

*Id.* (footnote omitted). Part of this passage relies on the demographic uncertainty that is inevitably involved in projecting electricity use long into the future. However, that uncertainty results mostly from the lengthy period for analysis DOE itself chose, and characterizes many of DOE's own predictions.

The quoted passage also argues that the savings in question would be spread out over the entire nation, and consequently those savings might not affect the need for additional generating capacity in any area. Petitioners maintain that the market in electricity is essentially a national one, and that incremental savings achieved across the nation really do diminish the need for new generating facilities. *See* Oral Comments of Angelo F. Orazio at 9 (May 20, 1982), J.A. at 3116. DOE did not details its reasons for rejecting that argument, and

we therefore have some difficulty in assessing the reasonableness of the opposing views in this subsidiary controversy. However, we are not now considering whether DOE's general doubts about the effect of savings on the need for new generating facilities would, if DOE's basic approach to significance were sound, support the particular quantities of energy DOE specified in its test. As we have discussed, DOE's definition of significant savings produces incongruous results in light of other EPCA provisions, and we are now searching for an agency explanation that might prop up this faltering definition. DOE's argument does not persuade us that DOE has, after all, acted within the discretion Congress allowed it.

Finally, DOE argued that its third test is grounded in former section 325 of EPCA. That section required the Federal Energy Administrator to set target figures for appliance efficiency improvement so that the ten priority appliances named in the Act would register an aggregate efficiency improvement of 20 percent between 1972 and 1980. Thus, unlike DOE's third test, section 325 established a target, not a threshold figure below which regulation would be abandoned as not worth the trouble. That target required an aggregate improvement for all ten appliances of 20 percent, thus recognizing that standards for some covered products might fall short of that level. In addition, the 20 percent target was based on a comparison of 1972 efficiency to 1980 efficiency and so is quite unlike DOE's comparison of its standards case with a projected no-standards base case. Given these major differences, we are unconvinced by DOE's argument.

We think DOE's argument is also at odds with other signs of legislative intent. The Senate Report on NECPA, for example, set forth the following table:

Table 4

Estimated Improvements in Average
Appliance Efficiency Over 1972 Levels (Percent)

| | Expected Improvements From EPCA Appliance Program | Expected Improvements From President's Initiative |
|---|---|---|
| Refrigerators | 27 | 47 |
| Freezers | 17 | 30 |
| Clothes Dryers | 5 ele[c]., 10 gas | 8 elec., 18 gas |
| Water Heaters | 10 elec., 14 gas 13 oil | 18 elec., 25 gas 23 oil |
| Room Air Conditioners | 15 | 54 |
| Clothes Washers | 15 | 20 |
| Furnaces | 5 | 23 |

S.Rep. No. 409, 95th Cong., 1st Sess. 147 (1977). The first column of the table indicates the improvement in efficiency the administration expected between 1972 and 1985 under EPCA as originally enacted. *Id.* The second column indicates the improvement in efficiency the administration expected during the same period under its proposal for mandatory standards, which in somewhat modified form became NECPA.

These projections were submitted to Congress by the Deputy Administrator of the Federal Energy Administration. He commented that under the administration proposal,

> [m]inimum efficiency standards shall be prescribed as soon as possible for refrigerators/refrigerator-freezers, freezers, water heaters, room air-conditioners, kitchen ranges and ovens, central air-conditioners, and furnaces. These products account for about 80 percent of the energy used in American households. Standards for these products would be required because *significant improvements in the energy efficiency of each is [sic] possible and a substantial national savings would result.*

*Id.* at 132 (statement of David J. Bardin) (emphasis added).

Because the table shows energy efficiency improvements as a comparison between 1972 statistics and 1985 projections, the figures it states are not directly comparable to those DOE used in calculating its 16.67 percent test. Nonetheless, the range in the table is instructive. For example, the table predicts that with standards, clothes washers would be 20 percent more efficient in 1985 than in 1972; without standards, the difference would be 15 percent. For electric clothes dryers, the figures are 8 and 5 percent; for gas clothes dryers, 18 and 20 percent. As these numbers show, Congress knew that standards for some covered products would produce quite modest incremental gains in efficiency and consequently in energy conserved. Congress was also authoritatively informed by the Federal Energy Administration—the predecessor agency to DOE in administering the appliance program—that the savings revealed by the table for each of the covered products were significant. On that understanding, Congress enacted the program.

■ We emphasize once again that we do not view the table we have reprinted above or any of the other legislative history we have discussed as absolutely binding DOE to any particular definition of significance. "[A]n agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely on the incumbent administra-

tion's views of wise policy to inform its judgments." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* — U.S. ——, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984). Nonetheless, when an agency does not reasonably accommodate the policies of a statute or reaches a decision that is "not one that Congress would have sanctioned," *id.* 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)), a reviewing court must intervene to enforce the policy decisions made by Congress. "[A] new administration may not choose not to enforce laws of which it does not approve, or to ignore statutory standards in carrying out its regulatory functions." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2875 n. *, 77 L.Ed.2d 443 (1983) (Rehnquist, J., concurring in part and dissenting in part).

■ We have acknowledged that Congress granted DOE considerable discretion to define significant conservation. This case does not require us to define the precise limits of that discretion: all we must decide is whether DOE has reasonably enforced the decisions Congress made when it enacted NECPA. For the reasons stated above, we believe DOE has failed to do so, and we accordingly hold that its definition of significance is inconsistent with the Act.

### III. DOE's METHOD OF DETERMINING SAVINGS THAT WOULD RESULT FROM STANDARDS

Petitioners launch two attacks on DOE's method of determining when "the establishment of [a] standard will not *result* in significant conservation of energy." EPCA § 325(b)(2) (emphasis added). First, they claim that DOE should not have calculated savings by comparing a standards case, which projected future energy consumption by particular appliances if standards were imposed, with a base case, which projected the same statistic in the absence of standards. Instead, petitioners assert that DOE should have "simply assess[ed] how much energy would be conserved if existing appliances were improved

to comply with minimum efficiency standards." Br. of Petitioners NRDC *et al.* at 54. As we understand this claim, petitioners argue that DOE should have estimated energy consumption by a product type or class over some future period of years if appliance efficiency remained at current levels, and should then have subtracted from that figure projected energy consumption over the same period if standards were imposed. Petitioners do not really avoid the need for some base case to use in determining the amount of energy that standards would conserve; in effect, they dispute only DOE's assumption that appliance efficiency will improve even in the absence of standards.

Second, petitioners challenge DOE's use of an econometric computer model called the Oak Ridge National Laboratory (ORNL) Residential Energy End-Use Model to project future energy consumption under both the base and standards cases. Among the ORNL model's assumptions is that as the cost of energy to consumers increases, consumers will become much more likely to purchase efficient appliances. Because the data fed into the ORNL model predicted sharp increases in the cost of energy, the assumed relationship between energy cost and consumer behavior caused the model to predict that even in the absence of standards, appliances would become much more efficient in the immediate future. That prediction substantially lowered projected energy consumption under the base cases for all the product types or classes considered in the rulemaking, and thus also lowered the figures for energy savings that would result from standards. Overall, the ORNL model predicted that for the period 1987 to 2005, appliance efficiency standards would save 32.8 Quads, as compared to the energy that appliances at 1978 levels of efficiency would consume. *See* 47 Fed.Reg. 14,424, 14,427–28 (1982). But the model also predicted that even in the absence of standards, improved appliance efficiency caused by market forces such as increased energy prices would save 27.6 Quads. *See*

*id.* Thus, the model indicated that 84 percent of the energy that more efficient appliances would save under standards compared to present efficiency levels would have been saved anyway; only the remaining 16 percent of energy savings would result from standards.

We examine these two challenges in turn.

### A. Statutory Authority for Subtracting "Base-Case" Savings From "Standards" Savings

The essence of DOE's position is straightforward: energy savings do not "result" from standards if the same savings would have been achieved without standards. We think it clear that nothing in the ordinary meaning of the statutory language renders DOE's interpretation unreasonable. Petitioners, however, rely on the legislative history of section 325 for their contrary interpretation. They point out that under EPCA as originally passed, Congress relied mainly on a manufacturer's voluntary compliance with target efficiencies, coupled with a labeling program to encourage informed consumer decisions, in order to increase appliance efficiency. Mandatory standards were authorized only if, after actual experience with these programs, DOE found that they were "not likely to be sufficient" to achieve the target efficiencies. NECPA, in contrast, called for the immediate issuance of standards in place of the old program, which employed standards only after milder government intervention had failed. According to petitioners, this shift shows that Congress affirmatively rejected further experimentation with the chance that in the absence of mandatory standards, appliance efficiency would nonetheless improve.[29] On this theory, DOE was no longer to consider whether market forces and labeling would achieve the desired improvements; instead, DOE was commanded to require those improvements at once, whether or not they might occur anyway.

However, the legislative history does not bear out petitioners' account of Congress' intent. The House Report explains succinctly what Congress hoped NECPA would accomplish:

First, the cornerstone of the national energy plan is conservation, and the proposal permits [the Federal Energy Administration] immediately to begin the process of establishing energy efficiency standards. If the present program were to continue without change, FEA would be permitted to set standards for a type of appliance only after a target had been established, energy labels had been in place for 18 months, data had been collected on industry performance, and there was evidence that targets were not being achieved. At the May 11, 1977, hearings, the FEA contended that this process "could delay [for] some 2 to 3 years the imposition of standards that will guarantee the attainment of technologically feasible and economically justifiable energy improvement targets."

The second purpose of utilizing minimum standards, as opposed to industry targets, is to place each manufacturer on an equal footing; all would be required to achieve the same energy efficiency. Under the target approach, there would be little incentive by a manufacturer to exceed a target, and to do so might place a given manufacturer at a competitive disadvantage.

The third purpose of the proposal is to eliminate uncertainties among manufacturers under the present target-setting

---

**29.** There are scattered hints in the NECPA legislative history that Congress based its view of likely energy savings from standards on figures assuming that appliance efficiency would remain constant if standards were not imposed. *See, e.g.,* S.Rep. No. 409, 95th Cong., 1st Sess. 147 (1977) (table), *reprinted supra* at 47 (Table 4). That fact, however, falls short of evincing a congressional intention to require that DOE make the same assumption. There is just no sign that Congress ever considered this problem. DOE also evidently applied its 1980 tests for significance by holding appliance efficiency constant, although its language on that score is ambiguous. *See* 1980 Economic Analysis Document § 6.3 at 6–5, J.A. at 674. That decision would not, of course, prevent the agency from later adopting a reasonable alternative.

approach. The uncertainty in the present system arises from the fact that targets are industry-wide and a particular manufacturer must decide on what its contribution to the target should be. If the manufacturer chooses to exceed the target, he must consider the long-term effect on his company. He has no certainty over whether his appliances will ensure that the target is met, or whether standards will eventually be established. H.R.Rep. No. 496, Pt. 4, 95th Cong., 1st Sess. 45 (1977), U.S.Code Cong. & Admin. News 1978, p. 8492. This passage certainly suggests congressional impatience with the delays that the wait-and-see approach of EPCA as originally enacted had caused. Congress plainly did not want DOE to delay the issuance of standards while it observed the effects of the target and labeling programs. However, neither NECPA nor its legislative history suggests that DOE may not project future gains in appliance efficiency and act on those projections in framing its method for deciding what savings would result from standards.[30]

■ We conclude, therefore, that DOE's use of projected gains in appliance efficiency to calculate energy savings resulting from standards was not unlawful. We must therefore consider whether the computer model that generated those projected gains—and the factual assumptions driving that model—were reasonable tools to carry out DOE's general approach to figuring energy savings.

### B. *The ORNL Model*

■ As we have recently reaffirmed, "[a]n agency may utilize a predictive model so long as it explains the assumptions and methodology it used in preparing the model. If the model is challenged, the agency must provide a full analytical defense."

*Eagle-Picher Indus., Inc. v. United States Envtl. Protection Agency,* 759 F.2d 905, 921 (D.C.Cir.1985) (footnotes omitted). However, we will defer to an agency's judgment to use a particular model if the agency examines the relevant data and articulates a reasoned basis for its decision. *See id.* at 921–22; *Small Refiner Lead Phase-Down Task Force v. Environmental Protection Agency,* 705 F.2d 506, 535 (D.C.Cir.1983); *Sierra Club v. Costle,* 657 F.2d 298, 332–33 (D.C.Cir.1981).

■ The ORNL model was originally "designed to produce an analytical tool which would assist decision-makers in their evaluation of the impact of conservation strategies and policies." 1982 Economic Analysis Document at 396 (app. E), J.A. at 1333. The model was not developed specifically for this rulemaking: government-supported scientists began work on the model in 1975, before passage of NECPA, and an initial version of the model was completed in 1976. *See id.* Numerous changes in the model have been made since then, including changes made as a result of comments received during this rulemaking. *See* 48 Fed.Reg. 39,376, 39,380 (1983); *see also* McMahon, *Residential End Use Demand Modeling: Improvements to the ORNL Model* in Beyond the Energy Crisis 297 (1981).

DOE used the ORNL model to compare "the energy used without a standard during [the periods selected by DOE] to the energy used with a particular standard during the same period," 48 Fed.Reg. at 39,-380, and thus to compute "the amount of energy saved during that period which is attributable to the standard," *id.* Petitioners attack the model's market penetration algorithm. This algorithm quantified DOE's assumption that as fuel prices go

---

**30.** We note that in defining energy savings as a factor bearing on economic justification, Congress required DOE to consider "the total projected amount of energy saving likely to result directly from the imposition of the standard." EPCA § 325(d)(3). We think that DOE could reasonably interpret savings likely to result *directly* from standards to exclude savings that would have been achieved anyway without

standards. Admittedly, the significance provision of § 325(b)(2) is worded differently from the related passage in § 325(d)(4). Nonetheless, we would not lightly hold that a definition of energy savings that seems clearly reasonable under one subsection of a statute is prohibited when used for a related purpose under another subsection within the same section of a statute. No reasons for such a holding appear here.

up, market distortion—that is, the tendency of consumers to make economically irrational decisions to buy inefficient appliances—will go down. *See generally* E. Hirst & J. Carney, The ORNL Engineering-Economic Model of Residential Energy Use 37–44 (1978). DOE expressed the overall costs of an appliance to a consumer as the "life cycle cost" of the appliance, which included "total purchase price, energy use over the life of the product, and the maintenance costs over the service life of the product, discounted to their present values." 45 Fed.Reg. 43,976, 43,984 (1980). As DOE explained,

> The Model recognizes that the existing market-place is not perfect; that is, all manufacturers do not make and all consumers do not purchase the type of equipment that would always be a consumer's most energy efficient choice from a life cycle cost standpoint alone. The Model calculates the difference between the optimal and the projected average life cycle costs of equipment in a base year from actual prices and sales information of equipment in that year and projected energy prices. The difference between the optimal and projected life cycle costs is defined as the market distortion. In years after the base year, the Model projects the level of market distortion based on the initial level as modified by the market penetration algorithm.

48 Fed.Reg. 39,376, 39,380 (1983) (citation and footnote omitted). Thus, market distortion during the *base* year is the difference between the life cycle cost the average consumer will in fact ultimately pay, and the life cycle cost an economically rational consumer—that is, one seeking to minimize life cycle cost—would have paid. These figures are calculated from historical data. The market penetration algorithm in the ORNL model then uses the base-year market distortion to project market distortion in subsequent years.

In general terms, the algorithm has the effect of diminishing the distortion between the optimal and the average life costs of equipment being purchased as a function of rising energy prices. In other words, as the price of fuel for an appliance rises, the market in that appliance will become more "rational," i.e., the efficiency of equipment being purchased will be closer to the optimal efficiency (from a life cycle cost perspective) than it was when the fuel price was lower. Under the Model's algorithm, however, distortion always remains. While higher prices reduce distortion over time, they can never eliminate it altogether.

*Id.*

The controversial assumptions underlying the market penetration algorithm go well beyond the proposition that consumers will respond to higher energy prices by buying more efficient appliances. DOE explained this as follows:

> The ORNL Model assumes that as energy prices increase, more efficient equipment will be produced and purchased. This is consistent with almost all analyses of the subject. However, the model goes beyond many other studies in making the assumption that the consumer *criteria* for selecting energy efficiency will change as energy prices increase. In effect, the model assumes that longer paybacks on investments in improved efficiency of equipment will be acceptable as energy prices rise.

1982 Economic Analysis Document § 5.3.-2.6 at 144 (emphasis in original), J.A. at 1081.

Until the August 1983 rulemaking, DOE also described this second assumption through the concept of an "implicit discount rate." *See infra* at 1390 (noting technical difficulties with DOE's use of implicit discount rates). An implicit discount rate describes "all of the various factors influencing the market response to higher energy prices." 1982 Economic Analysis Document § 5.3.2.6 at 144, J.A. at 1081.

A high implicit discount rate implies that future benefits are given relatively little value by the consumer [in making purchase decisions] (or, alternatively, that

the availability of efficient products in the market is limited). A low implicit discount rate indicates a relatively high value placed on future benefits and a high availability of efficient products. The reason for the relationship between the implicit discount rate and the energy efficiency of new products is that an initial investment in greater efficiency is returned in the future. Thus, the greater the value placed on future benefits, the greater the investment in efficiency improvements, and the lower the implicit discount rate.

*Id.* "An implicit discount rate of 100 percent means that [the average consumer demands] a full return on the investment ... within the first year [after] purchase." 1980 Economic Analysis Document § 4.2.4 at 4–9, J.A. at 431.

Even assuming that the implicit discount rate remained the same as energy prices increased, consumers would nonetheless purchase more efficient appliances. Suppose, for example, that the implicit discount rate for an appliance is 100 percent, and consumers thus demand a full return on efficiency-improving technology in one year. As fuel prices increase, the cost of operating an appliance during the first year of ownership also increases. The average consumer will therefore be willing to pay more—up to the increased cost of operation during the first year—for a more efficient appliance, even at the same implicit discount rate. The algorithm assumes, however, that the average consumer will spend not only amounts equal to the increased cost of operation over one year on more efficient appliances, but that the consumer will also be willing to accept a longer payback period. The implicit discount rate will consequently decline.

The market penetration algorithm, then, can be seen as reflecting three increasingly specific propositions about the consequences of higher fuel prices on the market. First, the algorithm assumes that consumers will purchase more efficient appliances; second, it assumes that consumers will accept longer payback periods, and

market distortion will therefore diminish; and third, it quantifies the expected change in market distortion in a specific mathematical formula.

Some of the petitioners challenged the first of these propositions during the rulemaking. *See* Comment No. 2121 at 24 (June 18, 1982) (NRDC), J.A. at 2758. In reply, DOE pointed to technical literature suggesting a general correlation between the price of energy and appliance efficiency, the results of consumer surveys, and anecdotal evidence from manufacturers and trade associations. *See* 48 Fed.Reg. 39,376, 39,380–81 (1983).

DOE also noted that between 1972 and 1981, in a time of rapidly increasing energy prices, appliance efficiency improved significantly. Petitioners suggested during the rulemaking that a combination of state-mandated efficiency standards, the threat of federal standards, and "increases in efficiency as a by-product of other design objectives," *id.* at 39,381, accounted for efficiency improvements during that period. DOE replied at some length in its August 1983 notice. In sum, DOE concluded (1) that commenters had not identified any efficiency-improving design changes that appliance manufacturers introduced as a "by-product" of other design objectives; (2) that while federal and state regulatory efforts may have contributed to more efficient appliances, market pressures might well have caused similar efficiency improvements without actual or threatened regulation; and (3) that the pattern and timing of improvements in appliance efficiency in the past were generally consistent with DOE's belief that market pressures, particularly increases in energy prices, were principally responsible for those improvements. *See id.* at 39,381–82 (1983). Rather than reciting all the evidence underlying this dispute, we merely note our conviction that the evidence was "fragmentary," Comment No. 2121 at 10 (June 18, 1982) (NRDC), J.A. at 2744, conflicting, and ultimately susceptible of different interpretations. DOE's notices acknowledged those problems, reviewed the record in

light of major criticisms voiced by commenters, and offered a reasoned defense of the agency's conclusions. We therefore uphold DOE's conclusion that rising energy prices tend to encourage production of more efficient appliances.

We pass, then, to objections focused on DOE's theory that market distortion decreases as energy prices rise. DOE commented that it found only one empirical study directly relevant to the effect of energy prices on market distortion. DOE initially summarized the findings of the study as follows:

> The only available information regarding changes in implicit discount rates as a function of energy price is an analysis of investment in thermal integrity for new houses from 1973 to 1979.... This analysis, based on survey information from 300,000 new houses and computer analysis of the energy use of the houses, shows almost no change in implicit discount rates for new houses with electric resistance heating and a relatively small (15 to 20 percent) reduction in implicit discount rates for gas-heated houses during the time period. As the 1973 data preceded the oil embargo and rapidly rising real energy prices in the residential sector during the middle 1970s, the apparent small reduction in implicit discount rates during this period suggests that the decisionmaking process on thermal integrity in new houses changes only slowly. Higher energy prices induce higher investment in energy efficiency improvements in the shells of new houses, but they appear not to change the decision criteria.

1982 Economic Analysis Document § 5.3.-2.6 at 145, J.A. at 1082 (citation omitted). The last sentence of this passage directly challenges the assumptions of the market penetration algorithm: DOE interpreted the study to suggest that higher energy prices "appear not to change the decision criteria" of consumers, while the algorithm assumes "that the consumer *criteria* for selecting energy efficiency will change as energy prices rise." *Id.* at 144 (emphasis in original), J.A. at 1081.

DOE's interpretation of the thermal integrity study changed as the rulemaking progressed. In the April 1982 notice, DOE decided that the study "involved circumstances sufficiently dissimilar to render its results inconclusive in the appliance context." 47 Fed.Reg. 14,424, 14,428 n. 13 (1982) (citation omitted). By the August 1983 notice, DOE had yet a different view:

> The study indicated that, while investment in thermal integrity in electrically heated homes showed little change in implicit discount rates over the period 1973–1979, the implicit discount rates for those investments in gas-heated homes declined 15 to 20 percent. Inasmuch as the real price of gas increased almost five times as rapidly during the period as that of electricity, and the initial implicit discount rates for electricity were only a fraction of the initial implicit discount rates for gas, such a differential in changes in implicit discount rates between gas and electricity is explainable. While DOE tentatively characterized this reduction in implicit discount rates as relatively small in the April 1982 proposal, upon further analysis DOE believes such a characterization is inapt. First, [t]hermal integrity improvements are almost entirely made by "third party" builders of new housing, and therefore market imperfections in this type of investment would tend to be greater than for products directly purchased by the ultimate consumer. Second, there is no labeling program for such improvements. Third, such reductions in discount rates are not inconsistent with those projected for some appliances by the ORNL model over the same period of time. More importantly, upon reconsideration of the tentative conclusion to be derived from this study [contained in the passage quoted above from the 1982 Economic Analysis Document], DOE has determined that the results of the study support the concept of the reduction of market distortion as a result of rising energy prices.

48 Fed.Reg. 39,376, 39,382 n. 25 (1983). DOE thus finally settled on the view that the study, "while certainly not conclusive, does suggest that higher fuel prices may lead to less market distortion." *Id.* at 39,-382 (citation and footnote omitted).

DOE's analysis of a technical engineering study is entitled to great deference from judges, who are hardly equipped to match the expertise of DOE's scientists. Although we are concerned by DOE's shifting position as the rulemaking proceeded and the market penetration algorithm came under increasing attack, we are unable to say that DOE's use of the thermal integrity study was arbitrary or irrational. Whether the 15 to 20 percent decline in the implicit discount rate for gas-heated homes was significant and what weight should be given to reasons why that discount rate might be particularly resistant to changes were questions addressed to the informed judgment of DOE scientists and policymakers. We cannot hold that DOE acted unreasonably in concluding that the study furnished some support, although concededly not unequivocal or decisive support, for the factual assumptions embedded in the market penetration algorithm.

DOE also believed that high energy prices would tend to counteract some major causes of market failure in the appliance market. For example, appliances are often purchased by landlords, builders of new homes, and other "third-party purchasers" who will not pay the fuel bills. Such purchasers have an incentive to minimize the initial purchase price by buying initially inexpensive but inefficient appliances with high life cycle costs. DOE believed that as energy prices went up, consumers would be more likely to demand energy-efficient housing units. These market pressures might consequently work to correct an important source of market distortion.[31] Similarly, DOE acknowledged evidence that at least for some appliances, its labeling program had been only modestly effective.[32] In DOE's view, higher energy prices would spur more consumers to consult the labels and thereby diminish market distortion.[33]

DOE sought to confirm these general views and to verify the algorithm's specific formula for declining market distortion by testing the algorithm against past experience. As the designers of the ORNL model conceded, the algorithm's formula was initially "ad hoc; it lacks a theoretical basis and empirical validation." E. Hirst & J. Carney, The ORNL Engineering-Economic Model of Residential Energy Use 71 (1978). *But cf. id.* at 44 (although further efforts were required to validate algorithm, it yields "results that are intuitively plausible"). However, DOE's tests provided

**31.** In its interpretation of the thermal integrity study, DOE implied that the market in appliances often purchased by third parties might be more resistant than the market in other appliances to price-induced reductions in market distortion. *See supra* at 1388. That view is in some tension with DOE's equivocal suggestion in support of the market penetration algorithm that this same source of market distortion was particularly likely to decline as fuel prices increased. *See* 48 Fed.Reg. 39,376, 39,382 & n. 21 (1983). Perhaps, in discussing the market penetration algorithm, DOE meant to suggest that users of appliances purchased by third parties pay little attention to the efficiency of those appliances until energy prices become quite high. Once a particular price level is reached, high energy prices might abruptly trigger the attention of users, and users might then pressure third-party purchasers to buy more efficient products. As DOE acknowledged, this possibility is at the very best a "logical" inference, 48 Fed.Reg. at 39,383, rather than an empirical-

ly supported projection. In any event, we believe that the shakiness of some subsidiary arguments DOE offered does not fatally undermine the assumptions of the algorithm.

**32.** The labeling program for furnaces was viewed as particularly troubled, *see* 48 Fed.Reg. at 39,382, because furnaces, unlike other covered products, were "labeled" with informational fact sheets rather than labels affixed to the product. *See, e.g.,* Comment No. 2105 at 27 (June 16, 1982) (Association of Home Appliance Manufacturers), J.A. at 4989.

**33.** DOE also noted that many covered products, such as furnaces and water heaters, are often replaced when they fail. In such a situation, consumers are likely to be principally concerned with obtaining a prompt replacement, rather than minimizing life cycle costs. *See* 48 Fed.Reg. at 39,382. DOE did not offer any specific account of how increased fuel prices might diminish this source of market distortion.

inconclusive for at least two reasons. First, DOE discovered that it could not obtain the market information required by the algorithm for any year before 1978. DOE attempted to estimate the necessary figures, but it was concerned that incorrect estimates might bias its tests. Second, DOE's efforts to verify the algorithm uncovered basic difficulties in DOE's procedures:

> [T]he scientists who developed the test designed it to measure changes in implicit discount rates, rather than changes in market distortion. In the course of making initial test runs, however, DOE discovered that under certain circumstances relatively minor changes in market distortion could result in drastic changes to the implicit discount rate. The clear implication of this was that implicit discount rates were not a good shorthand for market distortion, and that the test of the algorithm, if run in this manner, would be virtually useless because major deviations in the projected implicit discount rates from "actual" rates would not establish that the algorithm was inaccurate. Finally, in the course of the initial test runs and a general review of the ORNL Model, it was determined that a problem existed in the ORNL Model's life cycle cost-efficiency curve, which has the effect of tending to exaggerate the market distortion in future years. That is, separate from the disputed formula that reduces market distortion as a function of rising energy prices, the algorithm has a bias toward a larger than appropriate market distortion.

48 Fed.Reg. 39,376, 39,383 (1983) (footnotes omitted). DOE's scientists believed that lengthy study would be required to solve these problems. *See id.* at 39,383 & n. 30.

Because of "the time that would be required for the analyses, the doubtful usefulness of the conclusions that would be reached, and the limited effect of the market penetration algorithm" on the results of the rulemaking, *id.* at 39,383 (footnote omitted),[34] DOE decided not to delay the rulemaking while its scientists studied the algorithm further. However, DOE noted that it continuously reviews the ORNL model and market penetration algorithm for purposes unconnected with this rulemaking. DOE declared that if it discovered flaws in the model that might have affected the final rules under review, it would immediately reconsider the final rules. *See id.* at 39,384. No such reconsideration has been announced.

DOE's efforts to verify the algorithm empirically thus proved disappointing. Moreover, the remaining support for any general correlation between market distortion and fuel prices, let alone the specific relationship described in the algorithm, was largely conjectural and anecdotal. Commenters pointed out these shortcomings at length, but they did not show that any other method of predicting future market distortion—including the assumption that it would remain stable—would produce demonstrably more accurate predictions. In short, DOE attempted to solve the difficult predictive problem before it through use of an independently created econometric model which had received favorable notice in technical literature. *See id.* DOE responsibly addressed alleged defects in the model by changing the model or explaining why the defects were both extremely difficult to fix and of relatively minor moment to the rulemaking. Our comments about review of a computer model in a previous case apply here as well:

---

**34.** DOE ran three sensitivity analyses that replaced the market penetration algorithm's assumptions about changes in market distortion with three alternative assumptions. Specifically, the analyses assumed respectively that the historical trend in the efficiency of a particular appliance would continue; that the efficiency of the appliance would remain constant; and that the implicit discount rate for the appliance would immediately double, and that doubled

figure would then remain constant. *See* 47 Fed. Reg. 57,198, 57,201 (1982). The results of these analyses for standards at level 4 are included in the final rules for each product type. *See, e.g., id.* at 57,210; *id.* at 57,212. By eliminating the disputed assumptions from the model outputs, these analyses show the carrying extent to which the assumptions influenced the model's predictions.

The safety valves in the use of such sophisticated methodology are the requirement of public exposure of the assumptions and data incorporated into the analysis and the acceptance and consideration of public comment, the admission of uncertainties where they exist, and the insistence that ultimate responsibility for the policy decision remains with the agency rather than the computer. With these precautions the tools of econometric computer analysis can intelligently broaden rather than constrain the policymaker's options and avoid the "artificial narrowing of options that [can be] arbitrary and capricious."

*Sierra Club v. Costle,* 657 F.2d 298, 334–35 (D.C.Cir.1981) (footnote omitted).

In this case, the uncertainties underlying modeling assumptions were perhaps greater, and the factual basis for the assumptions correspondingly scanter, than in many others. But DOE's interpretation of the statute required it to hazard some predictions of market distortion, and at the time the final rules were issued the empirical foundation for any such predictions would evidently have been insecure. Under the principles of *Sierra Club,* we therefore decline to reject DOE's use of the ORNL model to predict energy savings, although DOE must change its unlawful definition of "significant" savings. Our decision does not, of course, mean that in the future DOE may continue to rely on the market penetration algorithm and the ORNL model if further study in light of more complete information shows the model's predictions to be unreliable.[35] *Cf. National Lime Ass'n v. Environmental Protection Agency,* 627 F.2d 416, 454 (D.C.Cir. 1980). "Recognizing that policymaking in

a complex society must account for uncertainty, ... does not imply that it is sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Life Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2871, 77 L.Ed.2d 443 (1983); *cf.* 1 Davis, Administrative Law Treatise §§ 6:13, :16 (2d ed. 1978). DOE may resolve even substantial factual uncertainties in the exercise of its informed expert judgment; but it may not tolerate needless uncertainties in its central assumptions when the evidence fairly allows investigation and solution of those uncertainties.

## IV. MAXIMUM TECHNOLOGICAL FEASIBILITY

### A. The Statute

EPCA requires that DOE "shall determine the maximum improvement in energy efficiency that is technologically feasible for each type (or class) of covered products." EPCA § 325(i)(3). DOE's standards "shall be designed to achieve the maximum improvement in energy efficiency which the Secretary determines is technologically feasible and economically justified." EPCA § 325(c). If DOE's standard is not set at the maximum technologically feasible level, DOE "shall state in the proposed rule the reasons therefor." *Id.* § 325(i)(3). Finally, if the establishment of a standard is not technologically feasible or economically justified, the Secretary is directed not to issue a standard. *See id.* § 325(c).

The statute thus establishes a clear decisionmaking procedure. DOE must first identify, for all product types or classes,

---

**35.** For example, in the August 1983 notice DOE commented that it had recently received a preliminary, undocumented report on the accuracy of the ORNL model. *See* 48 Fed.Reg. 39,376, 39,384 n. 34 (1983). That report apparently gave the model mixed reviews. *See id.* We assume that DOE will carefully consider the most recent investigations of the model before using its forecasts in future rulemakings. "Though this court in the past has approved agency use of predictive economic models ..., we have always stressed that the agency must

make 'a conscientious effort to take into account what is known as to past experience and what is reasonably predictable about the future' to monitor whether the model's assumptions work in practice." *City of Charlottesville v. Federal Energy Regulatory Comm'n,* 661 F.2d 945, 954–55 (D.C.Cir.1981) (concurring opinion) (quoting *American Pub. Gas Ass'n v. Federal Power Comm'n,* 567 F.2d 1016, 1037 (D.C.Cir. 1977)). That observation was offered in a ratemaking case, but we think it is equally pertinent here.

the maximum improvement in energy efficiency that is technologically feasible. If a standard at that level would be economically justified, DOE must set the standard there. If a standard requiring the maximum technologically feasible level would not be economically justified, DOE must set the standard at the highest level that is both technologically feasible and economically justified. *See id.* § 325(b)(2), (c).[36] In that event, EPCA requires DOE to explain specifically why a standard achieving the maximum technologically feasible improvement in efficiency was rejected. *See id.* § 325(i)(3).

The legislative history is clear on the meaning of maximum technological feasibility. The NECPA Senate report declared that " '[f]easible' is defined in the conference report accompanying [EPCA as originally enacted] to mean 'capable of being carried out.' The committee agrees with this definition." S.Rep. No. 409, 95th Cong., 1st Sess. 63 (1978). Thus, the phrase "technologically feasible" in NECPA carries over the meaning of the phrase as it was used in the original EPCA requirement that labeling rules be technologically feasible. The EPCA conference report quoted by the NECPA Senate report declared that "[t]he term feasibility is used in the strict sense, namely, 'capable of being carried out.' " S.Rep. No. 516, 94th Cong., 1st Sess. 172 (1975), U.S.Code Cong. & Admin.News 1975, p. 2014. Similarly, the House report on EPCA noted that a "determination of ... technological infeasibility is intended to provide the narrowest possible grounds for refusing to prescribe a labeling rule." H.R.Rep. No. 340, 94th Cong., 1st Sess. 97 (1975), U.S.Code Cong. & Admin.News 1975, p. 1859.

## B. *DOE's Treatment of Maximum Technologically Feasible Levels*

In the June 1980 proposed rules, DOE set forth the following general approach to maximum technological feasibility:

DOE believes that for 1986, product designs in prototype form [by] January 1980 represent the maximum technologically feasible products. Although there will be advances in development beyond some of these levels over the next 6 years, DOE believes that these developments could not be demonstrated as technologically feasible in that the long lead times would not allow such products to be introduced into the market by 1986.

Even though manufacturers have prototypes in the January 1980 time frame, it is not practical to expect a complete product line transformation considering product development cycle of engineering, prototype fabrication, laboratory testing, field testing, production engineering and production facility modification. As a result it is not realistic to expect that in 1986 the manufacturer would be able to produce only those products whose energy efficiency is equal to or greater than the maximum technologically feasible. Consequently, DOE has determined that it is not economically justifiable to propose energy efficiency standards at the maximum technological limit.

45 Fed.Reg. 43,976, 43,984 (1980). For these reasons, DOE announced that the "design options considered [as a basis for standards] were limited to those based on 'available' technology, defined as those technologies presently implemented in units available in the marketplace." *Id.*

These quotations reflect two crucial findings for this rulemaking. First, DOE determined that designs in prototype form by January of 1980 could be brought to market by 1986, when final standards were expected to take effect. DOE accordingly based its proposed determinations of maximum technologically feasible improvements on prototypes, as well as on design options actually used on appliances that were commercially available by January of 1980. EPCA § 325(b)(2).

---

**36.** Of course, standards must also meet the separate requirement of significant savings. *See*

Second, DOE determined that manufacturers could not reasonably be expected to use any design option available only as a prototype in 1980 on *all* appliances within a product type or class. A standard would, of course, be mandatory for all products of the type or class to which the standard applied. DOE therefore concluded from its second finding that in formulating standards it should consider only technologies included in appliances actually sold in 1980. In effect, DOE declared that all design options available only as prototypes in 1980 were economically unjustified as the basis for 1986 standards. That general rule applied regardless of the individual characteristics of the prototype design, the time needed to include any particular prototype design in a specific line of products, or the product type or class involved.

The June 1980 notice proposed specific maximum technologically feasible efficiency levels for each product type or class based on both prototypes and commercially available design options. These levels were expressed as measurements of the maximum efficiency attainable by the various products, as gauged by DOE-approved test procedures. *See, e.g.,* 45 Fed.Reg. 43,-976, 43,986 (1980) (Table 4.1–3); *id.* at 43,-989 (Table 4.2–3). DOE also identified efficiency levels for consideration as standards, based only on efficiencies attainable by commercial available design options. Finally, DOE examined those possible standards for economic justification, and proposed standards for all product types that, in the opinion of DOE, were technologically feasible and economically justified, and produced significant conservation of energy. *See supra* note 15.

In April of 1982, DOE published a new notice of proposed rulemaking. *See* 47 Fed.Reg. 14,424 (1982). In it, DOE followed the basic approach of the June 1980 proposed rulemaking: the 1982 notice proposed efficiency levels for consideration as standards based on design options that

were commercially available in 1980, and then considered whether standards at those levels would be economically justified and conserve significant energy. However, DOE's 1982 reexamination of the technical information supporting the 1980 rule produced lower levels as candidates for standards.[37] DOE also radically revised its analysis of economic justification and significant conservation and determined that no standard for any covered product saved significant energy and was economically justified.

The June 1980 notice had at least proposed a maximum technologically feasible level, although it immediately rejected standards at that level. The April 1982 proposed rulemaking, however, did not even go that far: it simply failed to acknowledge or comment on the statutory requirement that DOE determine maximum technologically feasible levels. The final rules announced in December of 1982 and August of 1983 also neglected to adopt, discuss, or reject DOE's 1980 determinations of maximum technologically feasible levels or to consider standards based on those levels.

In the August 1983 rulemaking, however, DOE did try to defend its refusal to consider standards based on all technologically feasible design options against objections by NRDC, Consumers Union, and others. First, DOE asserted that the economic information necessary to analyze prototype models and models available only in foreign markets as the basis for standards was simply unavailable. *See* 48 Fed.Reg. 35,376, 39,379 (1983). DOE also noted that EPCA does not permit DOE to issue a standard for a product type or class unless an approved test procedure for that product type or class existed. DOE conjectured that existing test procedures might be inadequate to evaluate prototype models, although it did not specifically determine that any or all of the prototypes described

---

**37.** DOE commented that one of the two principal reasons that the energy savings predicted to result from standards were smaller under the April 1982 proposal than under the June 1980 proposal was that DOE had lowered the standard levels analyzed. *See* 47 Fed.Reg. 14,424, 14,427 (1982).

by commenters could not be tested using those procedures. *See id.* Finally, DOE also argued that it did not have enough time to analyze technology that became commercially available after November 14, 1980 in developing rules issued during 1982 and 1983. *See id.*

DOE also used other broad rules governing its consideration of design options as a basis for standards. For example, in 1980 DOE decided not to consider design options that were likely to require a significant increase in the manufacturer's engineering staff. DOE also preferred energy-saving design options that manufacturers could introduce on their appliances as quickly as possible over other options that might arguably have resulted in greater energy conservation. *See* 45 Fed.Reg. 43,976, 43,983–84 (1980).

In addition, in 1982 DOE overturned one of its 1980 decisions in a way that narrowed the design options considered as a basis for standards still further. DOE initially intended to evaluate all options with a "payback period" shorter than the average life of the appliance. *See id.* at 43,983. The payback period for an energy-saving design option is the length of time it takes an average consumer to recover the higher purchase price the consumer paid to obtain the design option through the lower cost of energy used to operate the appliance. However, in 1982 DOE decided it would generally confine its analysis to design options with a payback period of less than 5 years. *See* 1982 Economic Analysis Document § 2.2.1 at 8, J.A. at 945. All options with a payback period exceeding 5 years were discarded as economically unjustified, even though DOE did not specifically weigh the benefits and burdens of those design options under the statutory criteria for economic justification.

## C. *DOE's Compliance with EPCA*

Petitioners attack DOE's treatment of maximum technological feasibility on three related grounds. First, they argue that DOE never adopted any determinations of maximum technologically feasible levels, as

EPCA required it to do. Second, they argue that DOE's decision to consider only certain commercially available design options as the basis for standards violated DOE's statutory duty to evaluate standards at the maximum technologically feasible levels. Third, they argue that DOE's decision to prescribe rules in 1982 and 1983 founded on information about appliances sold in 1980 unreasonably rejected more current information. We examine these challenges in turn.

### 1. *DOE's Failure to Determine Maximum Technologically Feasible Levels*

As we have observed, EPCA requires DOE to determine maximum technologically feasible levels for all product types and classes. *See* EPCA § 325(i)(3). If a standard is not prescribed at that level, DOE must specifically explain the reasons for its decision. *See id.* Under the statute, only two basic reasons are acceptable: DOE must find either that a standard at the maximum technologically feasible level would not be "economically justified," under the detailed definition of that term in EPCA, or that such a standard would not conserve significant energy. *See id.* § 325(c), (i)(3).

DOE's June 1980 proposed rulemaking did set forth maximum technologically feasible levels for comment. The 1980 notice did not satisfy the statutory requirement that DOE *determine* those levels, however, since DOE could only make such a determination after providing interested outsiders with the opportunity to comment. As it turned out, the proposed levels simply never resurfaced during the rulemaking, and consequently DOE never made the required determinations. DOE contends that it did ultimately adopt the maximum technologically feasible levels proposed in the June 1980 notice, *see* DOE Br. at 37–38, but DOE's citations do not support its claim. DOE first directs us to its April 1982 notice of proposed rulemaking, which under the heading "Technological Feasibility" notes that "[f]or all prod-

ucts and classes of products, DOE believes the efficiency levels analyzed are technologically feasible." 47 Fed.Reg. 14,424, 14,426 (1982). This passage simply notes that the standard levels analyzed—levels based on analysis *excluding* technologically feasible prototype designs—were technologically feasible. *See supra* note 39. The passage does not determine that standards *higher* than those analyzed would not also be technologically feasible, and it certainly cannot be read as endorsing the June 1980 determinations.

Next DOE points to a technical support document prepared by one of its contractors. *See* U.S. Department of Energy, Consumer Products Efficiency Standards: Engineering Analysis Document A–2, E1–1 to E9–5 (1982) [hereinafter cited as 1982 Engineering Analysis Document], J.A. at 1568, 1804–42. Normally, we would expect to find determinations that Congress expressly ordered DOE to make in the *Federal Register*, not in a technical support document such as the one DOE cites. In any event, the cited passages in the document do not in fact approve the June 1980 determinations. The very page cited by DOE *disclaims* any intention to comment on the maximum technologically feasible levels:

> The previous [draft of the] Engineering Analysis contained discussions of the maximum technological feasible efficiency level[s]. . . . Discussion regarding standards levels have [sic] been removed at DOE's request. *All of these discussions have been omitted from this T.S.D.* [technical support document] as they were inconsistent with the intent of this document which is to present the engineering basis to the cost efficiency data.

*Id.* at A–2, J.A. at 1568 (emphasis added).

DOE also attempts to explain its failure to determine the maximum technologically feasible levels in a different way. DOE announced in its June 1980 rulemaking that in light of the time required for "product development cycle of engineering, prototype fabrication, laboratory testing, field testing, production engineering and produc-

tion facility modification," 45 Fed.Reg. 43,-976, 43,984 (1980), manufacturers could not reasonably be expected to incorporate prototype designs into entire product lines within the 5-year phase-in period for standards. In effect, DOE declared that a standard based on prototypes would not be economically justified because such a standard would require manufacturers to do what could not reasonably be done in the time available. It thus would be pointless to determine maximum technologically feasible levels based on prototypes and analyze standards at those levels, since DOE already knew that no such standard could pass the statutory criterion of economic justification. On this theory, DOE says it reasonably confined its analysis to efficiency levels that might actually be prescribed as standards.

Moreover, DOE has suggested that the further analysis petitioners demand would be not only superfluous, but impossible. DOE claimed that it needed a detailed breakdown of manufacturing costs for a design option to determine whether a standard based on that option would be economically justified. According to DOE, this information was simply unavailable for prototypes, as well as for design options included on appliances sold only in foreign markets. Thus, even assuming manufacturers could change their product lines within 5 years to meet standards based on prototypes, DOE could not determine whether such standards met the statutory criteria. DOE met this problem by resolving the uncertainty against standards; it elected not to prescribe standards based on prototypes because in its view it could not ascertain whether such standards would be economically justified.

 There are serious objections to DOE's arguments. They do not establish that DOE complied with the statute, which on its face requires actual determinations of maximum technologically feasible levels and specific explanations if standards are not set at those levels. Instead, DOE seeks to show that its transgression did not affect the final rules, because DOE could

never have prescribed standards at maximum technologically feasible levels anyway. However, an agency may not ignore the decisionmaking procedure Congress specifically mandated because the agency thinks it can design a better procedure. Nor is it clear that DOE's adoption or modification of the June 1980 proposed determinations would have had no value. If DOE had followed the statute, it would have been able to calculate how much energy standards set at the maximum technologically feasible levels as finally determined would have saved. That information, in turn, would show the potential energy conservation DOE sacrificed when it refused to estimate whether standards based on prototypes would be economically justified. If the conservation sacrificed were large, DOE might have been moved to change its procedures; at the very least, DOE and commenters would have seen what potential gains in efficiency and what potential energy savings were lost by DOE's approach.[38]

But even if one ignores these defects in DOE's defense of its rulemaking, its arguments remain vulnerable on two scores. First, the argument conclusively assumes that manufacturers cannot incorporate *any* prototypes for *any* product type or class into all appliances of that type or class within the 5-year period. Second, it assumes that DOE could not reasonably decide whether standards based on prototypes were economically justified; and that consequently DOE could refuse to consider any standard based on prototypes at all. If these central assumptions fall, then DOE's argument collapses.

Deciding whether these assumptions are accurate requires us to pass beyond the formal attack on DOE's failure to determine maximum technologically feasible levels and to confront directly the petitioners' second challenge on the issue of technologi-

cal feasibility. Accordingly, we turn to that challenge.

### 2. *DOE's Refusal to Consider Standards Based on All Technologically Feasible Design Options*

Petitioners claim that DOE refused to analyze standards based on all technologically feasible design options without any adequate determination that standards based on those options would not be economically justified. In particular, petitioners note that DOE did not assess standards based on certain categories of design options, although those categories qualify as technologically feasible under DOE's own definition of the term. Those categories are (a) prototypes, (b) design options included only on appliances not sold in the United States, (c) design options with a payback period of 5 years or more, (d) certain design options that would require a significant increase in the engineering staff of appliance manufacturers or that had long lead times, and (e) certain design options specifically identified by commenters that DOE rejected as a basis for standards on grounds petitioners deem inadequate. We address each of these categories separately.

■ a. *Prototypes.* As we have stated, DOE's rationale for rejecting prototypes depended on two factual assumptions. The first of these is that no design option available only as a prototype in 1980 could reasonably be included on all appliances sold in 1986 within any product type or class. EPCA requires that in determining whether a standard is economically justified, DOE consider, among other factors, "the economic impact of the standard on the manufacturers." EPCA § 325(d)(1). If no standard could have been based on prototypes without requiring manufacturers to accomplish the impossible, we agree that DOE could reasonably deem all such standards economically un-

---

**38.** In addition, determinations of maximum technologically feasible levels, by describing and assessing in detail the most advanced available appliance technologies, might well have been useful beyond their immediate purpose at this stage of the present rulemaking.

justified without trudging through the remaining statutory factors.[39]

In our view, DOE's finding that manufacturers could not meet *any* standard based on prototype technologies for *any* product type or class is not supported by substantial evidence. Congress broadly defined technological feasibility to mean improvements in efficiency "capable of being carried out," *see supra* at 1391–92—an inclusive definition motivated by Congress' concern over "the rather low efficiencies of current consumer products." S.Rep. No. 409, 95th Cong., 1st Sess. 36 (1977). DOE's 1980 decision that prototypes were technologically feasible thus rests on solid ground.[40] But DOE's exclusion of all prototypes from consideration for standards took away with one hand what the other had given. That decision guaranteed that standards could do no more than require all products to be as efficient as the most efficient design options already in the market made possible, even though enactment of the appliance program rested on the view that the market had failed to promote efficient appliances.

In these circumstances, DOE cannot prevail merely by asserting that *many* or even *most* prototypes could not workably have been included within 5 years in all products of a particular type or class. Even assuming that this is true, a minority of prototypes would remain as technologically feasible and, for all DOE knew, economically justified design options that were *not* considered in the agency's deliberations. EPCA does not permit DOE to ignore design options meeting those two criteria. DOE must therefore show that substantial evidence supports its implicit determination that all or virtually all prototypes would have taken more than 5 years to introduce throughout a product type or class.

**39.** DOE did designate an alternative efficiency level, called level 4, for some covered products. Level 4 standards did take account of some efficiency-improving design options that were not commercially available in 1980. *See supra* note 22. DOE's final rules discussed level 4 standards for clothes dryers, *see* 47 Fed.Reg. 57,198, 57,210; ranges and ovens, *see id.* at 57,212; furnaces, *see* 48 Fed.Reg. 39,376, 39,394–95 (1980); room air conditioners, *see id.* at 39,398; and central air conditioners, *see id.* at 39,402–06. Level 4 standards were not identified for refrigerator-freezers, freezers, and water heaters.

Thus, for the latter three appliances DOE did not evaluate any standard based on design options that were commercially unavailable in 1980. For other appliances, DOE did consider such a standard, but the levels assessed were well below the maximum technologically feasible levels proposed in 1980. *Compare, e.g.,* 45 Fed.Reg. at 43,996 (maximum technologically feasible levels for room air conditions) *with* 47 Fed.Reg. at 14,445 (identifying level 4 standard for room air conditioners); 45 Fed.Reg. at 44,001 (maximum technologically feasible levels for central air conditioners) *with* 47 Fed.Reg. at 14,449 (level 4 for central air conditioners). DOE's limited assessment of level 4 standards for some product types therefore did not substantially modify DOE's general policy of declining to decide whether standards based on prototypes would be economically justified.

**40.** Some of the intervenors suggests that a design option is not technologically feasible unless it is "commercially workable." As prototypes, on this theory, are not commercially workable, they are also not technologically feasible, and DOE was not required to consider them in setting maximum technologically feasible levels or in evaluating possible standards. *See* Br. of Intervenors Association of Home Appliance Manufacturers *et al.* at 25–30 [hereinafter cited as AHAM Br.]. The short answer is that DOE expressly defined technological feasible improvements in efficiency to include improvements achieved by prototypes. *See supra* at 1392–1393. As we may sustain the agency's decision only on the rationale it offered, we cannot uphold the agency's result by adopting the new definition intervenors propose.

We do not, however, hold that DOE is inflexibly bound to its current definition of maximum technological feasibility, although any revision of that definition must be consistent with Congress' declaration that a design is technologically feasible if it is capable of being carried out. *See supra* at 1392. Any revision of that definition must also take account of Congress' instruction that DOE should evaluate considerations that are in essence economic rather than technological through DOE's separate assessment of economic justification. For instance, if DOE found on adequate evidence that manufacturers clearly could not, within the limits of advanced technology likely to be available, mass-produce a particular prototype or class of prototypes, DOE might be justified in determining that standards based on such a prototype or class of prototypes would not be technologically feasible.

We do not think that DOE has succeeded in that task. DOE's announcement of its position in the June 1980 notice contains no discussion of any evidence or citation to DOE studies. DOE's 1980 Economic Analysis Document recites essentially the same assumption about the lead time for prototypes as DOE stated in its notice, but the document discloses no serious effort to confirm that assumption through empirical study.[41] Moreover, DOE's assumption is in tension with the congressional finding that appliances already available in an unregulated market were simply not efficient enough to satisfy national policy goals. Congress designed the 5-year phase-in period precisely so that manufacturers could introduce new technologies required by standards.[42] In light of the potentially large number of technologically feasible design options that this single assumption excluded from consideration, we think that DOE was required to make a more thorough effort to confirm its abstract theory.

Numerous commenters in the rulemaking challenged DOE's exclusion of prototypes from consideration and in some instances offered specific prototypes for evaluation. In responding, DOE made little effort to argue that manufacturers could not modify particular product lines to incorporate a specific prototype within 5 years. Instead, DOE typically argued either that it lacked economic information about the prototype or that the use of the prototype on all appliances within a product type or class might compromise product performance or consumer acceptance. *See, e.g.,* 48 Fed.Reg. 39,376, 39,395 (1983) (re-

jecting prototype gas water heaters); 47 Fed.Reg. 57,198, 57,211 (1982) (rejecting biradiant ovens). Without something more than DOE's general and unelaborated concerns, we cannot uphold the crucial assumption that absolutely no prototypes could be made standard items for any product type or class within 5 years, when DOE did not show that this all-encompassing view was true even for the specific prototypes suggested to it.

Finally, it is not at all intuitively clear that DOE's assumption is likely to prove true. DOE was willing to consider standards based on design options included on a single appliance produced by a single company for sale in the United States before November 14, 1980. By including such design options in its deliberations, DOE acknowledged that other manufacturers might be able to comply with a standard based on design options that were not included on any appliances produced by those manufacturers in 1980. In other words, DOE thought that 5 years would sometimes be long enough for a manufacturer to redesign an entire product line and retool its manufacturing processes to incorporate a design option previously used only by one of its competitors. Nonetheless, DOE conclusively presumed that 5 years was not long enough to redesign and retool in order to incorporate any design option available only as a technologically feasible prototype, without regard to the characteristics of any particular prototype. We understand, of course, that the chance to observe a competitor's experience with a de-

---

**41.** The 1980 Economic Analysis Document states that "[f]or the analysis, the design options considered were limited to those based on 'available' technology defined as those technologies presently incorporated in units available in the marketplace at least in limited production quantities." 1980 Economic Analysis Document § 2.1.1 at 2–3, J.A. at 378. DOE sets forth this basic assumption in the section defining the scope of the document; the document does not defend the assumption in light of the statutory criteria for standards.

**42.** *See* EPCA § 325(c). The five-year phase-in period responded to repeated requests from appliance manufacturers that they be allowed ade-

quate lead time to comply with standards. *See, e.g.,* Hearings Before the Subcommittee on Energy Conservation and Regulation of the Senate Committee on Natural Resources, 95th Cong., 1st Sess. 264 (1977) (statement of an official of the Air-Conditioning and Refrigeration Institute); *id.* at 275 (statement of Truman B. Clark, Gas Appliance Manufacturers Association). EPCA authorized a phase-in period of up to five years, and in 1979 DOE decided to allow the full period so that manufacturers could "meet higher final standards than might otherwise be the case were a shorter period adopted." 44 Fed. Reg. 49, 52 (1979).

sign option could easily shorten a manufacturer's design and development time. Nonetheless, the exact length of that design and development time will logically depend on the particular prototype at issue. In the absence of careful analytic study of lead times for design changes in particular products, we cannot uphold DOE's blanket announcement that manufacturers would not have enough lead time to comply with any standard for any covered product based on any prototype at all.

We must therefore examine the alternative factual assumption on which DOE founded its exclusion of prototypes. This assumption was that for all prototypes, DOE could not obtain the information about manufacturing costs and consumer acceptance it needed to decide whether a standard based on that prototype design was economically justified.

We return once again to the statute for guidance. Although EPCA generally requires DOE to prescribe the highest standard that is technologically feasible and economically justified, the Act also states that DOE may not prescribe a standard covered product "if a test procedure has not been prescribed ... with respect to that type (or class) of products." EPCA § 325(b)(1). Section 323 of EPCA requires DOE to prescribe test procedures for all covered products, which must "be reasonably designed to produce test results which reflect energy efficiency, energy use, or estimated annual operating cost of a covered product during a representative average use cycle." EPCA § 323(b)(1). Similarly, the legislative history for EPCA as originally passed notes that DOE could decline to prescribe a labeling rule if "no test procedure which is an adequate approximation of energy use or relative energy efficiency can be devised." H.R.Rep. No. 340, 94th Cong., 1st Sess. 97 (1975), U.S.Code Cong. & Admin.News 1975, p. 1859. EPCA thus expressly recognizes that DOE may delay the issuance of a standard based on a particular design option if DOE is unable to measure the efficiency of an appliance incorporating that design option.

However, the text of the Act includes no parallel provisions allowing DOE to reject standards because it cannot precisely quantify costs relevant to DOE's assessment of economic justification. Instead, EPCA lists the following general considerations as relevant to DOE's assessment of a proposed standard:

(A) whether the standard to be prescribed is economically justified (taking into account those factors which the Secretary must consider under subsection (d) of this section),

(B) whether the standard will achieve the maximum improvement in energy efficiency which is technologically feasible,

(C) if the standard will not achieve such improvement, whether the reasons for not achieving such improvement are adequate, and

(D) whether such rule should prescribe a level of energy efficiency which is higher or lower than that which would otherwise apply in the case of any group of products within the type (or class) to be subject to such standard.

EPCA § 325(i)(3). EPCA further requires DOE to weigh the following factors in deciding whether a standard is economically justified:

(1) the economic impact of the standard on the manufacturers and on the consumers of the products subject to such standard,

(2) the savings in operating costs throughout the estimated average life of the covered products in the type (or class), compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard,

(3) the total projected amount of energy savings likely to result directly from the imposition of the standard,

(4) any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard,

(5) the impact of any lessening of competition determined in writing by the At-

torney General that is likely to result from the imposition of the standard,

(6) the need of the Nation to conserve energy, and

(7) any other factors the Secretary considers relevant.

EPCA § 325(d). DOE's claim is that it could not weigh these statutory factors for any prototype technologies.

The structure of the Act strongly suggests a congressional expectation that DOE ordinarily could and would estimate the economic justification for all technologically feasible design options. EPCA does not merely authorize DOE to decide, if the agency so chooses, whether technologically feasible standards would be economically justified: it instructs DOE to reach a decision on that question as the next step in the statutory decisionmaking procedure. DOE was required to design its methodology to fit the Act, rather than lopping off statutory provisions that did not fit the economic models it chose. Accordingly, we examine with particular thoroughness DOE's unorthodox excuse that it could not reasonably follow the text of the Act.

The NECPA legislative history shows that Congress was aware of the role projections and estimates were likely to play in the development of standards. For example, the conference report commented that:

The conferees recognize that some of the factors [the Secretary must weigh in assessing economic justification] cannot be quantified, such as "the need of the Nation to conserve energy." However, where quantification is possible, it is expected that the Secretary will perform such quantification of individual factors *to the greatest extent practicable.* The conferees do not intend that quantification of a factor inherently enhances its weight as against nonquantifiable factors. *Because the conference substitute requires the Secretary to weigh the factors, and because the increase in initial charges and any change in maintenance costs and energy savings will be quantified and compared,* the House

criterion [proposing a more specific test for economic justification] has been deleted.

S.Rep. No. 1294, 95th Cong., 2d Sess. 116 (1978) (emphasis added). Congress thus mandated quantitative analysis of the factors relevant to economic justification "to the greatest extent practicable." Congress did not, however, inflexibly require that DOE's forecasts be based on precisely and minutely verifiable details. Even more importantly, Congress flatly announced that DOE must first consider both the quantifiable and nonquantifiable statutory factors and must weigh those benefits and burdens against each other. Congress did not suggest that if DOE thinks it cannot quantify the factors precisely enough, it may refuse to make reasonable estimates of those factors, and on that ground refuse to perform the statutorily prescribed weighing.

All of this does not mean that if the statute requires DOE to consider projections that cannot reasonably be made, DOE must pretend that it has accomplished the unachievable. But it does strongly suggest that DOE's effort to follow these congressional directions was too perfunctory. DOE has told us that it needs manufacturer's assembly line costs for a design option to analyze the economic impact of a standard based on that design option. But we know nothing of any serious effort to determine whether these costs could be estimated for the full-scale working prototype models DOE refused to consider.

Moreover, DOE's explanation of its method for estimating the costs of commercially available technologies leaves it far from clear why that technique could not reasonably be adapted to any prototype models. DOE's basic approach was first to identify a "baseline" unit for each product type or class, which it defined as "the unit with an efficiency, output, and size approximately equal to that of the most commonly produced unit for the baseline year." 1982 Engineering Analysis at C–3, J.A. at

1575.[43] DOE then determined what design options were eligible for consideration as a basis for standards. Next, "using engineering analysis and computer simulations as appropriate, the efficiency improvements which would result from implementing various design options were estimated." *Id.* at C–4, J.A. at 1576; *cf.* 48 Fed. Reg. 39,376, 39,397–98 (1983) (discussing computer simulation predictions of efficiency levels likely to be achieved by particular design changes). Finally, DOE applied a combination of manufacturing information and general rules to arrive at a cost breakdown:

> Four basic cost elements (investment, materials, purchased components, and labor) were considered. Investment included capital equipment, plant, tooling, and an allowance for costs related to inventory, spare parts, line engineering, service training, and reissuing product literature. Per unit costs were estimated by amortizing these investment costs using the yearly production volume and depreciation periods of 30 years for plant, 10 years for capital equipment, 3 years for tooling and miscellaneous costs. Materials costs/unit were estimated by multiplying the estimated weight changes in materials identified in the design option analysis by the materials cost/pound. Costs/unit of purchased component[s] were based on quotes from suppliers. Although some larger manufacturers might make components such as compressors or vent dampers, these items were costed as purchased parts unless the majority of manufacturers made them in-house. Labor costs were obtained by estimating the change in labor in minutes for each design option and using a labor rate of $21.85/hour (direct cost plus burden). These four cost elements were summed to estimate the added factory cost.

1982 Engineering Analysis Document at C–4 to C–5, J.A. at 1576–77.

Several aspects of this discussion are relevant to the problem under examination. First, DOE does not report that it attempted to run its cost analysis on any particular prototype models and discovered that the effort required too much speculation. DOE excluded prototypes from its cost analysis as a threshold, preliminary step; it did not describe any actual experience in applying the analysis to prototypes. One might have expected that the difficulty of estimating manufacturing costs for a prototype could vary considerably depending on the design in question. For example, a prototype design utilizing a new combination of components already on the market could obviously be analyzed more easily than one requiring the manufacture of previously unproduced parts. This sort of specific analysis, however, is not reflected in the record.

Second, DOE evidently did not have precise, empirically derived manufacturing costs for the appliances it did consider as the basis for standards. DOE's method required it to identify energy-saving design options available on separately manufactured appliances within the same product type or class. DOE then hypothesized a baseline appliance to which the design options selected for consideration had been added, and calculated the benefits and burdens of the resulting composite "model." That composite, however, might well include a combination of design options that did not appear on any commercially available appliance; in fact, the composite model might not exist in reality at all. The record suggests that DOE relied in considerable part on computer simulations to predict the benefits and burdens of these imaginary appliances.

Essentially, DOE figured the manufacturing costs for its composite appliances by looking at manufacturing costs for different products that included the selected design options, estimating what part of the

---

**43.** In general, the baseline unit was "representative of the 1978 shipment weighted energy factor." 1982 Engineering Analysis Document at C–2, J.A. at 1574; *see also supra* note 22. "In a few cases, because of significant design changes between 1978 and 1980, baselines were selected from other model years." 1982 Engineering Analysis Document at C–2, J.A. at 1574.

manufacturing costs were attributable to the design options under study, and then including those estimates as part of the data used to generate total manufacturing costs for the hypothesized composite. If DOE could accomplish that task, it is unclear why DOE could not estimate the manufacturing costs for any full-scale, working prototypes at all. If, for example, a prototype consisted mainly of parts that were already manufactured for industrial use, DOE might have been able to estimate the assembly-line costs of the prototype using an additive approach similar to the one it adopted to estimate the cost of commercially available design options.

We acknowledged that with each step away from real-life information about benefits and costs, DOE's estimates would necessarily become less reliable. But on this record, we cannot tell whether cost estimates for full-scale, working prototypes would require more or less speculation than cost estimates for hypothesized appliances combining design options that are commercially available only on separate appliances produced by different manufacturers. In our view, the record does not disclose a fair investigation of whether DOE's methods, or reasonably practical methods of comparable reliability, could be adapted to measure the manufacturing costs of prototypes.

Third, DOE did not make individual cost determinations for important cost items in the manufacture of commercially available design options; instead, DOE applied general rules that might have been adapted to prototypes. For example, DOE used a standard labor rate, rather than investigating the particular cost of the labor required to effect specific manufacturing tasks. *See supra* at 1401. Thus, it is not clear exactly how far DOE carried its investigation of the costs particular manufacturers experienced in incorporating commercially available technologies into their products.

For these reasons, we conclude that nothing on the face of DOE's method for estimating manufacturing costs explains why those costs could not reasonably be estimated for prototypes. We do not, of course, presume to decide that whether DOE's method or reasonable alternatives to it in fact would have produced satisfactory results for some or all prototypes. All we decide is that the record does not show that DOE adequately investigated these questions and explained its results. Nor can we extrapolate from DOE's description of its analytic method any reason why that method is entirely ill-suited to the assessment of prototypes. DOE has thus failed to provide any explicit or reasonably inferred rationale for its assumption that it could not, as the statute required, evaluate all technologically feasible design options to determine which of those options could be used as the basis for economically justified standards. And, as we have stated, we are not here considering an incidental weakness in factfinding on the periphery of this rulemaking; we are considering a crucial determination at odds with the text and purposes of the statute. Viewing DOE's sweeping assumption in that light, we hold that it is not supported by substantial evidence.

DOE's last line of defense for its refusal to consider prototypes centers on the agency's speculation that existing test procedures might be inadequate to measure the efficiency of prototypes. But DOE never actually determined that the test procedures were inadequate for all or any of the prototypes suggested to it. DOE cannot simply guess that test procedures *might* be inadequate for some prototypes and for that reason refuses to evaluate *all* prototypes. The terms of the Act allow DOE to reject technologically feasible design options for consideration only if test procedures are *in fact* inadequate; and if test procedures are inadequate, DOE must attempt to devise new procedures. Because DOE never found that prototype design options were as a class untestable, we must reject this branch of DOE's rationale as

inadequately supported by DOE's own conclusions from the record.[44]

In summary, DOE's assumption that manufacturers could not within 5 years change all appliances within a product type or class to meet a standard based on prototype technologies is not, in our view, supported by substantial evidence. We also find that DOE has not identified substantial evidence supporting its view that no prototype could be analyzed to determine whether a standard based on it would be economically justified. Finally, we find that inadequate test procedures provide a basis for rejecting consideration of a design option only if, at a minimum, DOE actually finds that the test procedure cannot adequately measure the characteristics of the design option in question. DOE has not made this finding for any prototype, and thus DOE cannot on this record exclude all prototypes by reason of conjectured defects in the test procedures.

Two holdings follow from this reasoning. First, DOE's theory that its failure to determine maximum technologically feasible levels was in effect harmless error cannot be sustained, because DOE has not even produced substantial evidence for the two factual assumptions necessary to make a harmless error theory plausible. On remand, DOE must therefore finally determine maximum technologically feasible levels in accordance with the statute. Second, DOE may not rely on the very general arguments it offered in the rulemaking under review in support of its refusal to consider technologically feasible prototypes as a class in formulating standards.

For these reasons, we cannot accept the arguments DOE advanced for excluding prototypes as a class. We do not, of course, hold that any specific prototype could workably be the foundation for a standard. Nor do we hold that EPCA prevents DOE from determining that particular classes of prototypes cannot qualify as technologically feasible. If DOE does ex-

clude such classes of prototypes from consideration, however, that exclusion must rest on a stronger factual foundation than DOE supplied in this rulemaking. EPCA assigns DOE the job of gathering information relevant to these questions and making decisions. We hold only that DOE must do that job. DOE may not take a shortcut by discarding the entire class of prototypes in advance, despite its finding that prototypes qualify as "technologically feasible," through very abstract, unelaborated, and unsupported assumptions about prototypes.

■ b. *Foreign Market Design Options.* DOE's 1980 rulemaking stated that it would consider standards based on all technologies that were commercially available in 1980. However, DOE ultimately refused to analyze design options available only in foreign markets as a basis for standards.

[DOE] did not have detailed data for foreign designs not incorporated in domestic appliances and, therefore, could not analyze properly the impacts of standards based on foreign designs. Although some commenters criticized DOE for not analyzing standards using these technologies, DOE received little information on these designs. An additional problem with assessing foreign products was evident from the comments—disagreement and uncertainty as to the facts concerning the product. For example, NRDC and Whirlpool Corporation disagreed fundamentally over the capabilities of a particular Japanese refrigerator.

48 Fed.Reg. 39,376, 39,379–80 (1983).

DOE apparently wanted more specific information concerning both the manufacturing costs and performance characteristics of foreign-market appliances. What we have already said for prototypes also applies to foreign-market design options: the statute clearly instructs DOE to consider standards based on technologically feasible

---

**44.** Similarly, the appliance manufacturer intervenors worry that prototype designs will be based on proprietary designs. *See* AHAM Br. at 33. We think the answer is to take account of

that specific problem in designing standards, not to reject all prototypes because some might be based on designs that are unavailable to manufacturers generally.

design options, and DOE has not shown that it could not reasonably follow that requirement for foreign-market options. Concededly, the added assembly-line costs to domestic manufacturers that standards based on a particular design option would impose can be estimated most accurately if DOE can examine the actual cost of production for the design option to at least one domestic manufacturer. However, Congress knew that EPCA required DOE to make projections and estimates, and indeed DOE's final rules rely very heavily on highly controversial predictions about changing patterns of consumer behavior between 1980 and 2005. We do not think that the difficulties DOE anticipated in estimating production costs for foreign-market options justify rejecting those options as a class from consideration.

DOE also noted that commenters disagreed over the performance characteristics of foreign-market design options. However, it is unclear that these disagreements differed in principle from similar controversies over the performance and efficiency of domestically available design options. Congress required DOE to develop test procedures for covered products so that, when necessary, DOE could make factual findings for itself about the performance of appliances under conditions simulating actual use. DOE does not argue that it could not obtain models of foreign-market appliances or that these appliances were unsuited to DOE's test procedures and methods of analysis.

Again, we do not hold that DOE must consider any particular foreign-market design options. All we hold is that DOE has not identified adequate support in the record for its class-wide exclusion of these design options. DOE must therefore either offer a much more thorough explanation based on record evidence why it cannot consider foreign-market design options, or make more particularized determinations about its ability to test and analyze specific foreign-market options.

■■■ c. *The Five-Year Payback Period.* In 1980, DOE decided that it would evaluate all design options with a payback period shorter than the average life of the appliance. *See* 45 Fed.Reg. 43,976, 43,983 (1980).[45] Thus, a design option with a payback period shorter than the average life of an appliance is cost-effective for most consumers, since the appliance will probably last long enough for the consumer to recover the cost of the design option.

DOE repudiated that decision in 1982 and announced that it would generally evaluate only design options with a payback period shorter than 5 years. *See* 1982 Economic Analysis § 2.2.1 at 8, J.A. at 945. DOE informs us that for clothes dryers and kitchen ranges and ovens, DOE evaluated some design options with 9 year payback periods. *See* DOE Br. at 43, n.\*. The table below lists the average lifetime of the product types involved in this rulemaking, as determined by DOE in 1982. As the table shows, all of the products have an average life of substantially more than 5 or even 9 years. DOE's 1982 rule thus creates a serious threat that DOE will summarily reject design options with payback periods short enough so that the option is easily cost-effective for the average consumer, even though those payback periods may be longer than the maximum figures DOE set.

**45.** The standards actually proposed in 1980 had "paybacks which are on the order of five years or less." 45 Fed.Reg. 43,976, 43,982 (1980). But it does not, of course, follow that no design option with a longer payback period could contribute to an economically justified standard for any product type or class, and DOE did not make any such finding. To the contrary, DOE's analysis of design options with a much longer period shows its recognition that those design options should be considered in assessing possible standards.

Table 5

Appliance Lifetimes

| Lifetime in Years Product Type | [1982] Analysis |
|---|---|
| Refrigerator-Freezers | 19 |
| Freezers | 21 |
| Water Heaters | 13 |
| Furnaces | 23* |
| Clothes Dryers | 18.5 |
| Ranges and Ovens | 18 |
| Central Air Conditioners | 12 |
| Room Air Conditioners | 15 |

\* 22 years for gas boilers.

---

1982 Economic Analysis § 2.3.2 at 34 (citation omitted) (table reprinted only in part), J.A. at 971.

Petitioners cite the text of the statute, its legislative history, and the purposes of the Act in support of their attack on the 5-year limitation. Specifically, petitioners note that before deciding whether a proposed standard is economically justified, DOE is statutorily required to weigh, among other factors,

> the savings in operating costs *throughout the estimated average life of the covered products in the type (or class)*, compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard.

EPCA § 325(d)(2) (emphasis added). This provision explicitly requires DOE to compare the *lifetime* benefits of technologically feasible design options against their *lifetime* burdens in deciding whether standards based on particular options would be economically justified.

DOE's cutoff, however, conclusively assumes that design options with a payback period of five years or more (nine years or more for the two product types mentioned above) could not possibly be economically justified, regardless of their continued benefits over longer periods. DOE did not individually consider whether such design options might be economically justified according to the statutory criteria; the whole thrust of DOE's general rule was to exclude these design options as a class. Nor did DOE even determine whether that class of design options in the aggregate, or some substantial part of it, might include economically justified design options. In other words, the statutory criteria for economic justification were not even explicitly considered in DOE's rejection of the class as a whole, let alone in any consideration of particular class members.

This disregard for the statutory decision-making procedure is especially worrisome in light of the NECPA legislative history, which shows that Congress was concerned over the tendency of consumers to reject efficiency-improving appliances with long payback periods. As Representative Stockman explained, Congress viewed this consumer behavior as a kind of market failure:

> There is some reason to doubt that market forces alone will bring about the needed shift to more efficient appliances. Numerous witnesses appearing before the subcommittee testified that the average consumer looks for a payback from higher purchase prices within 3 years. In the case of an appliance with a useful life of 10 years, this short payback horizon severely limits the amount of higher purchase price the consumer will accept in choosing a more efficient product over a cheaper, less efficient product.

H.R.Rep. No. 496, Pt. 4, 95th Cong., 1st Sess. 360 (1977), U.S.Code Cong. & Admin.

News 1978, p. 8744 (additional views of Rep. Stockman). Since the average life of most covered products involved in this rulemaking is much longer than 10 years, the potential market failure caused by demanding a very short payback period is even greater than Representative Stockman suggested.

Moreover, DOE's general rule is apparently inconsistent with the explanation DOE offered for departing from it. DOE did, in fact, evaluate an insulation design option for clothes dryers, despite the long payback period for the option. In the December 1982 rulemaking, DOE noted that:

> Two ... commenters, Webster City Products (Webster City) and Whirlpool Corporation (Whirlpool), suggested that the extended payback period of this design option should disqualify it from consideration. Webster City remarked that its laboratory test investigation showed a 15 to 20 year payback period, while Whirlpool used cost figures from DOE's Engineering Analysis to compute a 22.3 year payback period.
>
> DOE agrees that the payback for this design option is not attractive, but this fact, given the purpose for which the design options in the Engineering Analysis are used, does not compel its elimination. The design options are used to assess the relationship between increases in the efficiency of a product and increases in the cost of that product. This relationship is then used in other analyses to project the effects that would be attributable to standards set at different levels. Design options with a range of payback periods may be useful in the derivation of the relationship between increases in efficiency and increases in cost. Of course, a standard that would require use of such a design option may not be economically justified.

47 Fed.Reg. 57,198, 57,209 (1982). This passage summarizes the fundamental problem with DOE's 5-year and 9-year rules: those rules drop design options out of the analysis at a preliminary stage, before their benefits and burdens are fully assessed. As we have stressed, EPCA allows DOE to reject consideration of technologically feasible design options as a basis for standards only if standards based on those design options could not be economically justified. Yet in the passage quoted above, DOE itself effectively rejected the idea that all design options with long payback periods are, by virtue of that fact alone, economically unjustified. DOE sensibly decided that it must look at the cost-benefit relationship of those design options before it discarded them. By refusing even to analyze most design options with longer payback periods, DOE deprived itself of exactly the information it needed to decide whether standards based on such design options would be economically justified.

In short, DOE has justified making an exception to its general rule on grounds that entirely discredit the rule itself. DOE's reply to Webster City and Whirlpool does not purport to explain why the particular design option in question should be considered, even though other design options with similarly long payback periods were not. Instead, DOE explained why, in general, design options with long payback periods should be considered in the engineering analysis. Having set forth these views, DOE may not rely on the inconsistent general proposition that no design option with a payback period longer than DOE's maximum figures could be economically justified.

Finally, our difficulty in understanding DOE's position is heightened by the lack of rationale in DOE's announcement of its 5-year rule. The rule is stated in the assumptions section of the 1982 Economic Analysis, and is thus a predicate for rather than a conclusion from DOE's technical analysis. Moreover, the only explanation for selection of 5 years rather than some other period as the cutoff is that payback periods shorter than 5 years are "considered to be acceptable to consumers." 1982 Economic Analysis Document § 2.2.1 at 8, J.A. at 945. But as we have discussed, the fact that consumers demand short payback periods was itself a major cause of the market failure that Congress

hoped to correct. DOE cannot logically reject design options because consumers would not in the absence of standards buy appliances including those design options, when the entire point of a mandatory program was to change consumer behavior.

DOE's refusal to consider design options with payback periods longer than 5 or 9 years, like its exclusion of prototypes, runs counter to the statutory text and legislative history of NECPA on a point with major consequences for the result of this rulemaking. Yet instead of trying to reconcile its anomalous practice with the statute, DOE first offered an explanation inconsistent with the purposes of the statute and later supported an exception to the rule with arguments that undermine the entire rule. Accordingly, we hold that this restriction on the design options DOE was willing to analyze is unsupported by substantial evidence.

■ d. *Lead Times.* Next, petitioners complain that DOE excluded design options "that might entail a 'significant increase in [the manufacturers'] engineering staff,' and selected only those with 'the shortest lead time.'" NRDC Br. at 40 (footnotes omitted). DOE described its method of minimizing the cost of increased engineering staff in the following terms:

> Lead times available for implementing design changes required to meet the efficiency levels analyzed are long enough so that no significant increase in engineering staff will be required.

1982 Engineering Analysis Document at C–1, J.A. at 1573. We read this sentence as describing a general approach to fixing appropriate lead times—*i.e.,* periods it would take a manufacturer to introduce particular design options on all appliances covered by a standard. DOE could have assumed that standards would force manufacturers into expensive, "crash" development and retooling programs. This approach would obviously achieve energy savings more quickly, but it would also impose much greater costs on manufacturers. Or alternatively, DOE could assume, as it did, that lead times should be calculated based

on more moderately paced programs to achieve compliance with standards. Under the latter view, the benefits of standards would be slower in coming, but the burdens on manufacturers would be much lighter. DOE plainly needed some method of estimating lead times, and we cannot say that the method on which it settled was unreasonable.

■ Petitioners also attack DOE's method of selecting the combination of design options that would best achieve particular levels of efficiency. The basic problem DOE had to solve was that different combinations of design options, with varying lead times and costs to manufacturers, could lead to comparable gains in efficiency. Thus, in assessing the benefits and burdens of standards at a specific level of efficiency, DOE needed some theory to identify what combination of design options that achieved that level of efficiency should be used as the basis for analysis. DOE settled on the following principles:

> 1) Improvements must have a reasonable initial cost to the consumer.
> 2) Only the lowest lead time and most cost effective improvements were considered.

Other paths (series of design improvements resulting from application of other philosophies) to higher efficiency can be envisioned. For instance, the lowest cost to the consumer to achieve each level could have been assessed. This could lead to a rearrangement of the grouping of design improvements to achieve each level. Minimizing lead time ... was felt, however, to be the most effective and likely scenario for introducing energy savings at the earliest date.

1982 Engineering Analysis Document at C–3, J.A. at 1575; *see also* 45 Fed.Reg. 43,976, 43,983–84 (1980).

This passage does not describe a path of analysis that arbitrarily excluded design options from consideration. Rather, we see the passage as describing a reasonable method of ordering and structuring agency deliberations, and we accordingly uphold that method against challenge.

e. *Specific Design Options.* During the rulemaking, petitioners and other commenters identified numerous energy-saving design options that, in the view of the commenters, should have been considered as the basis for standards. DOE rejected many of these suggestions for a variety of different reasons, and petitioners now challenge the legality of these decisions.

Under our view of the case, we need not resolve these disputes. As we have explained, we believe that DOE fundamentally misunderstood the statutory requirement that it first determine maximum technologically feasible improvements in efficiency, and then decide whether standards at that level or at some lower level would be economically justified. As we discuss in Part IV.C.3 below, DOE must approach that task anew. Because DOE must conduct a new rulemaking based on current technology, we need not pass on whether DOE's determinations that particular design options, as described in the information then before the agency, were or were not reasonable. The rulemaking on remand will be based on very different information, and consequently our view of DOE's decisions on specific design options could not provide useful guidance for the agency.

3. *DOE's Reliance on 1980 Data*

Much of the information underlying DOE's final rules was gathered in 1980 and never significantly updated, although the final rules were not issued until 1982 and 1983. Petitioners challenge DOE's reliance on data of this vintage as unreasonable; DOE replies that any effort to collect and analyze more recent information would have delayed the rulemaking even longer. *See* 48 Fed.Reg. 39,376, 39,379 (1983). However, we need not resolve this dispute either. We have already decided that (1) DOE must determine maximum technologically feasible levels and (2) DOE must reexamine its refusal to consider prototype and foreign-made design options as the basis for standards, and must look carefully and thoroughly at the specific characteristics of

those design options in determining whether they could reasonably be evaluated under the statutory criteria. Both of these inquiries will require detailed review of the characteristics of technologically feasible design options that are not "commercially available" within the meaning DOE assigned to that term in this rulemaking—that is, design options that were not available on commercially manufactured appliances sold in the United States in 1980.

Whether or not DOE acted reasonably in issuing rules in 1982 and 1983 based on 1980 information, we think it would be patently unreasonable for DOE to begin further proceedings in the last half of 1985 based on data half a decade old. As DOE itself acknowledges, the efficiency of many products involved in this rulemaking has changed dramatically since 1980. It would be wholly futile for us to require DOE to conform its decisionmaking procedures to the statute, but permit it to trudge through the correct procedure based on information that is now incontestably antique. Such a pointless exercise would make a mockery of the clear statutory emphasis on a realistically administered appliance program based on current technology.

Moreover, we believe that the text and legislative history of NECPA show that Congress would not have approved reliance on such outdated data. As we have discussed, the slow pace of agency proceedings under EPCA as originally enacted was a major reason for the enactment of the NECPA amendments. Congress wanted to avoid the delays involved in monitoring industry compliance with voluntary targets, and in part for that reason it eliminated the target approach. *See* H.R.Rep. No. 496, Pt. 4, 95th Cong., 2d Sess. 43–45 (1977). More importantly, Congress established a strict schedule in NECPA itself that specifically keyed the dates by which final rules were due to the dates on which DOE published an advance notice of proposed rulemaking and a notice of proposed rulemaking. *See supra* note 11. Those notices, in turn, determine the period for notice and comment and thus the period during which

major parts of the record for the rulemaking would be created.

Congress, then, passed provisions intended to set a specific outer limit on the time that could elapse between the closing of the record and the promulgation of final rules. Thus, when Congress defined "technologically feasible" as "capable of being carried out," *see supra* at 1392, it believed that only a relatively short period would pass between DOE's evaluation of available technology and its promulgation of final rules. As Congress knew that the state of technology changes rapidly, it had good reasons for this insistence on prompt action. We believe Congress thought that "technologically feasible" meant "technologically feasible based on information that is reasonably current at the time the final rules are validly adopted," not "technologically feasible based on information that was reasonably current at the time DOE first attempts to promulgate final rules,[46] even if it turns out that some years intervene between initial promulgation and the adoption of final valid rules." Indeed, DOE has emphasized that it "continuously attempted to use the most recent, reliable data, where to do so would not inordinately delay the rulemaking." 48 Fed.Reg. 39,-376, 39,379 (1983). We think that policy can be reasonably effected only if DOE gathers current information in its new proceeding, including current information about design options examined in the record that closed during 1980 and new information about design options that have become technologically feasible since 1980.

Our decision to require a new process of data-collection is also reinforced by section 325(h) of the Act, which requires that DOE reevaluate its standards after issuance and that "[n]ot later than 5 years after prescribing an energy efficiency standard," DOE "make and publish its determination" as to whether any standard should be amended. DOE published its final rules in December of 1982 and August of 1983, so its determinations as to amendments are due in December of 1987 and August of 1988. We note that the present rulemaking commenced in earnest with the June 1980 notice, and that DOE's reassessment of its data began in February of 1981. DOE thus took from February of 1981 to August of 1983, or some thirty months, to analyze data already collected, receive and consider comments, and publish final rules. If the process of preparing the determinations due at the five-year mark took the same time, DOE would need to begin analyzing data in February of 1986.[47] It would thus hardly be sensible for us to require DOE to redo its 1982 and 1983 rules based on 1980 information, when in a short time DOE would in any event be required to gather new data to see if its rules based on earlier data remained appropriate. Our decision, then, contemplates that DOE will investigate current design options to remedy the shortcomings we have already identified.[48] We thus do not consider whether DOE's reliance on argu-

---

**46.** As we have said, we do not hold that the record on which DOE acted when it promulgated the rules under review was reasonably current when the rules were promulgated. However, we assume for purposes of our discussion that it was.

**47.** We do not express any opinion as to any procedural requirements that § 325(h) of EPCA may require DOE to follow in conducting its periodic reviews of the appliance standards.

**48.** We have recognized before that "[a]dministrative consideration of evidence ... always creates a gap between the time the record is closed and the time the administrative decision is promulgated." *Wisconsin Elec. Power Co. v. Costle,* 715 F.2d 323, 327 (1983) (quoting *Interstate Commerce Comm'n v. Jersey City,* 322 U.S. 503,

514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944)). Accordingly, "an extremely heavy burden looms before a party seeking to overturn a final administrative order on grounds of staleness." *City of Angels Broadcasting, Inc. v. Federal Communications Comm'n,* 745 F.2d 656, 665 (D.C. Cir.1984); *see also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 294–96, 95 S.Ct. 438, 446–47, 42 L.Ed.2d 447 (1974). *But cf. Atchison, T. & S.F. Ry. v. United States,* 284 U.S. 248, 52 S.Ct. 146, 76 L.Ed. 273 (1932); *Delta Air Lines, Inc. v. Civil Aeronautics Bd.,* 561 F.2d 293, 306–12 (D.C.Cir.1977); *Oklahoma ex rel. Corporation Comm'n v. United States,* 193 F.Supp. 261 (W.D.Okla.1960) (3-judge district court).

For several reasons, we believe we are justified in requiring the agency to collect new information despite the deferential approach of these

ably obsolete information, were it the only potential difficulty in this rulemaking, would justify overturning the rules under review.

## V. ECONOMIC JUSTIFICATION

NECPA requires that standards be economically justified and sets forth six specific factors that DOE must consider, along with any further factors it believes relevant, in making that determination. EPCA § 325(d) (quoted *supra* at 1399–1400). DOE determined that no standards were economically justified for any of the eight product types at issue in this rulemaking. In this Part we consider petitioners' claims that DOE systematically under-estimated or disregarded altogether various benefits of standards; overestimated the real burdens of standards or conjured up fanciful burdens; and then irrationally found that the substantial benefits DOE allegedly identified under its own analysis failed to outweigh burdens that were slight in comparison.

### A. *DOE's Analysis of Benefits*

Petitioners first call attention to the fact that other alleged problems in the rulemak-

cases. First, we do not invalidate DOE's rules because the agency acted on a stale record or refused to reconsider an order already rendered based on new facts. Our disapproval of the rules is based on independent objections. Rather, the question is whether the agency may decline to consider new evidence, while simultaneously conducting a fresh proceeding in which large amounts of new evidence on closely related questions must be considered. Cf. *Oklahoma ex rel. Corporation Comm'n*, 193 F.Supp. at 265 (weakness of subsidiary findings by agency, coupled with agency proceeding in which similar issues must be considered, supported remand in light of stale record).

Second, DOE must in any case gather new information about design options that it should have considered, but in fact did not consider, in this rulemaking. That new information must concern not just the technological feasibility of improperly excluded design options, but also the economic justification for standards based on any such design options are found to be technologically feasible. To assess the economic justification for standards based on a newly considered design option, DOE must consider, among other things, how much it would cost manufacturers to incorporate the design option

ing, such as DOE's failure to consider standards set at higher efficiency levels and its use of the ORNL model to calculate savings, biased DOE's view of the benefits standards might confer. In Part IV, we concluded that DOE has not pointed to substantial evidence supporting its refusal to consider standards based on certain classes of design options. We also agree that this failure may have influenced the efficiency levels ultimately analyzed as candidates for standards, and thus the benefits and burdens attributed to standards. These views are enough to require us to overturn the final rules, but in order to guide the agency on remand we also review the independent challenges petitioners have brought to DOE's findings concerning economic justification.

### 1. *DOE's Discussion of the Nation's Need to Save Energy and Energy Savings*

 Petitioners argue that DOE failed outright to discuss or evaluate the nation's need to save energy, *see* State Pet. Br. at 49, which is one of the statutory factors relevant to economic justification. *See*

in appliances they make. That inquiry, in turn, depends on complicated facts about current manufacturing technology and the efficiency of currently manufactured appliances. It would be highly anomalous if DOE were to base its analysis of newly considered design options on new manufacturing costs, but were to use its old information for all other design options. Cf. *Delta Air Lines*, 561 F.2d at 308–09 (commenting on problems associated with selective updating of administrative record). Thus, at a minimum, DOE would be obliged to redo its cost analysis for all design options, and to collect new empirical information about appliance manufacturing on which to base that analysis.

Third, DOE has repeatedly stressed during this rulemaking that it expects rapid increases in the efficiency of appliances sold in an unregulated market. Thus, the agency's own assurances give us every reason to suspect that a record in this area will grow stale and useless for intelligent regulation very quickly.

And fourth, as we discuss in text, we do not rely primarily on general principles of administrative law for our holding that the agency must begin this proceeding anew. Instead, we rely specifically upon the structure and intent of EPCA.

EPCA § 325(d)(6). That blunt challenge can be readily discarded. Although DOE did not explicitly refer to this factor in the "Weighing of Factors" section that preceded determinations on economic justification for standards governing each product type, DOE did discuss the factor in a separate section preceding the "Weighing of Factors" statements. *See, e.g.,* 48 Fed. Reg. 39,376, 39,392, 39,393–94, 39,395 (1983). Moreover, those statements all contained explicit references to the amount of energy standards would save, *see, e.g., id.* at 39,392, 39,394, 39,395, and those references can fairly be understood to incorporate the earlier discussions concerning the need to save the quantity and kind of energy that standards might conserve. We are quite sure that DOE did not ignore this statutory factor completely.

Whether DOE's treatment of this statutory factor and the closely related factor of "energy savings" can stand in light of DOE's misunderstanding of "significant" savings is a far more difficult question. As we discussed in Part II, DOE seriously overestimated the energy savings it could reasonably demand from standards, and consequently rejected standards that saved amounts of energy Congress regarded as significant. In its April 1982 notice, DOE offered the following passage as its entire discussion of how to evaluate energy savings in considering economic justification:

> While the significant conservation of energy is a separate statutory requirement for imposing an energy efficiency standard, the total projected savings directly resulting from standards is also one factor to be considered in weighing the burdens and benefits under section 325(d). The ORNL results, discussed above, were utilized for this factor. In each product-specific analysis the savings are specified.

47 Fed.Reg. 14,424, 14,433 (1982). The product-specific discussions of energy savings, in turn, for each product type merely specified the highest number of Quads saved under DOE's various analyses of possible standards. DOE discussed the amount of energy saved only for central air conditioners—the product for which standards would have saved the largest amount of energy—where DOE termed a saving of .063 to .103 Quads annually as "not very great." 48 Fed.Reg. 39,376, 39,405 (1983). As we noted in Part II, the total annual source consumption of an appliance eligible for optional standards is about .0483 Quads. That figure, which Congress evidently thought was a noticeable amount of energy, is less than the lower boundary and less than one-half of the upper boundary for the range of savings from CAC standards that DOE thought "not very great." DOE did not comment on the amount of energy standards would save for any other product type. Thus, we do not know how DOE's appraisal of the energy savings under standards for other products figured in its evaluation of the overall benefits from those standards. But as no standard saved more than the standard for central air conditioners, and as DOE considered the total benefits of standards for each other product type considered in the August 1983 notice to be either "relatively small" or "minimal," [49] we must assume that DOE was quite unimpressed with the energy savings from any of them.

DOE, in short, elaborated only once on its view of energy savings as a statutory factor bearing on economic justification. That passage, quoted above, refers directly to DOE's standards for significant savings, which we have found to be unlawful. The question, then, is whether the unlawful significance standards tainted DOE's view of economic justification. We think it did. The explanation DOE provided for its assessment of energy savings referred *only* to DOE's standards for significance.[50] In

---

**49.** *See* 48 Fed.Reg. 39,376, 39,391 (1983) (benefits of level 3 refrigerator standards "relatively small"); *id.* at 39,394 (benefits of freezer standards "minimal"); *id.* at 39,395 (benefits of furnace standards "minimal"); *id.* at 39,397 (benefits of water heater standards "relatively small"); *id.* 39,400 (benefits of room air conditioner standards "minimal").

**50.** DOE did, of course, recognize that energy savings were relevant to this rulemaking in at

addition, DOE's disparagement of the savings predicted for central air conditioners, which was its only articulated evaluation of this factor in the product-specific discussions, is entirely in line with the unreasonably inflated demands the agency made of standards in evaluating significance. We think that DOE was right to link its interpretation of significance to its evaluation of energy savings, since related provisions of a statute should be understood as a unified scheme. In this case, however, the consequence of that principle is that DOE's incorrect view of significance infected its view of an important statutory criterion for economic justification.

■ Because DOE decided not to adopt any system for quantifying the factors to be weighed in determining economic justification, we have no way of knowing whether that error in turn affected the overall findings on the benefits of standards. But as the entire point of EPCA was to save energy, we can scarcely assume that DOE's opinion of how much energy was worth saving did not influence the final rules. Had DOE correctly understood the range of savings Congress regarded as significant, DOE would presumably have paused for reflection before weighing "significant" savings so lightly in assessing economic justification. As it is, however, we are in the awkard position of reviewing an agency which took a radically faulty view of congressional intent. We must decide whether, had DOE begun in a wholly different place, it would necessarily have ended where it did. The fact is that we do

not know, and that for us to speculate on the question would impermissibly intrude on the agency's prerogative to make policy judgments for itself. In sum, we find that DOE explicitly carried over its unlawful standards for significance into its evaluation of one of the statutory criteria for economic justification, and that this mistake was at least potentially dispositive of whether standards should be imposed.[51] DOE must consequently reconsider its view of energy savings, and thus its conclusions on economic justification, in light of a new definition of significance authorized by EPCA.

2. *DOE's Use of a 10 Percent Real Discount Rate*

In determining life cycle costs and the net present value of savings from standards, DOE used a real annual discount rate of 10 percent. The discount rate does not adjust for inflation, since DOE's calculations were expressed in real base-year dollars; instead, the discount rate reduces the value of future benefits and costs because the right to receive a dollar in the future is not as valuable as a dollar today. DOE's 1980 proposal had used a real discount rate of 5 percent, but DOE increased the rate to 10 percent in the April 1982 proposal because an OMB Circular prescribed that figure as a government-wide discount rate. The Staff of the Conservation Division of the California Energy Commission commented that:

The OMB discount rate was intended to be used in evaluating the future econom-

least two distinct ways: as a threshold determination under the "significance" provision and as a factor bearing on economic justification. Our point is that DOE's discussion of energy savings and economic justification really just cross-referenced to DOE's earlier assessments of significance. In light of that fact, we cannot assume that DOE's judgments on these two separate issues were independent.

**51.** The national need to conserve energy is a statutory factor bearing on economic justification that is distinct from, though related to, the amount of energy saved by a standard. We agree that under the former factor DOE was authorized, within reasonable limits, to reassess

the need to conserve energy in light of developments after the enactment of NECPA. During the rulemaking, DOE offered several arguments that the nation's need to conserve energy has declined since NECPA was enacted. *See* 47 Fed. Reg. 14,424, 14,434 (1982). We observe only that the amount of energy saved was an entirely *separate statutory criterion, and in considering* that criterion DOE adverted only to its invalid significance tests. Thus, even if one assumes that DOE's evaluation of the nation's need to save energy was independent of the significance tests, DOE's separate treatment of energy savings remains flawed by its reliance on those invalid tests.

ic benefits of *government* investments. The 10 percent discount rate was intended to represent the future economic benefits of *government* investments. OMB Circular # A–94 was *not* intended to be used in the economic analysis of consumer decisions.

The appropriate discount rate for consumers should be the interest rate for borrowing or investing individual savings. The real, after-tax rates available to consumers are considerably less than 10 percent used by DOE. That is, to purchase an appliance a consumer can obtain a consumer loan or take the funds out of savings. In either case the real after-tax interest rate that would be paid, or would have been earned, can be calculated.

For example, in the current credit market, consumer loans may cost 18 percent per year. Since interest paid is tax deductible at a 40 percent marginal tax rate the after-tax interest rate would be 10.8 percent (18% × .06). If inflation is 6 percent, then the real interest rate is 4.8 percent. The discount rate used to compare an investment in higher efficiency to future utility should therefore be 4.8 percent. Similarly, if the funds were obtained from an investment yielding 18 percent, the after-tax earnings would be 10.8 percent, and if inflation were 6 percent the real return would be 4.8 percent.

The same logic can be used to examine different combination of interest rates, tax rates, and inflation rates. No plausible combination of price variables would yield a consumer discount rate of 10 percent. A discount rate of 3 to 5 percent is more reasonable.

Comment No. 2097 at 1–2 (June 16, 1982), J.A. at 2591–92. DOE replied that:

Nothing in [OMB] Circular A–94 limits its application to consideration of Government investments or excludes regulatory programs. Even if there were [sic], if a 10 percent discount rate is an appropriate basis for measuring the present value to the Government of future savings the commenters have not sufficiently established why the present value to consumers from the same future savings should be different. Moreover, DOE believes a 3–6 percent discount rate, suggested by the commenters, is inappropriately low. See CEC [comment quoted above] (assuming 40 percent marginal tax rate for consumer).

48 Fed.Reg. 39,376, 39,389 (1983).

■ We do not believe DOE's response is satisfactory. The disputed OMB circular is essentially a general instruction to government agencies and does not explain the reasoning behind the discount rate it recommends.[52] It is no criticism of the circular to say that in a rulemaking which must be supported by substantial evidence, DOE may not rely without further explanation on an unelaborated order from another agency. Neither we as a reviewing court nor participants in the rulemaking can possibly discover the substantive basis of OMB's edict. Similarly, DOE's rejection of the comments critical of a 10 percent rate is simply too conclusory to qualify as reasoned decisionmaking. DOE's parenthetical description of the critical comment suggests that DOE may have thought that an assumed 40 percent marginal rate of taxation was too high. But a glance at the comment shows that considerably lower marginal rates would also have produced real discount rates substantially below 10 percent. We cannot, however, tell if DOE

**52.** Circular A–94 states that the discount rate it prescribes "applies to the evaluation of Government decisions concerning the initiation, renewal or expansion of all programs or projects, other than those specifically exempted below, for which the adoption is expected to commit the Government to a series of measurable costs extending over three or more years or which result in a series of benefits that extend three or more years beyond the inception date." Office of Management and Budget, Circular A–94 at 1 (revised Mar. 27, 1971). The discount rate is "[s]uggested for use in the internal planning documents of the agencies in the executive branch," *id.* at 2, and "required for use in program analyses submitted to the Office of Management and Budget," *id.*, but the circular "does not supersede agency practices which are prescribed by or pursuant to law," *id.*

accepted the basic approach of the comment to formulating a discount rate but disputed the figures; or if DOE thought that an entirely different approach was better suited to the purposes of this rulemaking; or if DOE even bothered to form a conviction on the subject. DOE has passed from "the tolerably terse to the intolerably mute." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

■■■ DOE's doubling of the 5 percent rate it originally proposed tended to reduce the value of ultimate energy savings as compared to higher purchase prices in DOE's life cycle and net present value analyses. As DOE's curves show, use of a 5 or even 7 percent real discount rate would have substantially increased life cycle benefits from standards for many appliances.[53] The major consequences of the discount rate made it particularly important that DOE fix the rate carefully and explain its decision intelligibly. It did not do these things, and we are accordingly constrained to reject its choice as fatally unexplained.

### 3. DOE's Calculation of Benefits From Central Air Conditioner Standards

Central air conditioners (CACs) were the single product type for which DOE concluded that standards would save significant energy, even under its extremely rigorous test for significance. DOE decided, however, that CAC standards would not be economically justified—a conclusion petitioners assail both on grounds generally applicable to DOE's interpretation of economic justification and on grounds particularly addressed to DOE's investigation of CACs. Petitioners offer four specific objections to the CAC findings: DOE allegedly failed to consider peak load savings, failed to consider certain high-efficiency models, used erroneous data in its CAC cost-efficiency curves, and offered no basis for the annual hours of operation figure DOE used in the ORNL model.

a. *Possible Reduction of Peak Load Electrical Demand.* A number of commenters stressed the particular importance of peak demand electrical consumption and the contribution that standards for room and central air conditioners might make towards its reduction.[54] In brief, reductions in peak demand—that is, in demand during the seasonal and daily periods of highest demand—are particularly valuable because they reduce the maximum output required of a utility, and so reduce the greatest generating capacity the utility must maintain. Because the marginal electricity produced to satisfy peak demand is more expensive per watt to generate than the average watt, reductions in peak demand also result in greater generating efficiency for utilities. *See* 1980 Economic Analysis at 5–43 to –46, J.A. at 526–29.

DOE considered adopting a test for significant savings based on reductions in peak demand electrical consumption. It ultimately decided not to do so for the following reasons.

A number of methodologies can be used to determine peak load savings attributable to a standard *in a particular utility service area.* Each of these methodologies requires data specific to the utility service area as to peak and average loads (which is generally available) and as to the contribution of the particular product in question to those peak and average loads (which is generally not available, although it is available for some utilities). The primary difficulty, however, is in making determinations on a national basis. First, it is simply *not possible, for data and resource reasons,* to determine the effect of a stan-

**53.** *See* U.S. Department of Energy, Supplement to March 1982 Consumer Products Efficiency Standards Engineering Analysis and Economic Analysis Documents 179–86 (1983) [hereinafter cited as 1983 Supplement], J.A. at 1987–92; 1982 Economic Analysis Document at 179.

**54.** Although we discuss peak load savings in our section dealing with the final rule for CACs, our discussion applies to DOE's treatment of this issue in evaluating both CAC and room air conditioner standards.

dard for a product on the peak load for each of the utilities in the United States and then simply add them. Second, it would be inaccurate in this instance simply to generalize to all utilities the impacts of a standard on the peak loads of a small number of particular utilities. Third, it is methodologically inaccurate to derive national peak load savings by backing out of aggregated national data regarding peak loads the demand reduction attributable to a standard for a product. The present inability to determine even order-of-magnitude national peak load savings attributable to a standard for any product, especially air conditioning equipment, makes impossible a specific test of the significance of energy savings based on peak load savings.

48 Fed.Reg. 39,376, 39,385 (1983) (footnotes and citation omitted) (emphasis in original). In footnotes to this passage, DOE noted that the reduction in peak demand attributable to a standard is not equal to the overall savings in demand from that standard, because not all units of any product, including central air conditioners, will be operating at times of peak demand. *Id.* at n. 41. DOE also commented that central air conditioner standards would not reduce peak load demand for winter-peaking utilities, although it did not suggest what effect this fact might have on overall reductions in peak demand from CAC standards. Similarly, DOE speculated that by reducing summer usage, CAC standards might turn summer-peaking utilities into winter-peaking utilities. For such a utility, the reduction of peak demand attributable to a standard would be the difference between the summer peak the utility would have experienced in the absence of standards and the winter peak it would experience with standards—not the difference between the summer peak without standards and the summer peak with standards. *See id.* However, DOE does not mention any utilities with this characteristic or estimate the effect that the existence of such utilities would have on peak-load reductions in energy consumption.

Nonetheless, we accept DOE's reasoning as sufficient to support its refusal to establish a test for significance that hinged on peak load reduction. Such a test necessarily designates a specific amount of electricity saved at peak loads, and requires a reasonably reliable method for quantifying the energy savings attributable to a standard as measured by the test. DOE's discussion does raise substantial questions whether such a method could be developed to measure peak load reductions.

 DOE's reasoning does not, however, fully carry over to consideration of peak load reductions in weighing economic justification. Factors bearing on economic justification need not be precisely quantifiable, a fact that DOE itself repeatedly relied on in considering quite nebulous factors that assertedly weighed against standards. Petitioners' real claim, we believe, is that DOE should have investigated peak load reductions in electrical consumption much more thoroughly, or at least should have given greater weight to the likelihood of such reductions in its weighing. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983).

In the 1980 Economic Analysis Document, DOE tentatively summarized the effect of standards at the levels proposed in 1980 on seven summer-peaking and three winter-peaking utilities. For all seven summer-peaking utilities, DOE noted that standards reduced peak demand more than they reduced baseload demand. *See* 1980 Economic Analysis Document § 5.5.5 at 5–44 to –45, J.A. at 527–28. In DOE's high price case, the ratio of peak demand to baseload demand was reduced in 1995 by .5 to 15.5 percent; in the low price case, the corresponding figures were .7 to 13.5 percent. DOE concluded that additional research was warranted "to gather more accurate data on the time of day usage of consumer products and the factors influencing peak and baseload electric demand growth in the representative electric utility service areas." *Id.* at 5–46, J.A. at 529.

The results of this research, if any was ever conducted, never became part of the record.[55]

Comments by utilities supported DOE's 1980 belief that peak load reductions could be an important benefit of CAC standards. For example, the Georgia Power Company submitted these comments in opposition to a no-standard standard for central air conditioners:

Our experience indicates that full load power requirements of central air conditioners occurs at the peak generation hour on the hottest day of the year. The use of central air conditioning in Georgia has increased to the point that it is considered a standard appliance in a majority of new home and new apartment construction. Each additional central air conditioner, therefore, constitutes an additional load on the power generation system.

The capital expenditures required by Georgia Power Company to meet these additional load requirements are reflected in the rate base and has the net effect of increasing utility rates for all customers.

Comment No. 2082 at 1 (June 15, 1982), J.A. at 2541; see also Comment No. 2141 at 5–6 & app. C (New York City Energy Office), J.A. at 2897–98, 2911–27; Comment No. 2173 (Aug. 2, 1982) (ACEE), J.A. at 2947; Oral Comments of Owen H. Davis, Pacific Gas & Electric Co. at 4 (May 18, 1982), J.A. at 3226. The Carrier Corporation, a major manufacturer of residential central air conditioners, believed that "[t]he utility summer peak would be reduced 26.1 million kilowatts as opposed to the peak under a no-standard standard. At $1500 per kw of new generating capacity that translates to $39 billion of cost avoidance." Comment No. 2120 at 8 (May 18, 1982) (oral comments of Edward A. Bailey), J.A. at 2727.

We think that whether DOE adequately investigated peak load savings presents a close question. Early in the rulemaking, these savings were thought potentially so important as to justify a separate test for significance; by its close, however, DOE abandoned its announced intention to investigate whether CAC standards would reduce peak load electrical consumption, and then resisted serious consideration of such reductions because it did not have the detailed information that investigation might have disclosed. Utilities, who were certainly in a position to have informed opinions on the subject, offered cogent anecdotal evidence that DOE's early determination to investigate peak load savings was correct. We recognize that DOE's doubts about its ability to quantify peak load savings precisely are rational on their face, but they are worrisomely divorced from the record. It might be that these savings so elude measurement that DOE could consider them only as a vague, atmospheric factor of very slight weight. That, indeed, seems to be the kind of consideration DOE did give this factor. But we are unsure from the record what consideration DOE gave the possibility that even if peak load savings could not appropriately be used as a measure of significance, they might be given more robust and detailed consideration as a potential benefit of standards. Cf. Association of Pac. Fisheries v. EPA, 615 F.2d 794, 819–20 (9th Cir.1980). Our concern is fortified by the significantly more prominent attention DOE gave to factors with a highly speculative basis in the record, such as the chance that standards might force manufacturers to forgo more economically productive investments of their capital or that standards might diminish product performance or utility in the future.

■■■ Nonetheless, we acknowledge that agencies rightfully enjoy very broad discretion in determining what aspects of a

55. In our order requesting supplemental briefing, we asked DOE whether the record contains any evidence gathered during the additional research DOE announced it would undertake into peak load savings. DOE's reply states that "[a]ll investigation of the question of what reductions in peak-load demand might be achieved by standards is reflected in the Federal Register notices." Supplemental DOE Br. at 5–6.

problem warrant investigation. Moreover, peak load savings are not among the factors specifically enumerated in section 325(d) of EPCA, and DOE obviously has considerable latitude in deciding how far to inquire into further benefits and burdens "the Secretary considers relevant." EPCA § 325(d)(7). In light of the broad deference appropriately due an agency in allocating its limited resources for investigation of different aspects of a complex and highly technical regulatory problem, we refrain from holding that DOE was legally required to conduct a more thorough factual inquiry into the likelihood and amount of peak load savings achievable through standards. We are, however, uncomfortable with DOE's failure to explain more clearly why the considerations that led it to reject a significance criterion based on peak load savings also support its terse treatment of those savings as a benefit of standards. Without holding that DOE's explanation on this subject was legally inadequate, we do express the hope that closer scrutiny of this question will emerge from the new rulemaking.

b. *Failure to Consider High-Efficiency Models.* Petitioners claim that DOE failed to analyze commercially available CACs that were notably more efficient than the highest-efficiency model considered by DOE. For example, DOE cited a small split system CAC with a seasonal energy efficient ratio (SEER) of 14.0, although the highest efficiency model of that CAC class DOE analyzed had a SEER rating of 10.4. DOE offered three related responses: (1) DOE did not have enough data to create a full "cost book" for design options at the efficiency levels identified by NRDC, *see* 48 Fed.Reg. 39,376, 39,401 n. 86 (1983); (2) "some currently marketed high efficiency units obtain their high efficiency at the expense of dehumidification" and therefore

compromise product performance, while others take advantage of quirks in DOE's testing procedure for CACs to generate misleadingly high SEER ratings, *see id.* at 39,400; and (3) DOE did not have time to create cost books for these models, which had become commercially available since 1980, *see id.*

We do not think that DOE's first suggestion, standing alone, would sustain its refusal to take account of commercially available design options. NECPA places upon DOE an affirmative obligation to gather the information required to discharge its duties, and DOE must at least attempt to obtain information it needs from manufacturers of high-efficiency appliances actually on the market. Similarly, while we recognize the force of the concerns raised by DOE's second explanation, DOE did not actually find that the models cited by DOE suffered from the problems identified. Where a commenter identifies particular appliance models alleged to be more efficient and cheaper than models analyzed by DOE, DOE may rest its rejection of the models on deficiencies in performance or anomalies in test results only if these problems actually affect the cited models.

DOE's third explanation rests on its decision not to consider data that became available after 1980. As we explained in Part IV.C.3, we do not pass on that stance. We note, however, that the CAC models discussed by NRDC vividly illustrate the problems that delay has occasioned in this rulemaking. It seems very likely that design options on the market by 1983 were technologically feasible within DOE's definition in 1980.[56] In any event, the effect of DOE's refusal to consider standards based on commercially unavailable technology, coupled with DOE's tardy issuance of final rules, resulted in the publication of rules

---

**56.** In discussing the cost-efficiency curves, DOE's brief states without citation that "[t]he agency determined that for the purposes of evaluating standards, the maximum technologically feasible improvement in energy efficiency was that represented in the 1980 market-place." DOE Br. at 75. It is true that in developing standards DOE did not consider any efficiency-

improving design options that were unavailable in 1980. However, DOE expressly defined the maximum technologically feasible improvement to include prototypes and other advanced technologies developed by 1980, though not yet commercially introduced, *see supra* at 1392–1393 & note 40, and during the rulemaking it never retreated from that position.

that did not consider standards at efficiency levels even approaching those of CACs that had been available in the domestic market for some time. While we refrain from rejecting DOE's final rule because DOE relied on somewhat stale information, *see supra* at 1408, 1409–1410, we must observe that DOE's reliance on demonstrably obsolete information, particularly when combined with other restrictions DOE imposed on design options it considered as a basis for standards, is in some tension with Congress' direction that DOE analyze standards that would achieve the maximum technologically feasible improvement in efficiency.

c. *Flaws in the Cost-Efficiency Curve.* Among the crucial determinations in this rulemaking were the cost-efficiency curves, which plotted efficiency levels for a product type or class against the additional cost to large- and medium-sized manufacturers of achieving those efficiency levels. *See* 1982 Engineering Analysis at C–1 to C–5, J.A. at 1573–77. These curves in turn influenced DOE's assessment of several statutory factors bearing on economic justification.[57] DOE constructed cost-efficiency curves for the four classes of CACs by locating six data points that represented the cost of achieving various levels of efficiency, and then fitting a curve to those points. During the rulemaking, NRDC complained that some CACs actually on the market achieved efficiencies comparable to the two highest-efficiency data points at lower cost than the points reflected. *See* Comment No. 2121 at 32–36 (June 18, 1982) (NRDC), J.A. at 2766–70. DOE responded by deleting the highest efficiency point on the curve (point 6) and adding a new data point at the same efficiency but lower cost. DOE did not, however, delete the other point (point 5) to which NRDC objected; in fact, the passage in the *Federal Register* notice accepting DOE's criticism of point 6 did not even mention that NRDC had also

criticized point 5. *See* 48 Fed.Reg. 39,376, 39,401 (1983).

We have carefully examined the arguments the parties have presented on this issue and have reviewed in detail the technical problems bearing on the issue. We are left uneasy with DOE's decision to retain point 5, and in fact to use that point as the basis for calculating other points on the curve at higher efficiencies, without confronting NRDC's criticism more directly. We recognize, of course, that DOE has published hundreds of pages about the many choices made in this rulemaking, and that sentence-by-sentence refutation of every objection raised by commenters is not required. Here, however, DOE accepted part of a comment and changed its information base accordingly, while leaving unaddressed closely related arguments raised in the same comment.

However, we would be reluctant to seize upon a single apparently erroneous datum in a very complex rulemaking and announce that the error undermines the entire rule governing CACs, particularly when the underlying technical issues have not, even with the benefit of supplemental briefing, been completely ventilated. More importantly, this dispute revolves around difficult questions of fact, and our resolution of those issues is unlikely to be of use in any new rulemaking. Accordingly, we do not rule on this question.

■ d. *Hours of Operation.* Between the April 1982 proposal and the August 1983 final rule, DOE reduced the figure for annual hours of operation for CACs used in the ORNL model from 1,000 to 750 hours annually. The ORNL model needed a figure for hours of operation to calculate national energy consumption by central air conditioners. DOE, however, stated that the product of average appliance capacity and *average* hours of use (previously estimated to be 1,000 hours) would under-esti-

---

**57.** The cost-efficiency curves were used for, among other purposes, estimating the energy savings from proposed standards, *see* 1980 Economic Analysis § 2.2.2 at 10, J.A. at 947, the life cycle costs of standards, *see id.* § 2.2.3, J.A. at

952, the net present value of standards, *see id.* § 2.2.2 at 14, J.A. at 951, and the impacts of standards on manufacturers, as calculated by the FIM, *see id.* § 2.2.4 at 20, J.A. at 957.

mate national energy consumption, because high-capacity appliances tend to be used for higher than average hours. *See* 48 Fed. Reg. 39,376, 39,401 (1983). DOE accordingly substituted for use in the ORNL model

the number of hours of use that when coupled with the national average capacity, yields an energy consumption estimate that is consistent with the national energy consumption attributable to CACs reported by the Edison Electric Institute. Given national average capacity, national average efficiency, total households having CACs, and total national CAC energy consumption and solving for the usage yields a value approximately equal to 750 hours/year.

*Id.; see also* 1983 Supplement at 468–2 (conclusory statement that 750 hours is "better estimate"), J.A. at 2170. Since lower hours of operation reduce energy savings in relation to purchase price, this change tilted against standards.

State petitioners protest that DOE never identified the Electric Institute statistics it relied upon or the exact value that was "approximately equal to 750 hours/year." *See* State Pet. Br. at 58; State Pet. Reply Br. at 15. DOE's brief is simply unresponsive; it cites only DOE's own *Federal Register* notice in support of the 750-hour figure. *See* DOE Br. at 76–77. DOE has not directed us to any evidence supporting or explaining the calculation it describes in the passage quoted above, and our own canvass of the record does not enable us to contradict the State petitioners' assertion that no such evidence exists. *See* State Pet. Reply Br. at 15. Without reaching the other arguments challenging DOE's hourly figure as unreasonable,[58] we agree that

DOE's figure cannot stand in light of DOE's entire failure to explain what statistics support its derivation.

### B. *DOE's Analysis of Burdens*

Petitioners challenge DOE's use of the Financial Impacts Computer Model (FIM) to calculate certain effects of standards on manufacturers and separately attack the data used in the FIM for central air conditioner standards. They also challenge two other asserted burdens of standards as unreasonably conjectural: the investment that manufacturers would be required to forgo in order to comply with standards, and possible future reductions in the performance or utility of products regulated by standards.

### 1. *The Financial Impacts Model*

DOE used the FIM to predict changes that two different levels of standards might cause in business risk, profitability, debt/equity ratio, and quick ratio[59] for small, medium, and large manufacturers of covered products[60] over the period 1980–1981. The FIM results were then used to gauge the economic impact of standards on manufacturers, which is one of the statutory criteria bearing on economic justification.

One of the analysts working on the FIM described that model as follows:

Our analysis clearly presupposes an absolutely worst case. We have assumed that there will be no price increase, no abandonment of low efficiency models, and no capital investment outside of the scenario specifications. Un-

---

**58.** Petitioners also maintain that DOE's figure was inconsistent with its test procedure for CACs, which assumed 1,000 hours of annual use, *see* 10 C.F.R. § 430.22(m)(1)(i)(B) (1984), and that DOE's regional analysis of CAC standards, *see* 1983 Supplement at 515–1 to 515–46, J.A. at 2222–67, also suggests that the 750-hour figure was wrong.

**59.** "The quick ratio is a measure of a firm's ability to withstand short-term downturns in business activity. Also called the acid test ratio,

it is defined as current assets, less inventory, divided by current liabilities." 48 Fed.Reg. 39,-376, 39,385 n. 43 (1983).

**60.** DOE did not analyze standards for clothes dryers or kitchen ranges and ovens under the FIM because DOE believed that those standards would result in minimal energy savings. *See* 47 Fed.Reg. 14,441, 14,448 (1982). The discussion in this section thus does not apply to the final rules governing those products.

der these conditions, the impacts appear to be minimal.

Memorandum from David P. Ross to Steven Lee at 4 (Sept. 14, 1981), J.A. at 2314. DOE describes the model-builders as having made "every attempt to use conservative assumptions," 1982 Economic Analysis at 209, J.A. at 1146, "[t]he most conservative of [which was] that the appliance industry has, as of this point in time, made no major investment in products with efficiencies approaching those of the final standard," *id.*[61] This assumption supposed that nearly all of the investment needed to achieve standard-mandated efficiencies resulted from standards, and thus tended to increase the burdens predicted for standards.

Petitioners suggest that the FIM produced unstable results. For example, the FIM predicted that the debt/equity ratio for freezer manufacturers under level 2 standards would deteriorate 6 percent for small firms, would improve for large firms, but would plummet by 183 percent for medium firms. For water-heater manufacturers, the debt/equity ratio of large firms de-

clined 280 percent, as against reductions of 32 percent and 26 percent for medium and small firms. We agree with petitioners that these and other FIM results[62] are surprisingly counterintuitive; and DOE's mild reply that "[t]he predictions of the FIM ... were well within a reasonable range," DOE Br. at 68, is not completely reassuring, because we do not know what DOE considers a reasonable range.

 We rest our decision, however, not on these surprising results, but on a specific assumption in the model. The FIM assumes that all appliance manufacturers will finance the increased investment required by standards with debt. This assumption molds at least one important projected consequence of standards, changes in a firm's debt/equity ratio, in a way that could substantially affect the dollar cost of that burden. Petitioners assert that the assumption rests on no evidence that appliance manufacturers in fact always employ debt rather than equity financing, and was thus arbitrary.[63] More

**61.** DOE does not further define "conservative" assumptions, but the example it gives, which we quote in text, gives credence to petitioners' charge that "conservative" simply means "likely to emphasize the negative effects of standards."

The FIM attributed to standards all investment needed to raise appliance efficiencies from 1978 levels to those required by standards. DOE recognized that this assumption was inconsistent with the ORNL model, which predicted that appliance efficiencies would increase between 1978 and the effective date of standards in any event. DOE accordingly reduced the FIM's projected impacts by a percentage equal to the ORNL model's projected increase in efficiency for the relevant product between 1978 and 1987. *See* 47 Fed.Reg. 14,424, 14,431 n. 17, 14,437 n. 31 (1982).

**62.** DOE reported that under level 3 standards, "[b]y 1991 (the last year of the analysis), the FIM predicts that the prototypical medium-sized manufacturer would have a 94 percent decrease in profitability, while the large and small manufacturers would have a 5 and 11 percent decrease, respectively." 48 Fed.Reg. 39,376, 39,-391 (1983) (citing 1983 Supplement at 317 (Table A.4–2), J.A. at 2053). Petitioners complain that DOE does not explain the much more serious impact predicted for medium-sized manufacturers.

DOE's 94 percent figure appears to be based on a comparison between the financial condition of medium-sized manufacturers in 1980 and 1991 if level 3 standards were imposed. In the absence of standards, the FIM predicted that profitability would sharply decline for medium-sized manufacturers of refrigerator-freezers—from a median return on sales of .046 in 1980 to a return of .013 in 1991, or a drop of over 70 percent. These statistics do not take into account the reduction in FIM impacts necessary to make the FIM predictions consistent with the forecasts of the ORNL model. *See supra* note 61.

**63.** Apparently no commenters, including petitioners, objected to DOE's all-debt assumption during the rulemaking. *See* Supplemental Br. of Petitioners at 10. However, § 336(b)(1) allows "[a]ny person who will be adversely affected by" an energy efficiency standard to seek judicial review. Unlike statutes providing for review by any *party* aggrieved, *see Simmons v. ICC,* 716 F.2d 40, 42–43 (D.C.Cir.1983), EPCA does not require that a petitioner have participated in the rulemaking proceeding in order to challenge the agency's standards in court. Petitioners who were not required to appear before the agency at all cannot reasonably be held to a strict requirement that they or other commenters have raised all their objections before the

specifically, petitioners charge that the all-debt assumption made it virtually inevitable that the model would overestimate deteriorations in debt/equity ratios under standards. Here is DOE's account of the assumption:

> As developed for this program, the FIM does not allow for equity financing. The only kind of financing allowed is debt financing. This assumption was made because the analysis was performed at the manufacturing division level. No manufacturing division, if it is not itself a corporate entity, can issue equity. The meaning of "debt" as used herein includes "debt" issued to the parent company in return for an intrafirm transfer of cash in the form of a "loan."
>
> The effect of this assumption is to overstate the indebtedness of the prototypical firm if it could obtain equity financing either directly or through a parent. Normally, equity financing of a division is not done, however. Conversations with industry experts indicate that normal practice requires the division to forward its budget requests to higher corporate authority where they are reviewed, revised and budgeted. These "loans" are then "repaid" out of funds from operations over some term of years.
>
> On the basis of industry practice, while indebtedness is to a certain extent overstated, the assumption captures industry practice more fully than would be the case if equity financing were allowed. Thus, it was felt that this assumption was neutral with respect to analysis of impacts on manufacturers.

1982 Economic Analysis Document § A.2.5.1 at 251, J.A. at 1188.

DOE has not explained how this analysis at the manufacturing division level could produce a meaningful prediction about the effect of standards on debt/equity ratio, which is necessarily a characteristic of an entire firm. We assume *arguendo* that, as DOE asserts, parent corporations normally "finance" capital improvements in manufacturing divisions through "loans," which the division eventually "repays." As DOE states, this conclusion breaks down for manufacturing divisions that are themselves corporations, and DOE does not tell us whether such corporations exist in significant numbers. In addition, DOE's argument relies entirely an accounting procedures *within* a corporation. The only "loan" necessarily involved is one from the parent to the division, and DOE offers no opinion at all about how the parent raised the money to make the loan. It is, in fact, perfectly consistent with everything DOE says—though not very likely—to suppose that parent corporations *always* raise the funds for capital improvements in appliance manufacturing divisions through equity financing, and then "lend" the money thus raised to the divisions. Thus, the "debt" of a division to a parent might correspond to equity financing or debt financing by the parent corporation, depending on how the parent obtained the money "lent."

One of the FIM's four outputs is the effect of standards on the debt/equity ratio of a firm. As DOE comments, a manufacturing division that is not a corporation has no stock. It consequently has no real debt/equity ratio, which is a characteristic of the entire firm. Of course, DOE will want to isolate changes in the debt/equity ratio of manufacturers resulting from efficiency standards. But we do not understand how DOE can do that without making some assumption about the way the parent raises the money that it then lends

---

agency. *Cf. Small Refiner Lead Phase-Down Task Force v. United States Envtl. Protection Agency,* 705 F.2d 506, 534–35 (D.C.Cir.1983); *National Lime Ass'n v. Environmental Protection Agency,* 627 F.2d 416, 433 (D.C.Cir.1980).

We recognize that whether an agency acted reasonably in adopting a position may depend on, among other things, what evidence was put before it by commenters who took a contrary view. *Cf. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 553–54, 558, 98 S.Ct. 1197, 1216–17, 1219, 55 L.Ed.2d 460 (1978). Nonetheless, an agency remains obliged to produce substantial evidence for its major assumptions in a rulemaking even in the absence of critical comments. *See Small Refiner Lead Phase-Down Task Force,* 705 F.2d at 534–35.

to the manufacturing division. It is not enough, so far as we can see, to call the money owed by the division to the parent "debt" and therefore exclude from the model's assumptions any possibility of equity financing. This is so because such "debt" may not represent any money owed by the corporation at all, which is the sense of debt relevant to a firm's debt/equity ratio. Petitioners argue that by defining "debt" in such a way that all capital investments required by standards are debt-financed, DOE virtually guaranteed that standards would worsen the debt/equity ratios of manufacturers. Our review of DOE's explanation does not enable us to say that petitioners are wrong.

Nor can we tell what effect the all-debt assumption may have had on the model's other outputs. While the debt/equity ratio is the output that on its face is most likely to have been affected by that assumption, all four outputs measure the financial impact of standards on manufacturers, and all four may have been affected by the "costs" of the "debt financing" DOE assumed. In any event, DOE's discussion of the FIM results does not enable us to decide how much any particular output influenced DOE's generally negative view of the financial impact standards would have on appliance manufacturers.[64] For these reasons, we cannot assume that the challenged assumption did not affect DOE's overall view of the FIM results; and we cannot assume that the FIM results, which DOE interpreted as weighing against standards, did not affect the final rules.

■■■ We wish to emphasize that we do not "invalidate" DOE's use of the FIM. We conclude only that this record does not contain an adequate explanation of the all-

debt assumption, and the model is therefore not supported by substantial evidence. There may be a straightforward answer to the objection we have sketched.[65] But the agency did not explain how the assumption we have questioned corresponds to the real world, and we cannot gauge with any confidence what effect that assumption had on the final rules. DOE must provide such an explanation if it is to use this assumption in the FIM to measure the burdens of standards.

### 2. The FIM Results for Central Air Conditioner Standards

■■■ As we noted in Part V.A.3.c, the NRDC criticized two points on one of the cost-efficiency curves for central air conditioners as substantially overstating the cost of achieving certain high efficiency levels. DOE adjusted one point to take account of the NRDC's comment, left the other unchanged, and used the resulting revised curve in the ORNL model. DOE did not, however, incorporate the lower cost data in the information used by the FIM for the following reasons:

> DOE does not have sufficient data to create a full "cost book" for a new design option at this efficiency level. DOE does not believe, however, that the change in cost would be substantial enough to affect the conclusions of the FIM. It should be noted that even a lower cost *per se* does not even necessarily mean that the negative impacts in the FIM would be reduced at all.

48 Fed.Reg. 39,376, 39,401 n. 86 (1983). DOE's brief adds that "because the impact on manufacturers of standards for that product was minimal to nonexistent even using the uncorrected data, a change in

---

64. In its separate discussion of the economic impact on manufacturers of standards for each covered product, DOE generally summarized the FIM results for the product, including the effect of standards on debt/equity ratio. *See, e.g.,* 48 Fed.Reg. 37,376, 39,391, 39,393 (1983). The "Weighing of Factors" sections offered overall characterizations of the FIM results. *See, e.g., id.* at 39,392, 39,394.

65. DOE has told us that it "was primarily interested in determining whether companies would continue to manufacture appliances if standards were prescribed," and it therefore appropriately focused "on the financial health of the manufacturing division." Supplemental DOE Br. at 13. We agree with DOE that such a focus was appropriate; our concern is with whether the assumption led to an accurate view of the financial health of these divisions.

costs would not have substantially affected the conclusions of the FIM." DOE Br. at 68.

The disputed points on the cost-efficiency curve were points 5 and 6. Point 6 on the curve described the cost of achieving the degree of appliance efficiency analyzed as standard level 4, which was the highest level considered as a basis for standards. In weighing the factors relevant to economic justification, DOE commented that for a CAC standard "[a]t level 4 there are very significant burdens. The impacts on manufacturers, while not overwhelming, are negative for small and medium-size manufacturers." 48 Fed.Reg. at 39,406. Thus, although DOE's brief stated that the financial impact of standards on CAC manufacturers as measured by the FIM was "minimal to nonexistent," see DOE Br. at 68, DOE's *Federal Register* notice described that same impact for level 4 standards as "substantial," *id.* at 39,403, although "not overwhelming."[66] We cannot read into DOE's characterization of the financial impact on manufacturers as "not overwhelming" a finding that the impact was "minimal to nonexistent," as DOE's brief would have it, and therefore did not influence DOE's rejection of level 4 standards. The most natural reading of DOE's phrase runs the other way: a burden that is substantial was apparently thought to be worthy of some weight. For us to conclude that the FIM results for level 4 standards did not influence DOE's rejection of those standards would be the merest guesswork about the agency's decisionmaking, and improbable guesswork at that.

We therefore cannot accept DOE's suggestion that the FIM impacts of level 4 standards could not have influenced the final rules, and pass to its "belief" that the changed costs were "not substantial enough to affect the conclusions of the FIM." However, we cannot tell on the present record how serious an effect

DOE's acknowledged error had on the cost-efficiency curve used in the FIM. The proposition that lower costs do not *"per se"* reduce negative impacts in the FIM is not enough: we need some idea whether the lower costs cited by NRDC and accepted in part by DOE for this appliance would noticeably reduce the specific negative impacts predicted for these proposed standards, and DOE hazards nothing more than unsupported conjecture on that central question.

Finally, we also have difficulty understanding DOE's explanation that it could not prepare a "cost book" for the commercially available CACs which furnished the basis for NRDC's criticism of point 6. As we have said, point 6 corresponded to standard level 4. DOE described level 4 as incorporating the use of some technologies not on the market in 1980, but DOE was nonetheless originally able to prepare sufficient manufacturing costs for FIM analysis of level 4 air conditioner standards. Commenters then cited to DOE commercially available models with efficiencies comparable to or higher than standard 4 levels, and DOE agreed that the price of these models was significantly lower than the prices DOE had predicted for models at that level of efficiency. In short, it appears that DOE *could* analyze hypothetical CACs at level 4 efficiencies under the FIM; but when commenters identified commercially available models at those efficiencies, DOE asserted that it needed unavailable information about manufacturing costs. We do not understand why these costs could be estimated for models that were not available, but could not be determined for appliances on the market. DOE's one-sentence disclaimer relating to cost books in its *Federal Register* notice does not explain this anomaly or otherwise elaborate on the missing information DOE needed; and its brief drops this line of argument

---

**66.** Petitioners suggest that the impact of standards on CAC manufacturers under the FIM was comparable to the impact of standards on manufacturers of other covered products. They argue that DOE's characterization of the CAC impacts as "minimal to nonexistent" thus effectively concedes that the FIM impacts were insignificant for most of the standards analyzed. *See* State Pet. Reply Br. at 12–13. We believe, however, that we cannot read a stray phrase in a brief as abandoning an apparently major part of an agency's rationale for its decision.

entirely. We must therefore conclude that DOE has not adequately supported its use in the FIM information it knew to be incorrect. As the FIM results were partly based on incorrect information, and as DOE's rejection of CAC standards at level 4 was partly based on the FIM results, we must hold that rejection to have been insufficiently supported in the record.

### 3. *Forgone Investment and Reductions in Product Performance or Utility*

Petitioners claim that DOE incorrectly gave weight to two unquantifiable burdens of standards. First, DOE believed that standards might force manufacturers to spend money on energy efficiency improvements and thereby deprive manufacturers of capital needed for more "appropriate" investments. *See* 48 Fed.Reg. 37,376, 39,-386 (1983). DOE noted that "the forgone investments could include investments in increased productivity, increased energy efficiency in the manufacturing sector, or new utility or performance features." *Id.; see also* 47 Fed.Reg. 14,424, 14,431–32 (1982). Manufacturers also indicated concern over this possible burden of standards. *See* Comment No. 2075 at 7–1 (June 16, 1982) (General Electric Co.), J.A. at 4661; Comment No. 2178 at 18–19 (August 2, 1982) (Whirlpool Corp.), J.A. at 5551–52.

 We do not think that DOE erred in giving this burden some weight. While an agency may not rely on unsupported conjecture to explain its decisions, *cf. Pillai v. Civil Aeronautics Bd.*, 485 F.2d 1018, 1023 (D.C.Cir.1973), neither is an agency forced to document copiously every collateral inference it draws from its experience with a regulated industry and its general economic views. *Cf. Center for Auto Safety v. Peck*, 751 F.2d 1336, 1367 (D.C.Cir.1985) (agency may rely on general view that reduced governmental regulation "would produce innovation to achieve [other] values"). Manufacturers obviously have limited funds, and money a manufac-

turer must spend on one project is money that the manufacturer cannot spend on other projects. DOE properly recognized that this burden was one that any scheme of mandatory standards would impose, and therefore declined to give it great weight. *See* 48 Fed.Reg. 39,376, 39,386 (1983). But we cannot fault DOE's decision to consider the burden at all.

 Similarly, petitioners criticize DOE's determination that mandatory standards might in the future diminish product utility or performance. DOE first noted that it had attempted to design product classes so that the standards analyzed, if adopted, would not compromise product utility or performance.[67] *See* 47 Fed.Reg. 14,424, 14,433 (1982). For example, automatic defrost refrigerators-freezers consume more energy than manual defrost refrigerators-freezers. *See* 45 Fed.Reg. 43,976, 43,987 (1980). If all refrigerator-freezers had been grouped in a single class and an efficiency standard has been based on the most efficient model in that class, the standard might have prevented the sale of any automatic defrost products at all. DOE avoided that result by placing automatic defrost refrigerators-freezers in a separate class, and considering standards based only on the most efficient model within that class. *Id.* Through its general practice of creating distinct classes for appliance models with energy-consuming features of value to consumers, DOE tried to avoid forcing appliances with such features out of the market.

DOE concluded that it had successfully defined classes that would avoid any loss of product utility or performance from mandatory standards. *See* 48 Fed.Reg. 39,376, 39,393, 39,395, 39,397, 39,405 (1983). However, DOE was concerned that after standards were prescribed, manufacturers might develop new performance-improving appliance features that increased energy consumption. If an appliance with a new feature could not meet the relevant stan-

---

**67.** There was a single exception: DOE found that standards would affect the portability of

one class of room air conditioners. *See* 48 Fed.Reg. 39,376, 39,399–400 (1983).

dard, the standard would ban appliances including that feature from the market. DOE might eventually amend its rules to create a new class for appliance models with the feature and prescribe a new standard, if appropriate, for that class. However, at best the availability of improved appliances might be delayed; and at worst, DOE feared, the uncertainty surrounding efforts to amend rules might create a disincentive to the development of improved appliances. *See* 47 Fed.Reg. 14,424, 14,433 (1982).

DOE concluded that these possibilities were a burden entitled to some weight. This burden, like that imposed by forgone investment, would be created to some extent by standards at any level. It therefore could not be given *dispositive* weight without rendering superfluous all other statutory factors bearing on economic justification. However, DOE could reasonably predict that the appliance industry will continue to develop new performance-improving features, some of which may increase energy consumption. It could also reasonably judge that standards might interfere with these developments. Petitioners jump from DOE's finding that standards would not immediately degrade appliance performance to the conclusion that standards would not have this effect in the future. But that argument assumes that the industry will not eventually develop any currently unforeseen appliance features, and DOE was clearly not required to act on that assumption.

We must also reject the claim that DOE's reliance on an unprovable forecast about future improvements in appliance design violates the substantial evidence requirement. Any prediction about the future impact of standards, and particularly about the possible tendency of standards to inhibit innovation, necessarily involves an informed attempt to resolve uncertainties. DOE acknowledged the uncertainties, made a rational prediction in light of the very limited evidence available, and from all that appears did not give more weight to its prediction than was reasonably warranted. We therefore uphold DOE's decision to con-

sider the potential loss of performance and utility as a burden of standards.

## C. *DOE's Weighing of Burdens Against Benefits*

Petitioners claim that even assuming *arguendo* that DOE correctly evaluated the benefits and burdens of standards, it was irrational for DOE to conclude that the burdens outweighed the benefits. We have already concluded, however, that DOE must reconsider the factual findings underlying its view of several benefits and burdens, and must also reconsider the weight it gave to a particularly important benefit, the amount of energy that standards would save. We therefore do not address petitioner's specific claims.

## VI. DOE's REFUSAL TO ALLOW CROSS-EXAMINATION

Section 336(a)(2) of EPCA provides that in prescribing energy efficiency standards the Secretary shall, by means of conferences or other informal procedures, afford any interested party an opportunity to question

. . . . .

(B) employees of the United States who have made written or oral presentations, with respect to disputed issues of material fact. Such opportunity shall be afforded to the extent the Secretary determines that the questioning pursuant to such procedures is likely to result in a more timely and effective resolution of such issues.

The conference report for this provision notes that

Interested parties are given an opportunity for written and oral presentations of views, data, and arguments on the standard, including an opportunity to question those who make such presentations. This presentation may address a number of factors including whether the standard is economically justified. Although under section 336(a) the right to question interested persons and employees of the United States making written and oral

statements is subject to the discretion of the Secretary, based upon his determination that such questioning is likely to result in a more timely and effective resolution of the issues, the conferees intend that the right will be a meaningful one, and that persons will be given a reasonable opportunity to cross-examine witnesses. A rule may not become effective earlier than 180 days after it is prescribed in order to provide time for manufacturers to meet the standards.

H.R.Rep. No. 1751, 95th Cong., 2d Sess. 116 (1978), U.S.Code Cong. & Admin.News 1978, p. 8160.

In 1982, DOE held several days of public hearings in Washington under the directive of section 336. At the hearings, interested members of the public expressed their views on the proposed rules before a panel of DOE employees, and the panel members questioned the speakers. At the opening of the hearings, however, the presiding officer stated the following policy concerning questioning of DOE employees on the panel:

Initially, questions may be asked only by the members of the panel conducting the hearing. However, any person wishing to direct a question to a speaker in regard to his testimony at this hearing may submit the questions in writing at the registration desk. The Presiding Official will determine whether the question is relevant and whether time limitations permit it to be presented to the person to whom it is addressed for an answer. If the question is allowed, it will be asked by the Presiding Official.

Transcript, May 20, 1982, at 6–7, J.A. at 3006–07. NRDC, both in its request to speak and in oral comments to the panel, requested an opportunity to question the DOE employees on the panel directly about the basis for the proposed regulations. *Id.* at 742, J.A. at 3041. DOE refused to comply, but apparently asked NRDC to provide a written statement describing its questions. On June 7, 1982, NRDC submitted a list of "six general topics" it wished to explore:

1. How were the tests for "significant conservation of energy" developed; what other tests were considered but rejected, and why?

2. Did DOE's assessment of standard levels reflect any information concerning technological progress since 1980, including foreign developments; and on what basis did DOE reduce proposed standards below manufacturers' recommendations?

3. Does the [Notice of Proposed Rulemaking] reflect a judgment that federal targets, state standards, and the threat of federal standards have *not* been significant factors in improved appliance efficiency, or were these factors simply not addressed?

4. Did DOE examine the impact of different LCC discount rates and higher standards levels on savings?

5. Did the savings analysis take any account of the higher national savings that arise from saving marginal as opposed to average costs, and, similarly, did the analysis include any assessment of savings from reduced powerplant requirements?

6. Does DOE believe that it has already adequately addressed the potential environmental impact of preempting state standards; or does it believe it need not perform such an analysis or that it is free to do so at some time after promulgation of a final rule?

Letter from Alan S. Miller to William Frank (June 7, 1982), J.A. at 2319–20.

The Assistant General Counsel at DOE replied:

Your June 7, 1982 letter fails to indicate how any of your six general areas of inquiry would aid in a more timely and effective resolution of disputed issues of material fact. Accordingly, DOE is unable to grant your request at this time. However, if you wish to pursue this matter, DOE will need the following information prior to making a determination.

1. A list of questions concerning the alleged disputed issues of material fact, your justification for considering these

issues to be ones of disputed material fact, and your reasons for believing that the questioning of DOE employees will aid in the timely and effective resolution of those issues.

2. A list of DOE employees that you wish to question and the matters that you desire to question them about.

3. A discussion of the reasons for your belief that the April 2, 1982 Notice of Proposed Rulemaking and Technical Support Documents would be a written presentation within the meaning of the preamble or 42 U.S.C. § 6306(a)(2) and the reasons for your belief that the employees listed in (2) above, have made the type of written or oral presentations contemplated in the preamble or 42 U.S.C. § 6306(a)(2).

Letter from Lona L. Feldman to Alan S. Miller (June 22, 1982), J.A. at 2321–22. NRDC promptly replied, setting forth arguments that the six areas of inquiry it named in its previous letter concerned disputed issues of material fact. NRDC also observed that DOE had permitted questioning similar to that NRDC now requested at public hearings held in 1980 on the June 1980 proposed rules. Letter from Alan S. Miller to Lona L. Feldman (June 30, 1982), J.A. at 2323.

DOE then finally refused the NRDC's request, on the ground that NRDC sought to raise "questions of general policy and legal determinations that are not subject to examination under 42 U.S.C. § 6306(a)(2)." Letter from Lona Feldman to Alan S. Miller (July 22, 1982), J.A. at 2327. DOE included with that refusal a memorandum addressing the general concerns raised by NRDC's six questions. *Id.* (app.), J.A. at 2328.

DOE advances two arguments in support of its action. The first, which was the sole ground DOE stated during the rulemaking, is that NRDC's questions did not involve "disputed issue of material fact." The second, which has appeared for the first time on appeal, is that section 336(a)(2)(B) allows interested persons to question only DOE employees who offer "written or oral presentations" in response to the proposed rules, not DOE employees who make such presentations during preparation of the rules.

 We believe that NRDC raised disputed issues of material fact. While some of NRDC's "topics" did draw into question large controversies over policy, others addressed factual questions in the most rigorous sense of the words. For example, NRDC asked whether DOE had considered technologies developed since 1980 in assessing standards; whether DOE considered the effect of different discount rates and different standard levels; and whether DOE's analysis of savings considered the marginal or average cost of energy production. In our view, these questions were clearly material to the rulemaking. We acknowledge that section 336(a)(2)(B) requires DOE to permit cross-examination "to the extent the Secretary determines that the questioning ... is likely to result in a more timely and effective resolution of [disputed issues of material fact]." That caveat plainly gives DOE substantial discretion to limit unhelpful or repetitive questioning. However, DOE did not rely on this discretion in refusing NRDC any opportunity to question DOE employees at all.[68] Having determined that DOE's proposed inquiries did not fall within section 336(a) at all, DOE never finally decided whether questioning would be useful in a timely and effective resolution of issues. In addition, we doubt whether the Secretary's discretion under section 336(a) could properly be invoked to refuse all questioning. The conference report expressly noted that the right of cross-examination was to be "meaningful," and that interested persons were entitled to a

---

**68.** In its June 22, 1982 letter, DOE did suggest that DOE's questions might not aid in the timely and effective resolution of disputed issues. Indeed, that letter comprehensively challenged NRDC's compliance with every revelant provision of § 336 and demanded that NRDC provide a full account of its intentions. However, DOE's final letter of July 22, 1982, mentioned only NRDC's alleged failure to raise disputed issues of material fact.

"reasonable opportunity to cross-examine witnesses." This legislative history reinforces the most natural reading of section 336(a): Congress granted a statutory right to cross-examine DOE employees on disputed factual issues, but allowed DOE to impose reasonable limits on the right so as to assure orderly and efficient procedures. *No* cross-examination is not, in our view, meaningful or reasonable cross-examination. For us to hold otherwise would mean that section 336(a) confers a right to question DOE employees only at the whim of the Secretary—a result that is not supported by the statutory text, its legislative history, or any sensible theory of what Congress hoped to accomplish by writing this provision into the statute.

Our conclusion that DOE did not act reasonably is bolstered by the contrast between the hearings held in 1980 and those held in 1982. In 1980, DOE scheduled a special public meeting at which DOE employees answered written and oral questions about the proposed rules from meeting participants.[69] The 1982 hearings created exactly the same opportunity: DOE assembled a panel of expert employees in order to gather information from the public. This time, however, no oral questioning of DOE employees was allowed at all.

These hearings were expressly convened under the requirement in section 336(a) that DOE hold "conferences or other informal procedures"—the same provision that grants a qualified right of cross-examination at such events. We think DOE did not act reasonably in forbidding all oral questioning of its experts, either at these public hearings or subsequently, despite the congressional admonition that the agency must grant a meaningful right to cross-examine DOE employees.

■ DOE's second argument is that section 336(a)(2)(B) only applies to DOE employees who themselves present comments on a proposed rule. *See* DOE Br. at 94 n. *. DOE did not advance this view of the statute during the rulemaking. "To carry much weight, [an agency's] interpretation must be publicly articulated at some time prior to the embroilment of the agency in litigation over the disputed provision." *Nordell v. Heckler,* 749 F.2d 47, 48 (D.C.Cir.1984). In any event, we think that DOE's interpretation, as applied to the facts of this case, is not reasonable.

First, section 336(a) contains a separate provision allowing interested persons who appear at "conferences or other informal

---

**69.** The 1980 public meeting at which DOE experts answered questions was held before the 1980 public hearings at which witnesses presented oral comments on the proposed rules. *See* 45 Fed.Reg. 43,976, 43,976 (1980) (announcing meeting and hearings). At the public meeting, which was expressly held to satisfy the requirements of section 336(a)(2), the presiding officer announced the following policy:

[The purpose of this session] is to give to those of you who are interested in the rule a chance to question those of us at DOE who have worked on the rule, so that you will have a better understanding of the basis for our recommended proposed rule, and so that in the upcoming public hearings you will be able to design your comments so that they will be as direct and clear and relevant and pertinent as possible, so that the information that you give us will help us develop the best possible final rule, and so that we will be able to consider fully your concerns and interests and positions in making that final rule development.

Transcript, July 16, 1980, at 6. DOE subsequently described the 1980 meeting as follows:

The actual conduct of the meeting consisted of the reading of questions and answers that had previously been submitted to DOE by interested parties and of the oral questioning of the staff panel by meeting participants.

The questions, both oral and written, were divided by subject matter category, such as general questions, product-specific questions, economic questions and certification and enforcement questions.

A review of the transcript shows that there was extensive questioning of the staff panel by interested persons. The staff answered all questions to the fullest extent possible, occasionally asking for an opportunity to provide answers after the meeting in order to be able to give the fuller response.

No question was ruled out of order, and no one refused to answer any questions.

No participants were cut off if they wished to ask more than one question, and no one asked for a continuation to ask further follow-up questions.

Transcript, August 11, 1980, at 15–16 (quoting opinion of the General Counsel, DOE).

procedures" to question other persons making "oral presentations." Thus, if interested persons could cross-examine only government employees who made oral statements at the public hearings, section 336(a)(2)(B) would at best merely emphasize that the right of cross-examination applied to DOE employees as well. That reading would make section 336(a)(2)(B) nearly superfluous. Moreover, the reading is implausible because the subsection dealing with DOE employees is not parallel to the subsection dealing with other witnesses; DOE employees are covered if they make "written or oral presentations," while other persons are covered only if they make "oral presentations." DOE argues that this difference means only that DOE employees who submitted written comments in response to the proposed rules, as well as those making oral statements at the hearings, may be questioned. If no DOE employees submit comments on the rulemaking, then on DOE's theory no employees may be questioned.

This theory attributes an extremely unlikely intention to Congress. Comments are a method for members of the public to express their views on proposed agency action. They are not normally a method for agency employees to agree or disagree publicly with their employer's decisions; agency employees, one assumes, make their contribution by drafting the proposed rules and by responding to, rather than initiating, comments. We cannot suppose that Congress carefully created a qualified statutory right to cross-examine agency employees only under the unusual contingency that employees submitted formal comments on the rule, and then confidently spoke in the legislative history of having created a "meaningful" right.

We think Congress expected something resembling the 1980 procedure, when a panel of representative DOE experts did make "presentations" at an "informal conference" and was duly questioned. Although we do not decide the issue, we believe that if DOE had again allowed questioning of such a panel in 1982, it might well argue that the word "presenta-

tions" in section 336(a) was limited to presentations at public hearings. Under that reading, questioners would not then be able to delve further into DOE's decisionmaking procedures by attempting to cross-examine every DOE employee who wrote a memorandum or spoke at an internal meeting about factual issues bearing on the rulemaking. But DOE may not first restrict its interpretation of "written or oral presentations" to oral presentations at the public hearing and formal written comments submitted during the rulemaking, and then completely defeat the purpose of section 336(a)(2)(B) by arranging matters so that no DOE employee makes any such "presentation." That view is mere gamesmanship, not a good-faith effort to accommodate the purposes of the sections within fair and practical limits.

We therefore hold that NRDC did raise disputed issues of material fact within the meaning of section 336(a)(2), and that DOE did not provide a "reasonable opportunity to cross-examine witnesses," as Congress intended it should. We decline to formulate a rigid judicial definition of "presentations" in this case, because we believe DOE should be allowed to formulate its own reasoned interpretation of this provision during the new rulemaking. Nor do we define or restrict DOE's discretion to limit questioning to promote the "timely and effective resolution of issues." We believe, however, that DOE must exercise that discretion in accordance with the statute, rather than contriving artificial interpretations of the text to deny questioning altogether.

VII. DOE's FAILURE TO PREPARE AN ENVI-
RONMENTAL ASSESSMENT OR
ENVIRONMENTAL IMPACT STATEMENT

The National Environmental Policy Act of 1969 (NEPA) provides that

The Congress authorizes and directs that, to the fullest extent possible ... all agencies of the Federal Government shall ... include in every recommendation or report on proposals for legislation

and other major federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on

 (i) the environmental impact of the proposed action, [and]
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and]
 . . . .
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C).

The "detailed statement" of section 102(2)(C), generally called an environmental impact statement (EIS), is thus required only for legislative proposals and other "major federal actions significantly affecting the quality of the human environment." When an agency determines that contemplated "major Federal action" does not fall within this category, regulations promulgated by the Council on Environmental Quality generally require the agency to explain its finding of no significant impact in a "concise public document" called an "environmental assessment" (EA). 40 C.F.R. §§ 1501.4(a)–(b), 1508.9 (1984). The environmental assessment must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* § 1508.9(a)(1); *see Andrus v. Sierra Club,* 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979) (CEQ interpretations of NEPA are entitled to substantial deference); *Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 146–47 (D.C.Cir.1985). "We believe that an 'assessment' statement must provide convincing reasons why a ... project with 'arguably' potentially significant environmental impact does not require a detailed impact statement." *Maryland-National Capital Park & Planning Comm'n v. United States Postal Office,* 487 F.2d 1029, 1040 (D.C.Cir.1973).

 In reviewing an agency's decision not to prepare an environmental impact statement, this court makes four related inquiries. We ask "(1) whether the agency took a 'hard look' at the problem; (2) whether the agency identified the relevant areas of environmental concern; (3) as to the problems studied and identified, whether the agency made a convincing case that the impact was insignificant; and (4) if there was an impact of true significance, whether the agency convincingly established that changes in the project sufficiently reduced it to a minimum." *Sierra Club v. Peterson,* 717 F.2d 1409, 1413 (D.C. Cir.1983); *see also Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976); *Potomac Alliance v. United States Nuclear Regulatory Comm'n,* 682 F.2d 1030, 1035 (D.C.Cir. 1982) (Bazelon, J., concurring); *Scientists' Institute for Pub. Information, Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079, 1092 (D.C.Cir.1973).

 In June of 1980, DOE prepared and published a lengthy environmental assessment of mandatory appliance standards at the levels proposed in the June 1980 notice. *See* 1980 Environmental Assessment, J.A. at 225; *see also* 45 Fed.Reg. 43,976, 44,086 (1980) (summary). DOE evaluated the effect of mandatory standards on air quality, *see* 1980 Environmental Assessment § 3.5.1, J.A. at 267, water quality, *see id.* § 3.5.3, J.A. at 281, solid waste disposal, *see id.* § 3.5.4, J.A. at 283, and various socioeconomic factors affecting consumers, *see id.* § 3.6.1, J.A. at 285, manufacturers, *see id.* § 3.6.2, J.A. at 289, and the nation, *see id.* § 3.6.3. The assessment reported that

 [n]o significant adverse environmental or socioeconomic impacts have been found to result from instituting the [standards] as proposed. On the contrary, the effects of the Program should be primarily positive. In addition, most alternatives to the Program appear unlikely to achieve equivalent savings of energy and are therefore unlikely to significantly affect the nation's environmental quality or to benefit the environment to the same degree as the proposed action.

*Id.* at S–11, J.A. at 241. The assessment concluded that the promulgation of mandatory standards would not be a major feder-

al action affecting the environment, *see id.; see also* 45 Fed.Reg. 43,976, 44,027 (1980). DOE therefore did not take the further step of preparing a full-scale EIS.

In the April 1982 proposal, DOE discussed three consequences of its new proposal to issue "no-standard standards" that might be relevant to NEPA. Those consequences were: (1) the failure to establish energy efficiency standards in states that did not have any state-mandated standards in effect; (2) possible federal exemption of state standards from the preemptive effect of DOE's proposed rules; and (3) possible federal preemption of state standards in the event states failed to apply for exemptions, or DOE denied exemption applications from states. *See* 47 Fed.Reg. 14,424, 14,457 (1982). DOE declared that "[t]he first element clearly would not be environmentally significant since it is simply a continuation of the *status quo*." *Id*.[70] As to the second element, DOE decided to review the environmental consequences of granted exemptions from federal preemptions "on a case-by-case basis." DOE expressed its belief that the third element would not have significant environmental impacts, a determination it purportedly based on the 1980 Environmental Assessment. *Id*.

DOE received critical comments on its refusal to prepare an Environmental Impact Statement or even an Environmental Assessment. The California Energy Commission accurately noted that the 1980 Environmental Assessment did not evaluate the impact of rules prescribing no mandatory standards. *See* Comment No. 2097 at 10, J.A. at 2571; *see also* 1980 Environmental Assessment § 2.1, J.A. at 249. In the Commission's view, the 1980 Environmental Assessment was concerned with a completely different set of proposals, and did not support DOE's new position.

In its August 1983 notice, DOE further considered the environmental impact of preempting state standards. DOE first constructed a "worse-case" scenario, under which it assumed that all states had mandatory appliance efficiency standards as stringent as California's, which in fact were the most stringent state standards in the nation. *See* 48 Fed.Reg. 39,376, 39,408 (1983). DOE determined that even if all these hypothetical state standards were preempted, and even under further assumptions that unrealistically increased the adverse effects of preemption, the total effect of preemption would be an increase in energy use of .95 Quads per year. This *increase* in energy use was lower than the *decrease* in use of 1.6 Quads per year that DOE found environmentally insignificant in the 1980 Environmental Assessment. DOE concluded from that comparison that even under highly unfavorable assumptions, the preemption of state standards would have no significant environmental impact. *Id*. DOE also attempted a "realistic" appraisal of the preemptive consequences of its final rules, and emerged with much smaller possible increases in energy consumption. These, too, were viewed as insignificant, evidently because the increased annual consumption DOE predicted was a far lower figure than the *decreased* consumption analyzed in the 1980 Environmental Assessment. Finally, DOE expressed its disbelief that "a no-standard standard determination would result in *any* increase in energy usage compared to the base case." *Id*.

We first consider DOE's view that increases in energy consumption are environmentally significant only if a decrease in consumption of the same amount would be environmentally significant. Only on that premise does the 1980 Environmental Assessment support DOE's present position, since the 1980 document was wholly concerned with evaluating the largely beneficial effects of proposed mandatory standards. DOE is correct in pointing out that both beneficial and adverse effects on the environment can be significant within the meaning of NEPA, and thus require an EIS. But that general principle does not solve DOE's problem, which is to show that increased energy consumption would have,

---

**70.** Petitioners do not challenge DOE's view that preservation of the status quo could not be an environmentally significant consequence of the rules under review, and we therefore assume without deciding that DOE's view is correct.

Quad for Quad, precisely the same degree of "impact" on the environment as decreased consumption. That proposition is far from self-evidently true. It might be that relatively slight increases in consumption would have quite dramatic environmental effects, even if a corresponding decrease had very moderate effects. As the 1980 Environmental Assessment itself demonstrates, calculating the effect on the environment of shifting energy consumption is a most complex matter: increased energy consumption might, for example, conceivably require new generating capacity, with possible accompanying changes in air quality, water quality, and the character of the environment at the sites of new construction. DOE's notices set forth no arguments or expert judgments in support of its view that increases and decreases in energy consumption of the same amount have equal impact. We are simply told without elaboration that this is so. That bald assertion does not amount to "convincing reasons why potential impacts are truly insignificant," *Maryland-National Capital Park & Planning Comm'n v. United States Post Office*, 487 F.2d 1029, 1049 (D.C.Cir.1973), and we accordingly cannot uphold the agency's refusal to prepare an EA on that theory.

DOE appeared to offer another rationale for its decision, although it gave that rationale far less prominence. DOE concluded that "for the reasons explained earlier," its no-standard determinations would not increase consumption at all. DOE apparently had two reasons in mind: (1) market forces would, even if state standards were preempted, continue to encourage the production and sale of efficient appliances; and (2) a procedure was available through which states could seek exemption from federal preemption. We think, however, that DOE's mere statement of these arguments is not enough. DOE's own "realistic" scenario predicted that some increased consumption would result from preemption of existing state standards. That finding casts into doubt DOE's appar-

ent belief that market forces would prevent the preemption of state standards from having any impact at all. DOE's analysis of *federal* standards does not support its conclusion that state standards did not increase appliance efficiency. The analysis of federal standards considered levels unrelated to state-mandated levels, and in any event concluded only that each federal standard for a product type, considered alone, would not save significant energy under a very high definition of significance. DOE's general confidence in the efficacy of the market cannot sustain an unelaborated finding, if DOE indeed intended to make one, that state standards had not resulted in any increased appliance efficiency. We note, too, that California and other states vigorously contended that regulation had been effective in promoting greater efficiency, and that comments of manufacturers supported that view.

Similarly, DOE does not tell us why the availability of the exemption procedure could be relied upon to prevent significant impact. DOE did not, so far as the record reveals, conduct any substantial investigation into the likelihood that DOE would in fact grant exemptions for state standards at levels current when the final rules were promulgated. Thus, even assuming that every state with mandatory standards would seek exemption—an assumption that, as events actually unfolded, proved mistaken [71]—DOE did not even tentatively determine the likelihood that those standards would survive its own scrutiny. We recognize that DOE could not make predictions with much certainty about applications it had not yet received. But DOE obviously acquired substantial information about state standards during the course of this rulemaking, and DOE had well-developed general views about the effect of mandatory efficiency standards on the market. DOE would have drawn on exactly that expertise in making decisions on state applications. We think, therefore, that DOE should have made a more thorough effort to explain its judgment that state

---

**71.** Of the 47 states with appliance standards, 24 filed petitions for exemption from the preemptive effect of DOE's final rules. Letter from Pat

Collins to Gov. Joseph E. Brennan (Feb. 21, 1984), State Pet. Br. Addendum at 206.

applications would be granted. In particular, DOE should have supported that judgment by discussing the efficiency levels actually mandated by state standards in effect and DOE's interpretation of the statutory criteria for granting exemptions. After all, DOE affirmatively argued that even if preempting state standards might otherwise significantly affect the environment, the exemption procedure diminished the consequences of preemption enough so that an EA or EIS was unnecessary. Having relied on a particular prediction to defeat the application of NEPA to a major federal action, DOE was required to produce convincing reasons in support of the prediction. Instead, however, DOE produced almost no reasons at all.

We have rejected as arbitrary and capricious both grounds on which DOE defended its refusal to undertake the first and least burdensome step towards compliance with section 102(2)(C) of NEPA—the preparation of an Environmental Assessment. On this ground alone we would be constrained to vacate the final rules under review and remand for reconsideration in accordance with NEPA.

CONCLUSION

In enacting the NECPA amendments to EPCA, Congress expressed deep concern both about the serious energy crisis then at hand, and about the dangerous long-term consequences of profligate energy use. DOE argued to a subsequent Congress that the statutory mandate for an appliance program should be repealed because the concerns of the 95th Congress were no longer vital enough to justify the regulatory burdens of the program. Congress refused DOE's proposal, and specifically added funds to the administration's budget proposal so that the program could be carried out. We think it apparent that Congress charged DOE to investigate, within reasonable limits of time, money, and certainty, all technologically feasible improvements in appliance efficiency, to assess fairly the economic benefits and burdens that those improvements could achieve, and to prescribe standards that would result in significant savings. Undeniably, Congress

also authorized DOE not to prescribe standards if no standard for an appliance could satisfy the statutory prerequisites. But Congress' clear belief, based largely upon advice from one of DOE's predecessor agencies, the Federal Energy Administration, was that DOE could and would prescribe standards in accordance with the text of the statute, as Congress understood that text.

By and large, DOE has not unearthed startling new facts that challenge the basic factual predicates accepted by Congress when it enacted NECPA. Instead, DOE adopted tests for significant savings over well-founded objections that the tests openly violated congressional intent; it failed to determine the maximum technologically feasible improvements in efficiency for covered products and limited the technologies it was willing to consider for standards without sufficient explanation; it made persistently pessimistic assumptions about the burdens of standards and was conspicuously reluctant to address their benefits; and it rejected the face to face dialogue between commenters and agency experts mandated by the statute.

DOE would, in any event, have soon been required under EPCA to begin its five-year reconsideration of the appliance standards. Our decision today will require a comprehensive reappraisal of the appliance program. We do not, of course, require any particular outcome in the new rulemaking that DOE must conduct, but we hope and expect that so long as this statute is on the books, the agency will exercise its reasoned discretion within a fair view of the limits set by Congress. Just as the doctrine of the separation of powers forbids us to trespass on lawful agency discretion, so it requires the agency to carry out faithfully its legislative charter.

The petitions are granted and the rules under review are set aside.

*So ordered.*